1  WHATLEY DRAKE & KALLAS LLC
   Joe R. Whatley, Jr.
2  jwhatley@wdklaw.com
   Edith M. Kallas
3  ekallas@wdklaw.com
   1540 Broadway, 37th Floor
4  New York, NY 10036
   Tel: (212) 447-7070
5  Fax: (212) 447-7077

6  Adam Plant
   aplant@wdklaw.com
7  2001 Park Place North, Suite 1000
   Birmingham, AL 35203
8  Tel: (205) 328-9576
   Fax: (205) 328-0669

9
   Attorney for Plaintiff AARON WALTERS and
10 LEAD CLASS COUNSEL

11 [Additional counsel appear on signature pages]

12          **UNITED STATES DISTRICT COURT**

13    **NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

| | |
|---|---|
| 14  In re Apple iPhone 3G Products Liability Litigation | ) CASE NO. M 09-02045 JW |
| 15  _____ | ) **CLASS ACTION** |
| 16  THIS MATTER PERTAINS TO: | ) **MASTER ADMINISTRATIVE** |
| 17  ALL ACTIONS. | ) **CONSOLIDATED AMENDED** ) **COMPLAINT BASED ON:** |
| 18  _____ | ) |

    **1.**   **Violation of California Business & Professions Code § 17200,** *et seq*;

    **2.**   **Violation of California Business & Professions Code § 17500,** *et seq.*;

    **3.**   **Violation of Consumers Legal Remedies Act, Cal. Civ. Code § 1750,** *et seq.*;

    **4.**   **Breach of Express Warranty and Implied Warranty of Merchantability;**

    **5.**   **Violation of the Magnuson-Moss Warranty Act;**

    **6.**   **Violation of Title 33, Ch. 501 of the Florida Consumer Protection Act;**

    **7.**   **Violation of Title 56, Ch. 8 of the New Jersey Consumer Protection Act;**

    **8.**   **Violation of § 349 of the New York General Business Law;**

    **9.**   **Violation of N.C. Gen. Stat. § 75-1,** *et seq.*

    **10.**   **Negligence;**

1

11.   **Common Counts and Unjust Enrichment;**
12.   **Negligent Misrepresentation;**
13.   **Fraud and Deceit; and**
14.   **Declaratory Relief**

**Judge:       Hon. James Ware**

Plaintiffs, on behalf of themselves and all others similarly situated, based on the investigation of counsel and information that is available to the general public, and formed after a reasonable inquiry, submit this Master Administrative Consolidated Amended Complaint ("Complaint").  On information and belief (except where identified as on personal knowledge), Plaintiffs make the following allegations, which likely will have evidentiary support after a reasonable opportunity for further investigation and discovery.

This Complaint incorporates parties subject to this MDL proceeding. This Complaint does not merge the above-referenced suits into a single case or alter the rights of any party in any respect.  This Complaint shall have no effect on applicable choice of law principles and is not intended to waive any argument regarding the applicable choice of law governing these claims.

## I.

## <u>INTRODUCTION</u>

1.      Before July 2008, Apple iPhones operated on a 2G network.  To lure additional customers and entice existing customers to upgrade to the "iPhone 3G," Apple Inc. ("Apple") and AT&T Mobility LLC ("ATTM")—the exclusive network provider for the iPhone 3G— released the iPhone 3G with great fanfare.

2.      Marketing for the iPhone 3G extolled the virtues of the greater operating and network speed of the iPhone 3G, which, as its name implies, was represented as operating on a faster 3G network.

3.      Apple not only named the iPhone "3G", asserting faster operating speed than the existing 2G iPhone model and network, but also both Apple and ATTM uniformly advertised the iPhone 3G as "Twice as Fast" in comparison to the "2G" EDGE network on which the earlier iPhone operated.

4.      Through marketing to consumers, and even by the very name of the phone itself, Defendants engaged in a campaign to represent to consumers that the new iPhone would be significantly faster with regard to upload and download transfer rates and, therefore, superior to the predecessor iPhone, which operated on the slower 2G network.

5.      In June and July 2008 news releases announcing the time for the product launch, both Apple and ATTM sounded an optimistic note for the iPhone 3G's capabilities.

6.      Defendants' representations regarding the iPhone 3G were false or misleading. The iPhone 3G did not result in the "tremendous value" or jump in technology in terms of being "twice as fast" that ATTM and Apple represented, because it could not actually perform to 3G standards.  Consumers who purchased the iPhone 3G mainly still connect to the 2G EDGE network, not a 3G network.  Customers often receive no 3G connectivity at all, or experience a significant level of dropped calls because the iPhone 3G cannot locate an available 3G network connection.

7.      As a result, Plaintiffs and Class Members who purchased the iPhone 3G and entered into a two-year service commitment with AT&T have been injured in fact.

## II.

## PARTIES

*The Plaintiffs*

8.      On personal knowledge, Plaintiff Haig P. Ashikian is, and at all material times was, a resident of Los Angeles County, California.  In August 2008, Ashikian purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Encino, California.  Ashikian was also required to enter into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Ashikian has suffered injury in fact and has lost money and/or property as described more fully below.

9.      On personal knowledge, Plaintiff Ron J. Brayteson is, and at all material times was, a resident of Volusia County, Florida.  In August 2008, Brayteson purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Ormond Beach,

Florida.  Brayteson entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Brayteson has suffered injury in fact and has lost money and/or property as described more fully below.

10.     On personal knowledge, Plaintiff William French is, and at all relevant times has been, a resident of Kaufman County, Texas.  In August 2008, French purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Mesquite, Texas.  He entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, French has suffered injury in fact and has lost money and/or property as described more fully below.

11.     On personal knowledge, Plaintiff William J. Gillis Jr. is, and at all material times was, a resident of San Diego County, California.  In August 2008, Gillis purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in San Diego, California.  Gillis entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service and an equipment start up fee.  As a result of purchasing the iPhone 3G, Gillis has suffered injury in fact and has lost money and/or property as described more fully below.

12.     On personal knowledge, Plaintiff Onel Gonzalez is, and at all material times was, a resident of Miami, Florida.  In approximately July 2008, Gonzalez purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Miami, Florida. Gonzalez entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Gonzalez has suffered injury in fact and has lost money and/or property as described more fully below.

13.     On personal knowledge, Plaintiff Ione Jamison is, and at all material times was, a resident of both Waxhaw, North Carolina, and Bethesda, Maryland.  In summer of 2008, Jamison purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from

4

an Apple Store in Charlotte, North Carolina.  Jamison entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Jamison has suffered injury in fact and has lost money and/or property as described more fully below.

14.     On personal knowledge, Plaintiff Peter Keller is, and at all material times was, a resident of San Diego County, California.  In July 2008, Keller purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in San Diego, California. Keller entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Keller has suffered injury in fact and has lost money and/or property as described more fully below.

15.     On personal knowledge, Plaintiff Avi Koschitzki is, and at all material times was, a resident of Nassau County, New York.  In August 2008, Koschitzki purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Garden City, New York.  Koschitzki entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Koschitzki has suffered injury in fact and has lost money and/or property as described more fully below.

16.     On personal knowledge, Plaintiff Jacob Medway is, and at all material times was, a resident of Los Angeles County, California.  In September 2008, Medway purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an ATTM store in Los Angeles, California.  Medway entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Medway has suffered injury in fact and has lost money and/or property as described more fully below.

17.     On personal knowledge, Plaintiff Karen Michaels is, and at all relevant times has been, a resident of Smith County, Texas.  In or about December 2008, Michaels purchased an

5

1    iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Tyler,

2    Texas.   Michaels entered into a monthly service agreement for iPhone service, exclusively

3    provided by ATTM, which includes a monthly premium for iPhone 3G service, and an

4    equipment start up fee.  As a result of purchasing the iPhone 3G, Michaels has suffered injury in

5    fact and has lost money and/or property as described more fully below.

6            18.     On personal knowledge, Plaintiff Alyce R. Payne is, and at all relevant times has

7    been, a resident of Collin County, Texas.  In or about December 2008, Payne purchased an

8    iPhone 3G, which Apple advertised, distributed, and/or sold, from an ATTM Store in Plano,

9    Texas.   Payne entered into a monthly service agreement for iPhone service, exclusively

10   provided by ATTM, which includes a monthly premium for iPhone 3G service, and an

11   equipment start up fee.  As a result of purchasing the iPhone 3G, Payne has suffered injury in

12   fact and has lost money and/or property as described more fully below.

13           19.     On personal knowledge, Plaintiff James R. Pittman is, and at all material times

14   was, a resident of the State of Washington.  In July 2008, Pittman purchased an iPhone 3G,

15   which Apple advertised, distributed, and/or sold, from an Apple Store in Seattle, Washington.

16   Pittman was also required to enter into a monthly service agreement for iPhone service,

17   exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and

18   an equipment start up fee.  As a result of purchasing the iPhone 3G, Pittman has suffered injury

19   in fact and has lost money and/or property as described more fully below.

20           20.     On personal knowledge, Plaintiff Timothy Ritchie is, and at all times has been, a

21   resident of Middlesex County, New Jersey.  In September 2008, Ritchie purchased an iPhone

22   3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Edison, New

23   Jersey.   Ritchie entered into a monthly service agreement for iPhone service, exclusively

24   provided by ATTM, which includes a monthly premium for iPhone 3G service, and an

25   equipment start up fee.  As a result of purchasing the iPhone 3G, Ritchie has suffered injury in

26   fact and has lost money and/or property as described more fully below.

27           21.     On personal knowledge, Plaintiff Jessica Alena Smith is, and at all material times

28   was, a resident of Birmingham, Alabama.  In July 2008, Smith purchased an iPhone 3G, which

1    Apple advertised, distributed, and/or sold, from an Apple Store in Birmingham, Alabama.

2    Smith entered into a monthly service agreement for iPhone service, exclusively provided by

3    ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up

4    fee.  As a result of purchasing the iPhone 3G, Smith has suffered injury in fact and has lost

5    money and/or property as described more fully below.

6         22.    On personal knowledge, Plaintiff Eulardi Tanseco is, and at all material times

7    was, a resident of Middlesex County, New Jersey.  In July 2008, Tanseco purchased an iPhone

8    3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Bridgewater, New

9    Jersey.  Tanseco entered into a monthly service agreement for iPhone service, exclusively

10   provided by ATTM, which includes a monthly premium for iPhone 3G service, and an

11   equipment start up fee.  As a result of purchasing the iPhone 3G, Tanseco has suffered injury in

12   fact and has lost money and/or property as described more fully below.

13        23.    On personal knowledge, Plaintiff Wilton Lee Triggs II is, and at all material

14   times was, a resident of Birmingham, Alabama.  In July 2008, Triggs purchased an iPhone 3G,

15   which Apple advertised, distributed, and/or sold, from an Apple Store in Birmingham, Alabama.

16   Triggs entered into a monthly service agreement for iPhone service, exclusively provided by

17   ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up

18   fee.  As a result of purchasing the iPhone 3G, Triggs has suffered injury in fact and has lost

19   money and/or property as described more fully below.

20        24.    On personal knowledge, Plaintiff Aaron Walters is, and at all relevant times

21   described herein was, a resident of Hazen, Arkansas.  In or about July 2008, Walters purchased

22   an iPhone 3G, which Apple and ATTM advertised, distributed, and/or sold, at an ATTM Store

23   in Little Rock, Arkansas.  Walters entered into a monthly service agreement for iPhone service,

24   exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and

25   an equipment start up fee.  As a result of purchasing the iPhone 3G, Walters has suffered injury

26   in fact and has lost money and/or property as described more fully below.

27   / / /

28   / / /

7

*The Defendants*

1

2      25.      Defendant Apple Inc. is a California corporation that is licensed to do, and is

3   doing, business in California and throughout the United States.  Its principal place of business is

4   in Cupertino, California.   At all relevant times, Apple designed, manufactured, promoted,

5   marketed, distributed, and/or sold the iPhone 3G throughout the United States and California.

6      26.      Defendant AT&T Mobility LLC is a Delaware corporation that is licensed to do,

7   and is doing, business in California and throughout the United States.  ATTM's principal place

8   of business is in Atlanta, Georgia.  ATTM transacts business in California and at all relevant

9   times assisted in the design, promotion, marketing, provision and/or sale of the iPhone 3G.  At

10  all relevant times, ATTM was—and still is—the exclusive provider of the telephone and data

11  service plans for the iPhone 3G throughout the United States and in California.  ATTM owns,

12  operates and/or maintains a 3G network in this District and State and has other significant

13  contacts with Apple in this State, including entering into service and provisioning contracts with

14  Apple that are to be performed in this State.  The activities at issue emanated at least in part

15  from this District and State.

16     27.      Defendants acted in concert with each other in the design of the iPhone 3G

17  and/or the representations made to the Class and, as a result, are each legally responsible in

18  some manner for the unlawful acts of the other.  Authorized Apple and ATTM retailers were the

19  Defendants' agents, ostensible agents, employees, servants, joint ventures, actors in concert, or

20  aiders and abettors.  At all relevant times, Defendants have jointly made, and continue to make,

21  misrepresentations in the marketing, advertising and/or sale of the iPhone 3G and required

22  service plans.

23                                              **III.**

24                            **JURISDICTION AND VENUE**

25     28.      This Court has jurisdiction over the consolidated proceedings that are the subject

26  of this Complaint under the Class Action Fairness Act, 18 U.S.C. § 1332(d), and the July 1,

27  2009 Order of the Judicial Panel on Multi-District Litigation ("MDL Panel").  In the aggregate,

28  the damages suffered and sought to be recovered by Plaintiffs and the Class exceed the Court's

1    jurisdictional minimum for a class action. The exact amount of damages caused to Class

2    members cannot be precisely determined without access to Defendants' records.

3          29.    This Court has jurisdiction over each Defendant because each Defendant is either

4    a corporation or an association organized under the laws of California, a foreign corporation or

5    association authorized to do business in California and registered with the California Secretary

6    of State, or does sufficient business in or has sufficient minimum contacts with California, or

7    otherwise intentionally avails itself of the California markets through the promotion, marketing,

8    advertising and/or sales of their products and services in California to render the exercise of

9    jurisdiction by California courts permissible under traditional notions of fair play and

10   substantial justice.

11         30.    Venue is proper in this Court based on the ruling of the MDL Panel, because

12   Apple's principal place of business is in this District, and because ATTM engages in substantial

13   business in this District.

14                                              **IV.**

15                          **CLASS ACTION ALLEGATIONS**

16         31.    Plaintiffs bring this action on behalf of themselves and all other persons similarly

17   situated within the United States of America or such states as the Court determines to be

18   appropriate. Under Federal Rule of Civil Procedure 23(b), the proposed class is both

19   ascertainable and shares a well-defined community of interest in common questions of law and

20   fact.

21         32.    The Class is currently defined as follows: "All persons in the United States of

22   America, or in California and such other states within the United States as the Court determines

23   to be appropriate, who purchased an iPhone 3G and entered into an ATTM 3G service plan

24   between July 11, 2008 and the present." Plaintiffs reserve the right to amend or modify the

25   Class definition with greater specificity or further division into subclasses or limitation to

26   particular issues as discovery warrants.

27   / / /

28   / / /

                                                9

### A.    **Numerosity**

33.    Class members are so numerous that individual joinder of all members is impracticable.  While the precise number of Class members has not been determined at this time, and the facts to determine that number presently are within Defendants' sole control, based on public reports Plaintiffs believe the number of Class members who bought an iPhone 3G and purchased ATTM 3G service during and after July 2008 is likely well over four million people.

34.    Class members are readily ascertainable.  Defendants' sales, service plan and subscription records contain information as to the number and location of all Class members, a significant number of whom are likely still under service contracts with ATTM.  Because Defendants Apple and ATTM should have accurate and detailed sales and service information regarding individual Class members and up-to-date contact information, including their e-mail or SMS addresses, an easy and accurate method is available for identifying and notifying Class members of the pendency of this action.

### B.    **Commonality**

35.    Common questions of law and fact predominate over questions affecting individual Class members.  These common questions of law and fact include:

(a)    Whether Defendants Apple and ATTM advertised and sold the iPhone 3G by promoting the characteristics of increased speed and performance over the original iPhone; and

(b)    Whether Apple and ATTM failed to disclose material facts about limitations in the speed and performance characteristics of the iPhone 3G to consumers, and whether such a failure violates statutory and common law prohibitions against such conduct, as detailed more fully below.

### C.    **Typicality**

36.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs sustained injury and a loss of money or property arising from, and as a result of, Defendants' unlawful common course of conduct.  They each purchased the iPhone 3G based in substantial part on the

1  uniform advertised claim of the phone having the characteristics of increased data transfer speed

2  and greater performance than was actually provided.  Those representations were a substantial

3  factor in the decision to purchase the iPhone 3G.  Plaintiffs have received, at best, sporadic 3G

4  speed or connection to a 3G network with their iPhone 3G.  They did not receive any

5  disclosures from Defendants Apple or ATTM before or after purchase explaining the material

6  limitations in the iPhone 3G and how its interaction with ATTM 3G network materially reduced

7  its actual speed and performance such that, for a significant period of time, the phones do not in

8  fact provide 3G capability and access, but rather only access to the slower 2G EDGE network.

9         **D.**    **<u>Adequacy of Representation</u>**

10        37.    Plaintiffs can fairly and adequately represent and protect the Class's interests.

11  Plaintiffs' claims are both typical of the Class's claims and are based on facts that are common

12  to them and the Class.  The Class representatives have suffered similar injuries and damages

13  arising from Defendants' conduct.  As such, Plaintiffs can adequately represent the Class

14  because they seek the same or similar remedies that would be available to other Class members.

15  No irreconcilable conflicts exist between the positions of Plaintiffs and those of the Class

16  members.

17        38.    Plaintiffs have retained attorneys who are competent and experienced in

18  litigating significant class actions to represent their interests and that of the Class.  Counsel have

19  significant experience in handling class actions and the types of claims asserted herein, and have

20  been appointed as class counsel by courts in other actions.  Plaintiffs and their counsel already

21  have done significant work in identifying and investigating the potential claims in this action,

22  and are willing to devote the necessary resources to vigorously litigate this action.  Plaintiffs

23  and their counsel are aware of their fiduciary responsibilities to the Class to represent fairly and

24  adequately the Class and are determined to discharge those duties by seeking the maximum

25  possible recovery for the Class based on the merits of these claims and the available resources.

26         **E.**    **<u>Superiority of a Class Action</u>**

27        39.    A class action is a superior method for resolving the claims herein alleged as

28  compared to other available group-wide methods for adjudicating these issues.  The remedy to

11

resolve the common classwide issues regarding the iPhone 3G and the 3G network deficit capacity issue detailed herein would be to refund a portion of the cost of the iPhone 3G and/or the increased service plan costs, the combined cost of which is estimated at less than $600 per Class member based on the required two-year service agreement. Because of that low individual damage amount, individual Class members would have little incentive to prosecute such claims. Such individual actions are not cost-effective or practical, as the costs associated with proving a *prima facie* case would exceed the obtainable recovery.

40. Important interests are served by addressing the issues raised in the Complaint in a class action. Adjudication of individual claims would result in a great expenditure of court and public resources. Resolving the claims on a classwide basis results in significant cost savings. Class action treatment allows similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. All actions addressing the Apple iPhone 3G are pending before this Court and are appropriately centered in this geographic location.

41. There is a substantial likelihood of inconsistent verdicts, which would frustrate the resolution of these legal issues for Defendants and force them to comply with inconsistent legal standards.

42. Failure to certify a class would make it impossible for a great many of the Class members to seek relief. For those who seek judicial relief, there is a strong likelihood that separate court rulings would lead to inconsistent verdicts, working a substantial prejudice on Defendants, especially, as in this case, where equitable relief is being sought. A class action presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

43. Plaintiffs are unaware of any insurmountable difficulties in the management of this action to preclude its maintenance as a class action and believe their claims can all be established at trial on a classwide basis.

/ / /

/ / /

## IV.

## __STATEMENT OF FACTS__

44.     Since at least June 2008, Defendants have uniformly misrepresented to the public the material characteristics of superior speed, strength and performance that consumers would obtain from Apple's iPhone 3G through an extensive advertising campaign, which reportedly has cost over $36 million.

45.     Defendants Apple and ATTM have an agreement whereby ATTM is the exclusive service provider for the iPhone 3G in the United States, and Apple and ATTM are the primary retail sellers of the iPhone 3G.  A close relationship exists between the two, with Apple being responsible for the consummation of the iPhone transaction and the activation of the iPhone 3G, thereby requiring Apple and ATTM to both be aware of consumers' needs.  Class members are unable to choose any other network or carrier when using their iPhone 3G, and ATTM requires all iPhone 3G customers to sign up for a more expensive data connection plan.  Through this joint agreement, Apple and ATTM misled Plaintiffs and other consumers by misrepresenting material facts and not disclosing that the iPhone 3G and ATTM 3G network were faulty and failed to provide consistent connectivity on a 3G network.

46.     Apple offered its original iPhone for sale at a retail price of approximately $599, beginning in June 2007.  That original iPhone operated on a second generation, or 2G, multiple access standard known as EDGE, which had a maximum data transfer rate of 237 kbps (kilobytes per second).  The iPhone 3G was designed to operate both on the 2G network and a third generation, or 3G, multiple access standard network.  According to Defendants, 3G technology features faster peak data transfer rates over previous networks.  For the radio chips installed in certain of the iPhone 3G devices, the 3G network is alleged to have a potential transfer rate of up to 7.2 Mbps (megabytes per second).  Yet, Apple's iPhone 3G and ATTM's 3G network fail to consistently deliver those characteristics as advertised to Plaintiffs and Class members.  For many of the initial iPhone 3G models, the maximum data transfer rate was only increased to 384 kbps—meaning it would never actually be "twice as fast," contrary to Defendants' representations.

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT                    CASE NO.: M 09-02045 JW

47.    Apple named the iPhone "3G" and uniformly advertised the iPhone 3G as "Twice as Fast."  An example of an advertisement making that representation is set out below:



48.    Before the iPhone 3G was launched, ATTM and Apple represented through the press to the general public that the iPhone 3G would be "twice as fast" on the ATTM network:

> Apple Inc. is about to release the follow-up to its widely popular iPhone device. Apple's iPhone 3G, supported by AT&T Inc.'s third-generation wireless network, will hit the market July 11.
>
> *Apple (NASDAQ: AAPL) and AT&T (NYSE: T) officials say the new iPhone 3G will operate at network speeds that are twice as fast as the first generation iPhone. San Antonio-based AT&T remains the exclusive U.S. carrier for the new iPhone.*
>
> Apple and AT&T are going to sell the new device at a starting price of $199 with a two-year contract. The devices will be sold in more than 2,200 AT&T retail stores and kiosks, as well as direct business sales channels.
>
> "We're offering the most advanced mobile device ever on the nation's most advanced high speed network," says Ralph de la Vega, president and CEO of AT&T Mobility. "We think iPhone 3G is an amazing mobile device and our customers are going to love using iPhone 3G to make calls, send e-mails and surf the Web even faster."

/ / /

Staff, *Apple, AT&T are releasing newest iPhone 3G*, San Antonio Bus. J., June 9, 2008 (emphasis added).

49.    That representation was designed to focus consumers on the specific characteristic that the iPhone 3G would provide superior performance over iPhones that operate on a 2G network, which were available before launch of the iPhone 3G.  Through the very name of the phone itself, Apple engaged in a campaign to lead consumers to believe this new phone is always, if not consistently, connected at faster uploading and downloading transfer rates and thus was superior to the predecessor iPhone, which operated on the slower 2G EDGE network.

50.    Without explaining the distinction between 2G and 3G, Defendants actively and consistently advertised, beginning in or before June 2008, that the new iPhone 3G was "Twice as Fast," focusing in television commercials on its almost immediate data transfer rate, while ATTM advertised the iPhone 3G operated on "the nation's fastest 3G network."  These claims were misleading.   Defendants either were aware, or should have known, that they were misleading at the time when they were made.

51.    At Apple's World Wide Developer's Conference in June 2008, at approximately 11:35 a.m., Apple CEO Steve Jobs made several representations regarding the speed of the iPhone 3G that were published by CNET, a leading source of technology information:

> Jobs goes over the 3G support first.  Faster downloads are a no-brainer, he says. He does a side-by-side comparison of a Web page loading on EDGE vs. one on 3G.  The National Geographic's home page downloads in 21 seconds on the 3G network, and the EDGE one is taking forever.  Twenty-one seconds is a lot, but this is a pretty photo-heavy Web page.  It took 59 seconds on EDGE.  ***The 3G speeds are close to Wi-Fi, Jobs said. Jobs compares the 3G iPhone to the Nokia N95 and Treo 750, two other 3G phones, and says the 3G iPhone is 36 percent faster to download the same Web page. In an iPhone 1.0 to iPhone 2.0 comparison, an e-mail attachment downloads in 5 seconds on the 3G model, and 18 seconds on EDGE.***

Tom Krazit, CNET news, *Live blog: Steve Jobs at WWDC 2008*, June 9, 2008, at http://news.cnet.com/8301-13579_3-9960064-37.html  (last visited Oct. 8, 2009)  (emphasis added).

52.    The ATTM website boasted at the time: "iPhone 3G harnesses the power of AT&T's broad and powerful 3G mobile broadband network, which offers 3G mobile phones

15

download speeds of up to 1.4 Mbps.** AT&T's 3G network is currently available in 280 leading U.S. metropolitan areas; by year-end, the company plans to offer 3G service in nearly 350 metro areas." ATTM web site *at* http://www.wireless.att.com/cell-phone-service/specials/iPhone.jsp?wtSlotClick=1-0015FP-0-1&WT.svl=calltoaction).

53.     On the AT&T Answer Center web site, ATTM represented the following as "benefits of the iPhone 3G":

- "iPhone 3G users will enjoy a home broadband-like speed experience when surfing the Internet, sharing files and using media-rich Web applications.  The new iPhone will operate in Wi-Fi mode through wireless modems in homes and offices, as well as public hot spots."

- "The new iPhone 3G is a serious business tool, designed to meet the needs of companies of all sizes. New business capabilities include access to corporate email, calendars, and intranets; generating updated PowerPoint customer presentations; sending video footage in real time; and uploading/downloading data in real time."

- "Features AT&T's super-fast mobile broadband network puts iPhone 3G in the broadband fast lane with download speeds of up to 1.4 Mbps."

ATTM  web  site,  *at*  http://www.wireless.att.com/answer-center/main.jsp?t=solutionTab&ft…Panels&locale=en_US&_dyncharset=UTF-8&solutionId=KB93031&isSrch=Yes .

54.     In an article from the *Detroit Free Press*, a technology columnist accepted the pitch being made by Apple and ATTM:

[T]he new iPhone 3G that goes on sale at 8 a.m. Friday at Apple and AT&T stores . . . has three things the current models don't have.

* * * * *

***Third, the iPhone 3G runs faster, using AT&T's advanced 3G, or third-generation, wireless network, which the company claims is twice as fast as the EDGE network used by the current iPhone. That's admittedly very nice.***

Since 2005, AT&T has spent more than $20 billion across the country beefing up its network.

"Having access to 3G in more places means having incredible speed and reliability from your broadband wireless network in places you once thought weren't possible," said Brian Ducharme, vice president and general manager for AT&T's wireless operations in Michigan.

The iPhone 3G will automatically detect 3G service and use it; otherwise it will connect to the slower EDGE network used by the older model. EDGE works across most of Michigan, even the Upper Peninsula.

**There's really only one reason to get the new iPhone 3G. That 3G AT&T network speed.**

**If you are in your car or on the road a lot and need full and fast connectivity, it's the phone for you. I plan to replace my old iPhone with the new model because of just those reasons.**

Mike Wendland, *What Makes the iPhone 3G Hot and Not So Hot*, <u>Detroit Free Press</u>, D1, July  10, 2008.

55.     Contrary to these claims, Plaintiffs and the Class experience connectivity on the 3G network only a fraction of the time they are connected to the ATTM network, or receive no 3G connectivity at all for a significant portion of time.  The lack of 3G connectivity also causes Plaintiffs to experience a significant number of dropped calls when the iPhone 3G cannot locate an available 3G network connection.  Apple and ATTM either knew, reasonably should have known, or were obligated to understand that the iPhone 3G could not consistently perform at a 3G level, contrary to the Defendants' representations.

56.     Both Apple and ATTM profited by selling iPhone 3G devices without the appropriate infrastructure in place and/or the presence of defective hardware and/or software in the iPhone 3G.  At approximately $173 per phone, Apple is estimated to have achieved a 55% profit margin on each iPhone 3G sold.  ATTM, despite having to pay a reported $300 per phone subsidy to Apple, profited by requiring Plaintiffs and Class members to upgrade their service plans at a $10 per month premium over earlier iPhone plans; pay a $28 per phone equipment fee; and to enter into a new two-year data connection contract at one of the highest monthly plan levels available from ATTM.  Apple iPhone customers on average paid ATTM 60% more in monthly fees than ATTM received from its average cellular telephone customers who were not on the exclusive licensing agreement with Apple for the iPhone 3G.

57.     ATTM enjoyed the benefit of being the exclusive service provider for Apple iPhone 3G devices in the United States, making the iPhone a substantial reason for ATTM's continued success and significantly increased profitability:

AT&T Inc posted a smaller-than-expected drop in quarterly profit on improved margins for its wireless service, helped by the iPhone, and strong growth for its video and high-speed Internet service.

Subsidies for Apple Inc's iPhone had cost AT&T dearly in recent quarters, but analysts said the partnership is now starting to help rather than hurt profits as users of the touch-screen phone spend heavily on data services.

AT&T shares rose nearly 4 percent as analysts said the biggest U.S. phone company had reported impressive results given the weak economy.

"For this economy, it was an outstanding performance," said Commresearch analyst Gregory Lundberg, citing very strong broadband, video and wireless growth.

* * * * * *

AT&T reported a wireless profit margin of 40.9 percent, above the 39.2 percent forecast by Bernstein analyst Craig Moffett, who saw iPhone as the key driver.

AT&T said 1.6 million Apple iPhone customers had activated services on the AT&T network during the quarter, more than 40 percent of whom were new to the telephone operator.

"The base of iPhone customers is now large enough to offset the subsidies for new iPhone users," said Moffett.

Shares of Apple rose $1.75, or 1.44 percent to $123.51 on Nasdaq early Wednesday afternoon after the news.

AT&T added 1.2 million net cell phone customers in the quarter, in line with analyst expectations. . . . .

***Some analysts worry that AT&T, the exclusive U.S. provider for the iPhone, depends too heavily on one device, with an estimated three-quarters of its net new monthly bill-paying customers being iPhone users.***

***"It's a little bit worrisome as to what happens if and when their exclusivity ends," said Stifel Nicolaus analyst Chris King.*** "Without iPhone their net adds would be negligible."

Sinead Carew, *AT&T profit boosted by iPhone, video, Internet*, Reuters, Apr. 22, 2009, *available at* http://www.reuters.com/article/technologyNews/idUSTRE53L29L20090422 (last visited Oct. 15, 2009) (emphasis added).

58.   Class members paid higher rates so that they could specifically access a 3G network, yet often consumers could only access the slower 2G network.  Based on the anticipated large profits each would receive, ATTM was in no position to tell Apple the iPhone

18

3G would not operate as represented at the time of its release based on the state of the ATTM network, and Apple was in no position to delay the introduction of the iPhone 3G until basic problems regarding the phone's operation itself, and its operation in concert with the ATTM 3G network, were resolved.

59.     Apple and ATTM either knew, reasonably should have known, or were obligated to understand that ATTM's 3G network could not handle the massive influx of bandwidth demand from iPhone 3G devices based on the phone's increased needs.  The network strain could not have surprised either of them, as the original iPhone sold more than seven million units and both companies were aware of the bandwidth necessary for the iPhone 3G to operate consistently on a 3G network.  ATTM representatives specifically represented that the network was prepared for and could handle the increased bandwidth demands:  "***We have anticipated the influx of users*** and can, [do] and will continue to support that."  Brian X. Chen, "iPhone 3G Users Heated Over Network Issues", Wired.com, July 23, 2008, http://blog.wired.com/gadgets/2008/07/iphone-3g-users.html (emphasis added).

60.     Both Apple and ATTM were also on notice such increased traffic was likely because public reports indicated the companies anticipated the sale of millions of iPhone 3G devices in the first year alone.  Eric Savitz, *Apple: Confusion Reigns On Q3 iPhone Sales Projections*, BARRON'S: Tech Trader Daily (June 19, 2008), *available at* http://blogs.barrons.com/techtraderdaily/2008/06/19/apple-confusion-reigns-on-q3-iphone-sales-projections/ (last visited Oct. 21, 2009) ("Apple has forecast it would sell 10 million iPhones in calendar 2008").  Further evidence of the demand Defendants created for the iPhone 3G is found in a *Wall Street Journal* report that one out of five ATTM cell phone customers were planning to upgrade to an iPhone.

61.     Both companies profited from their misleading representations by gaining market share, by locking consumers into two-year contracts, and by receiving billions of dollars in additional revenue by selling millions of new iPhone 3G devices and rate plans, all at the expense of customers who were unable consistently to access the product and services Defendants represented consumers would obtain with an iPhone 3G.

62.     The iPhone 3G suffers from poor connectivity to the ATTM 3G network due either to a hardware flaw—demanding too much power to operate routinely at 3G bandwidth levels and the iPhone 3G device's sensitivity or inability to consistently access 3G network radio connectivity—or a software flaw in the programmed algorithms.

63.     Further, when the iPhone 3G was released, the ATTM 3G network lacked the established infrastructure necessary to handle the anticipated increased traffic and connectivity demands for the iPhone 3G, resulting in an overburdened and oftentimes inaccessible 3G network for Apple iPhone 3G users.

64.     The iPhone 3G is designed to search for an available 3G radio network connection, and if that is not available, a 2G radio network connection. It is common for iPhone 3G users to be on the 3G network for only a few minutes before their iPhone 3G switches over to the slower 2G EDGE network on which the original iPhone operated, or simply lose connectivity altogether and having to re-boot their phone.

65.     While the strain on the ATTM 3G network was foreseeable, based on how the iPhone 3G is set up and designed, the combination of the phone and/or the network made it difficult for Class members to receive reliable and sustained connectivity on the 3G network as compared to the slower 2G EDGE network.  According to Apple employees, a significant number of all iPhone 3G calls were dropped as consumers' phones searched for limited 3G network resources.  Whether attributable to the phone, the network or both, that significant level of dropped calls is further evidence that iPhone 3G users do not consistently experience the represented benefits of 3G service, increased data transfer rates.

66.     Apple and ATTM overloaded the system by selling more phones and subscription plans than the ATTM 3G infrastructure could support, ultimately requiring ATTM to admit it needed to spend billions of dollars more to support  traffic on what  was supposedly the "nation's fastest 3G network."  *The New York Times* stated as follows regarding the degree to which the iPhone had taxed ATTM's exclusive network:

Slim and sleek as it is, the iPhone is really the Hummer of cellphones.

/ / /

It's a data guzzler. Owners use them like minicomputers, which they are, and use them a lot. Not only do iPhone owners download applications, stream music and videos and browse the Web at higher rates than the average smartphone user, but the average iPhone owner can also use 10 times the network capacity used by the average smartphone user.

"They don't even realize how much data they're using," said Gene Munster, a senior securities analyst with Piper Jaffray.

The result is dropped calls, spotty service, delayed text and voice messages and glacial download speeds as AT&T's cellular network strains to meet the demand. Another result is outraged customers.

\* \* \* \* \*

Taylor Sbicca, a 27-year-old systems administrator in San Francisco, checks his iPhone 10 to 15 times a day. But he is not making calls. He checks the scores of last night's baseball game and updates his Twitter stream. He checks the local weather report to see if he needs a coat before heading out to dinner — then he picks a restaurant on Yelp and maps the quickest way to get there.

Or at least, he tries to.

"It's so slow, it feels like I'm on a dial-up modem," he said. Shazam, an application that identifies songs being played on the radio or TV, takes so long to load that the tune may be over by the time the app is ready to hear it. On numerous occasions, Mr. Sbicca says, he missed invitations to meet friends because his text messages had been delayed.

And picking up a cell signal in his apartment? "You hit the dial button and the phone just sits there, saying it's connecting for 30 seconds," he said.

More than 20 million other smartphone users are on the AT&T network, but other phones do not drain the network the way the nine million iPhones users do. Indeed, that is why the howls of protest are more numerous in the dense urban areas with higher concentrations of iPhone owners.

***"It's almost worthless to try and get on 3G during peak times in those cities," Mr. Munster said, referring to the 3G network. "When too many users get in the area, the call drops."*** The problems seem particularly pronounced in New York and San Francisco, where Mr. Munster estimates AT&T's network shoulders as much as 20 percent of all the iPhone users in the United States.

Owners of the iPhone 3GS, the newest model, "have probably increased their usage by about 100 percent," said Chetan Sharma, an independent wireless analyst. "It's faster so they are using it more on a daily basis."

Mr. Sharma compares the problem to water flowing through a pipe. "It can only funnel so much at a given time," he said. "It comes down to peak capacity loads, or spikes in data usage. That's why you see these problems at conferences or in large cities with high concentration of iPhone users."

/ / /

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT                 CASE NO.: M 09-02045 JW

When thousands of iPhone owners descended on Austin, Tex., in March during South by Southwest, an annual technology and music conference, attendees were unable to send text messages, check their e-mail or make calls until AT&T installed temporary cell sites to amplify the service.

***AT&T's right to be the exclusive carrier for iPhone in the United States has been a golden ticket for the wireless company. The average iPhone owner pays AT&T $2,000 during his two-year contract — roughly twice the amount of the average mobile phone customer.***

But at the same time the iPhone has become an Achilles' heel for the company.

"It's been a challenging year for us," said John Donovan, the chief technology officer of AT&T. "Overnight we're seeing a radical shift in how people are using their phones," he said. "There's just no parallel for the demand."

***AT&T says that the majority of the nearly $18 billion it will spend this year on its networks will be diverted into upgrades and expansions to meet the surging demands on the 3G network. The company intends to erect an additional 2,100 cell towers to fill out patchy coverage, upgrade existing cell sites by adding fiber optic connectivity to deliver data faster and add other technology to provide stronger cell signals.***

* * * * *

But AT&T faces another cost — to its reputation. AT&T's deal with Apple is said to expire as early as next year, at which point other carriers in the United States would be able to sell the popular Apple phones. Indeed, a recent survey by Pricegrabber.com found that 34 percent of respondents pinpointed AT&T as the primary reason for not buying an iPhone.

"It's a P.R. nightmare," said Craig Moffett, a senior analyst with Sanford C. Bernstein & Company.

* * * * *

In preparation for the next wave of smartphones and data demands, all the carriers are rushing to introduce the next-generation of wireless networks, called 4G.

Analysts expect that in a year or so, AT&T's network will have improved significantly — but it may not be soon enough for some iPhone owners paying for the higher-priced data plans, like Mr. Sbicca, who says he plans to switch carriers as soon as the iPhone becomes available on other networks.

"What good is having all those applications if you don't have the speed to run them?" he said. "It's not exactly rocket science here. It's pretty standard stuff to be able to make a phone call."

Jenna Worthan, *Customers Angered as iPhones Overload AT&T*, N.Y. Times, Sept. 3, 2009, at

http://www.nytimes.com/2009/09/03/technology/companies/03att.html (last visited Oct. 20, 2009) (emphasis added).

/ / /

67.    Despite these inherent flaws in the system, President and CEO of ATTM's wireless unit, Ralph de la Vega, directly aligned ATTM with the sale of the iPhone 3G to encourage continued sales of the iPhone 3G, even when initial problems with the network were an issue: "We will continue to expand our 3G network coverage into new areas, grow our lineup of industry-leading devices, such as iPhone 3G, and deliver compelling new 3G services to market like Video Share SM."   ATTM News Release, *AT&T Offers Nation's Fastest 3G Network: Nation's Fastest 3G Network Complements Best Global Coverage and Industry-Leading Portfolio of 3G Devices*, July 10, 2008, http://www.att.com/gen/pressroom?pid= 4800&cdvn=news&newsarticleid=25993.

68.    In response to initial complaints about this 3G connectivity issue, ATTM spokesperson Brad Mays represented in July 2008 that the iPhone 3G is "performing great. . . . Customers in 300 major metro areas in the United States and 350 by the end of the year are experiencing the fast network connectivity that our 3G network provides." Mays stated, "***We have anticipated the influx of users*** and can, [do] and will continue to support that."  Brian X. Chen, "iPhone 3G Users Heated Over Network Issues", *Wired.com*, July 23, 2008, http://blog.wired.com/gadgets/2008/07/iphone-3g-users.html (emphasis added).    Internally, however, ATTM recognized its 3G network, as configured, could not handle the bandwidth demands attributable to the iPhone 3G.  Ultimately, in a *Fortune* magazine article in September 2009, ATTM admitted this material, misrepresented fact:

> "*3G networks were not designed effectively for this kind of usage*," says John Donovan, AT&T's chief technology officer, referring to the current generation of broadband wireless.   "We fight the day-to-day guerrilla warfare as the customers move around."

John Fortt, "Bandwidth Hogs – iPhone and Other Smartphones," *FORTUNE: Brainstorm Tech Blog*, Aug. 28, 2009, *at* http://brainstormtech.blogs.fortune.cnn.com/2009/08/28/bandwidth-hogs-iphone-and-other-smartphones/ (last visited Oct. 19, 2009).

69.    Although Apple's TV advertisements released before and during the initial release of the iPhone 3G attempted to show how much faster the iPhone 3G would operate as compared to the original iPhone and consistently repeated the phrase "twice as fast," in real life

an iPhone 3G operating on the ATTM network may achieve an actual speed of about half of Apple's advertised performance—about the same as the original iPhone, if not slower.

70.     Apple's packaging for the iPhone 3G does not contain a disclaimer of these material facts and limitations.

71.     Disclosures regarding the true nature and limitations of the iPhone 3G and ATTM's 3G network should have been provided to customers before they purchased an iPhone 3G.  Based on the extensive multi-million dollar advertising campaign focusing on this 3G characteristic, Defendants consistently represented to potential and actual customers that the iPhone 3G would operate on a faster 3G network, as compared to the slower 2G EDGE network, and by being "twice as fast" would consistently provide faster upload and download capabilities than the original iPhone.

72.     ATTM  failed to warn Plaintiffs and Class members of the bandwidth limitations associated with using the iPhone 3G or its internal understanding that its 3G network was not designed to provide consistent connectivity to its 3G network for a large number of iPhone 3G users, despite its express statements and advertisements that it offered the "nation's fastest 3G network".  When consumers complained to ATTM about such issues, they were told ATTM recognized a problem with the iPhone 3G existed, but that the problem was with the iPhone itself.  When consumers complained to Apple about such issues, they were told that a problem exists with the iPhone 3G, but the problem was the fault of the ATTM 3G network.  Representative of both Defendants thus recognized this defect in the system existed, but blamed the other for that defect.

73.     Plaintiffs were injured in fact and lost money or property as a result of these material misstatements and omissions of material fact, paying more to receive essentially the same, if not inferior, service.  In addition to the $299 cost of the iPhone 3G, ATTM charged consumers $10 per month for 24 months in additional fees to sign up for additional 3G network coverage and a $28 additional equipment charge.  Customers were required to enter into a two-year data plan contract with ATTM to use their iPhone 3G and/or an $18 additional service fee that ATTM imposes on iPhone 3G customers.

74.     Some customers, and some Plaintiffs, already had an iPhone when they purchased the iPhone 3G.  Like the rest of the Class, they did not receive the benefits of "upgrading" to the iPhone 3G.

75.     As a result of Defendants' material misrepresentations and omissions of material facts, Plaintiffs and Class members are locked into a two-year service plan with inferior ATTM 3G network connectivity.  A substantial factor in entering into those agreements was the representation that the iPhone 3G would operate as a true 3G device.

76.     Apple and ATTM acted in concert to sell the iPhone 3G and either knew, should have known, or were obligated to understand that they were trying to sell more iPhone 3G devices than the existing ATTM 3G network could handle, and the iPhone 3G itself suffered from defective hardware and/or software.  Plaintiffs were injured, either directly or indirectly, in response to the representations, advertising and other promotional materials that were prepared and approved by Apple and/or ATTM and disseminated on the face of the product and/or through advertising that contained the representations regarding the iPhone 3G and ATTM 3G network, including on the Defendants' websites.  Had the true facts been disclosed, Plaintiffs would not have purchased the iPhone 3G at the prices and under the terms and conditions to which they were and are subjected.

77.     Defendants failed to disclose at the time of making their false and misleading statements to Plaintiffs and the Class that the infrastructure of the ATTM 3G network and/or the iPhone 3G itself were defective and inadequate to provide the represented performance and speed, resulting in injury to the Plaintiffs and the Class.  Neither of the Defendants has offered a remedy to this situation, despite demands therefor.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# V.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Unlawful, Unfair, and Fraudulent Business Practices in Violation of**
**California Business & Professions Code §17200, *et seq.*)**

78.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

79.     The Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*, defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

80.     Defendant  Apple violated, and continues to violate, California Business and Professions Code § 17200, *et seq.*, by misrepresenting the actual speed and performance of its iPhone 3G models.

81.     Defendant ATTM violated, and continues to violate, California Business and Professions Code § 17200, *et seq.*, by misrepresenting the strength of the ATTM 3G network in terms of its ability to support the millions of iPhone 3G users and the ability of the iPhone 3G to be in regular connection with its 3G network as compared to its slower 2G EDGE network.

82.     By engaging in the above described acts and practices, Defendants have committed an unfair business practice within the meaning of California Business and Professions Code § 17200, *et seq.*  Consumers suffered substantial injury they could not reasonably have avoided other than by not purchasing the product, and there was no countervailing benefit to consumers from Defendants' unsupported claims and premature release of the iPhone 3G.

83.     Defendants' acts and practices have deceived and/or are likely to deceive Class members and the public and thus constitute a fraudulent business practice.  Apple uniformly advertised the iPhone 3G as "Twice as Fast," together with ATTM asserting it operates the "nation's fastest 3G network".  Yet the iPhone 3G connects to the Internet using the slower 2G EDGE network a significant part of the time and/or results in a significant number of dropped

26

calls as the iPhone 3G searches for an available 3G network path. Calling this product an "iPhone 3G" was likely to lead reasonable consumers, including Plaintiffs, to believe the advertised "Twice as Fast" is in relation to the 3G term, meaning the phone is twice as fast as earlier iPhone models in terms of data transfer rates and processing. Appellations like "3G" and "twice as fast" were a substantial factor in consumers purchasing the iPhone 3G. Yet, the iPhone 3G did not provide significantly faster data transfer rates despite the installed 3G radio chip and, even if consumers used later versions, they could not achieve faster rates because of the inadequate ATTM 3G network or hardware or software defects in the phone itself.

84.    The acts and practices of Apple and ATTM are an unlawful business act or practice because they violate the laws identified in this Complaint, including Negligence, Breach of Express and Implied Warranty of Merchantability, the Magnuson-Moss Warranty Act, Fraud and Deceit, Negligent Misrepresentation, the Consumers Legal Remedies Act, and California Business & Professions Code § 17500, as described below.

85.    As discussed above, Plaintiffs and the members of the Class purchased an iPhone 3G model and service plan directly from Apple and/or ATTM and/or their authorized agents. Plaintiffs were injured in fact and lost money or property as a result of such acts of unfair competition.

86.    Apple and ATTM received the funds paid by Plaintiffs and the members of the Class. Apple and ATTM profited enormously by misrepresenting the speed and performance of the iPhone 3G and not disclosing material problems and limitations with the iPhone 3G and its interaction with the ATTM 3G network. Apple's and ATTM's revenues attributable thereto are thus directly traceable to the millions of dollars paid out by Plaintiffs and the Class for the iPhone 3G, the required service plans and the associated fees.

87.    Unless Defendants Apple and ATTM are enjoined from continuing to engage in the unlawful, unfair and fraudulent business acts and practices as described herein, Plaintiffs and the Class will continue to be injured by Apple's and ATTM's conduct.

88.    Apple and ATTM, through their acts of unfair competition, have acquired money from Class members. Plaintiffs and the Class request this Court disgorge and restore such

1  money to them and enjoin Apple and ATTM from continuing to violate California Business and

2  Professions Code §17200, *et seq*.

3      89.    The unlawful, unfair and fraudulent conduct described herein is ongoing and

4  continues to this date. Plaintiffs and the Class, therefore, are entitled to relief described below as

5  appropriate for this Cause of Action.

6                              **SECOND CAUSE OF ACTION**

7              **(False and Misleading Advertising in Violation of
8              California Business & Professions Code §17500, *et seq*.)**

9      90.    Plaintiffs incorporate by reference each and every preceding paragraph as though

10  fully set forth herein.

11      91.    Defendants' acts and practices as described herein have deceived and/or are

12  likely to deceive members of the Class and the public.  Apple and ATTM have spent over $36

13  million to advertise, including through their websites on the Internet, to call attention to, or give

14  publicity to Apple's and ATTM's iPhone 3G and 3G network service.  Apple uniformly

15  advertises the iPhone 3G as "Twice as Fast," and ATTM uniformly advertises such phones

16  operate on the "nation's fastest 3G network."  In reality, the iPhone 3G connects over the slower

17  2G EDGE network a significant amount of the time and/or drops a significant number of calls

18  while searching for limited 3G network resources.  Marketing the phone by naming it "iPhone

19  3G" would lead a reasonable consumer, including Plaintiffs, to believe they regularly can obtain

20  3G network connectivity and significantly higher data transfer rates.

21      92.    ATTM uniformly advertises and sells 3G network data plans for the iPhone 3G

22  and requires Class members to pay higher rates for such plans.  For a significant amount of

23  time, Plaintiffs and Class members are unable to access a 3G network and cannot consistently

24  get 3G connectivity and data transfer rates despite Defendants uniformly advertising this

25  characteristic and selling it to them at a premium.

26      93.    By their actions, Apple and ATTM are disseminating uniform advertising

27  concerning their products and services, which by its nature is unfair, deceptive, untrue, or

28  misleading within the meaning of California Business & Professions Code §17500, *et. seq*.

Such advertisements are likely to deceive, and continue to deceive, the consuming public for the reasons detailed above.

94.     The above-described false, misleading, and deceptive advertising Apple and ATTM disseminated continues to have a likelihood to deceive in that Apple and ATTM have failed to disclose the true and actual performance of the iPhone 3G based on its interaction with ATTM's insufficient 3G infrastructure.   Apple and ATTM have failed to instigate a public information campaign to alert consumers of these deficiencies, which continues to create a misleading perception of the iPhone 3G's speed, performance and enhanced network and operating connectivity.

95.     In making and disseminating the statements alleged herein, Apple and ATTM should have known their advertisements were untrue and misleading in violation of California Business & Professions Code § 17500, *et seq*.   Plaintiffs and the Class members based their decisions to purchase the iPhone 3G in substantial part on Defendants' misrepresentations and omitted material facts.   The revenues to Apple and ATTM attributable to products sold in those false and misleading advertisements amount to millions of dollars for the iPhone 3G and required service plans.   Plaintiffs were injured in fact and lost money or property as a result.

96.     The misrepresentations and non-disclosures by Apple and ATTM of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code § 17500, *et. seq*.

97.     As a result of Apple's and ATTM's wrongful conduct, Plaintiffs and the Class request that this Court cause Apple and ATTM to restore money to them, and to enjoin Apple and ATTM from continuing to violate California Business & Professions Code § 17500, *et. seq*.

98.     Such conduct is ongoing and continues to this date.   Plaintiffs and the Class are therefore entitled to the relief described below as appropriate for this Cause of Action.

## THIRD CAUSE OF ACTION

**(Violation of Consumers Legal Remedies Act – California Civil Code § 1750, *et seq*.)**

99.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT                    CASE NO.: M 09-02045 JW

100.   This cause of action is brought under the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA").   Plaintiffs are consumers as defined by California Civil Code § 1761(d), and the Apple iPhone 3G and ATTM's 3G network are goods and services within the meaning of the CLRA.

101.   Defendants violated and continue to violate the CLRA by engaging in the following deceptive practices proscribed by California Civil Code § 1770(a) in connection with transactions intended to result in, and that did result in, the sale of the iPhone 3G at issue herein to Plaintiffs and members of the Class in violation of, *inter alia*, the following provisions:

a.   Representing the goods and services have characteristics, uses or benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b.   Representing the goods and services are of a particular standard, quality or grade if they are of another (Cal. Civ. Code § 1770(a)(7));

c.   Advertising goods and services with the intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

d.   Representing a transaction involves rights, remedies or obligations that it does not have or involve (Cal. Civ. Code § 1770(a)(14)); and

e.   Representing the goods and services have been supplied in accordance with a previous representation when they have not (Cal. Civ. Code § 1770(a)(16)).

102.   Plaintiffs and other Class members, in purchasing and using the iPhone 3G as herein alleged, did reasonably act in response to Defendants' above representations or would have considered the omitted facts detailed herein material to their purchase decision.   Plaintiffs and the Class have suffered damage by the wrongful acts and practices of Defendants that are in violation of California Civil Code § 1781.

103.   Under Section 1782 of the CLRA, Defendants have received notice in writing by certified mail of the particular violations of Section 1770 of the CLRA from several Plaintiffs on behalf of all Class members, demanding Defendants offer to resolve the problems associated with the actions detailed above and give notice to all affected consumers of the intent to so act.

30

1   The time for Defendants to respond to those letters has passed without an agreement to take the

2   actions required by the CLRA on behalf of all affected consumers.  Plaintiffs and the Class are

3   therefore entitled to all forms of relief provided under Section 1780 of the CLRA, including

4   actual and statutory damages, restitution and injunctive relief.

5        104.   Based on their knowledge or reckless disregard of the facts as detailed herein,

6   Defendants were guilty of acting with malice, oppression or fraud.  Plaintiffs and members of

7   the Class are therefore also entitled to recover exemplary damages in addition to actual damages

8   under Civil Code § 1780(a)(4) for the reasons set forth above.

9        105.   Plaintiffs and the Class pray for all relief set forth below as appropriate under

10  this Cause of Action.

11  **FOURTH CAUSE OF ACTION**

12  **(Breach of Express Warranty and Implied Warranty of Merchantability)**

13       106.   Plaintiffs incorporate by reference each and every preceding paragraph as though

14  fully set forth herein.  All Plaintiffs except Smith and Triggs assert this Cause of Action.

15       107.   Plaintiffs and Class members purchased the iPhone 3G and used them for their

16  ordinary and intended purpose of providing consistent, reliable and sustained access to the

17  supposedly faster 3G network, and entered into agreements with Apple or its agents and

18  received uniform warranties in connection with the purchase of such phones.

19       108.   The iPhone 3G cannot perform its ordinary and represented purpose because the

20  iPhone 3G does not provide consistent connection to the ATTM 3G network in combination

21  with using the iPhone 3G.  Whether the problem is with the iPhone itself or with the ATTM 3G

22  network, or a combination of the two, is irrelevant as to whether the warranty was breached.

23       109.   When Defendants placed the iPhone 3G into the stream of commerce, they knew,

24  reasonably should have known, or were obligated to understand that the intended and ordinary

25  purpose of their phone was to provide consistent connectivity to a supposedly faster 3G network

26  and that users would expect regular 3G connectivity and materially faster data transfer rates as

27  compared to the original iPhone.

28  ///

31

1    110.    Plaintiffs and the Class purchased their iPhone 3G with the reasonable

2    expectation that they would receive reliable and sustained connectivity to a purportedly faster

3    3G network.   The advertisements Defendants disseminated that stressed the excellence and

4    reliability of the iPhone 3G constitute a warranty that the products would operate as advertised

5    during their useful life, upon which Plaintiffs and the Class reasonably acted.  The iPhone 3G is

6    not fit for its warranted, advertised, ordinary and intended purpose of providing reliable 3G

7    network connectivity and is in fact defective, or would not pass without objection in the trade or

8    industry in terms of being unable to provide consistent and reliable 3G network connectivity.

9    This defect has manifested for all Plaintiffs and Class members as they do not consistently

10   receive 3G network connectivity using their iPhone 3G.

11   111.    Plaintiffs have given notice to Defendants of this breach, either by separate letter

12   or demand or by virtue of the filing of a lawsuit, which demands have been ignored or rejected.

13   Apple has tried several firmware fixes, which have not provided Plaintiffs or the Class with

14   reliable or sustained 3G connectivity.

15   112.    Defendants' breach of the warranty described above also constitutes a violation

16   of Cal. Civ. Code §1792, *et seq.*

17   113.    Plaintiffs and Class members are entitled to damages as a result of such breaches.

18   Plaintiffs and the Class request relief as described below as appropriate for this Cause of Action.

19                         **FIFTH CAUSE OF ACTION**

20               **(Violation of the Magnuson-Moss Warranty Act)**

21   114.    Plaintiffs incorporate by reference each and every preceding paragraph as though

22   fully set forth herein.   All Plaintiffs except Plaintiffs Smith and Triggs assert this Cause of

23   Action.

24   115.    Plaintiffs and Class members are "consumers" within the meaning of the

25   Magnuson-Moss Act.

26   116.    Defendants are "suppliers" and "warrantors" within the meaning of the

27   Magnuson-Moss Act.

28   / / /

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

117.   The iPhone 3G is a "consumer product" within the meaning of the Magnuson-Moss Act.

118.   Defendants' written affirmations of fact, promises and/or descriptions as alleged herein are each a "written warranty" as to the iPhone 3G providing consistent 3G network connectivity and/or there exists an implied warranty for the sale of such products within the meaning of the Magnuson-Moss Act.

119.   For the reasons detailed above, Defendants breached these express and implied warranties, as the iPhone 3G did not perform as Defendants represented or were not fit for their intended use.   Defendants have refused to remedy such breaches, and their conduct caused damages to Plaintiffs and members of the Class.

120.   The amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

121.   As Defendants have refused all previous requests, resorting to any informal dispute settlement procedure and/or affording Defendants another opportunity to cure these breaches of warranties is unnecessary and/or futile.   Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Defendants have indicated they have no desire to participate in such a process at this time.   Any requirement under the Magnuson-Moss Act or otherwise that Plaintiffs resort to any informal dispute settlement procedure and/or afford Defendants a reasonable opportunity to cure the breach of warranties described above is excused and/or has been satisfied.

122.   As a result of Defendants' breaches of warranty, Plaintiffs and Class members have sustained damages and other losses in an amount to be determined at trial.   Plaintiffs and Class members are entitled to recover damages, specific performance, costs, attorneys' fees, rescission, and/or other relief as is deemed appropriate.

/ / /

/ / /

/ / /

## SIXTH CAUSE OF ACTION

### (Violation of Title 33, Chapter 501, of Florida's Consumer Protection Act)

123.    This claim is asserted by Plaintiffs Gonzalez and Brayteson, who incorporate by reference each and every preceding paragraph as though fully set forth herein.

124.    Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

125.    By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in Florida, Defendants engaged in deceptive acts and practices.

126.    Defendants materially misled Plaintiffs and other Class members located in Florida and as a result Defendants' acts and practices were improper.

127.    Defendants have violated, and continue to violate, Florida law, and specifically Title 33, Chapter 501 of the Florida Consumer Protection Act, which makes such deceptive acts and practices unlawful.

128.    Plaintiffs seek to enjoin such unlawful deceptive acts and practices as described above.  Each Class member located in Florida will be irreparably harmed unless Defendants' unlawful actions are enjoined in that Apple and ATTM continue to falsely and misleadingly advertise with respect to the speed, characteristics and performance of the iPhone 3G.  Towards that end, the above Plaintiffs request an order granting appropriate injunctive relief.  The above Plaintiffs have not previously asked for such injunctive relief.

129.    In addition, as a direct and proximate result of Defendants' violation of the Florida Consumer Protection Act, Class members located in Florida have been injured and have suffered damages, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Violation of Title 56, Chapter 8, of New Jersey's Consumer Protection Act)

130.    This claim is asserted by Plaintiffs Tanseco and Ritchie.   Those plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

131.    Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

132.   By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in New Jersey, Defendants engaged in deceptive acts and practices.

133.   As Defendants materially misled such Class members, Defendants' acts and practices were improper.

134.   Defendants have violated, and continue to violate, Title 56, Chapter 8 of the New Jersey Consumer Protection Act, which makes such deceptive acts and practices unlawful.

135.   Plaintiffs seek to enjoin such unlawful and deceptive acts and practices as described above.   Class members located in New Jersey will be irreparably harmed unless Defendants' unlawful actions are enjoined in that Apple and ATTM will continue to falsely and misleadingly advertise with respect to the speed, characteristics and performance of the iPhone 3G.   Towards that end, Plaintiffs request an order granting appropriate injunctive relief. Plaintiffs have not previously asked for such injunctive relief.

136.   In addition, as a direct and proximate result of Defendants' violation of the New Jersey Consumer Protection Act, Class members located in New Jersey have been injured and have suffered damages, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Violation of Section 349 of the New York General Business Law)

137.   This claim is asserted by Plaintiff Koschitzki.  Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

138.   Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

139.   By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in New York, Defendants engaged in, and continue to engage in, deceptive acts and practices.

140.   Defendants materially misled such Class members such that Defendants' acts and practices were improper.

141.   Defendants have violated, and continue to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful.

142.     Plaintiff seeks to enjoin such unlawful deceptive acts and practices as described above.  Class members located in New York will be irreparably harmed unless Defendants' unlawful actions are enjoined.  Towards that end, Plaintiff requests an order granting appropriate injunctive relief.  Plaintiff has not previously asked for such injunctive relief.

143.     As a direct and proximate result of Defendants' violation of Section 349 of the New York General Business Law as described above, Plaintiff and Class members located in New York have been injured and have suffered damages, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

**(Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq*.)**

144.     This claim is asserted by Plaintiff Jamison.  Jamison incorporates by reference each and every preceding paragraph as though fully set forth herein.

145.     The North Carolina Unfair Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, defines a trade practice as unfair or deceptive if it has the capacity or tendency to deceive.

146.     Defendants violated the NCUDTPA by advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in North Carolina.

147.     Defendants engaged in, and continue to engage in, deceptive acts and practices.

148.     By engaging in those acts and practices, Defendants have committed one or more deceptive and unfair acts of trade within the meaning of the NCUDTPA.

149.     Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the public.

150.     Jamison and other North Carolina purchasers purchased iPhone 3G devices directly from Apple and/or one of its authorized retailers or resellers.

151.     Jamison and other North Carolina purchasers were injured in fact and lost money or property as a result of their purchase of iPhone 3G devices from Apple, ATTM, and/or their authorized agents, and the false and misleading statements described above were a substantial factor in their decisions to purchase an iPhone 3G.

152.    Defendants, through its acts of unfair competition, have acquired money from Jamison and other North Carolina purchasers.  This Court, therefore, should disgorge and restore this money to Jamison and other North Carolina purchasers and enjoin Defendants from continuing to violate the NCUDTPA, N.C. Gen. Stat. § 75-1, *et seq.*

## TENTH CAUSE OF ACTION

### (Negligence)

153.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

154.    At all times mentioned herein, Defendants undertook a duty to properly manufacture, design, test, produce, assemble, inspect, distribute, market, package, prepare for use and sell the iPhone 3G to function as advertised and represented on the ATTM 3G network.

155.    The Apple iPhone 3G, either alone or by acting in combination with the ATTM 3G network with which it exclusively operates, was negligently tested, manufactured, built and/or designed, which causes Plaintiffs and the Class to fail to receive reliable and sustained connectivity to the ATTM 3G network.

156.    Defendants, by the conduct detailed above, breached their duty to properly manufacture, design, test, produce, assemble, inspect, distribute, market, package, prepare for use, or sell the iPhone 3G to function as advertised.

157.    As a proximate result of Defendants' negligence, Plaintiffs and the Class suffered separate economic damages and loss from the purchase of the iPhone 3G itself, as alleged herein.

## ELEVENTH CAUSE OF ACTION

### (Common Counts and Unjust Enrichment)

158.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

159.    Defendants have benefited from their unlawful conduct as detailed above by receiving millions of dollars in revenues and profits derived from the sale of the Apple iPhone 3G and access to the ATTM 3G network.  Defendants appreciated the benefit of the receipt of such revenues and profits.

1   160.   Because Defendants were unjustly enriched and have received this excessive
2   revenue at the expense of Plaintiffs and the Class based on false and misleading statements
3   regarding the iPhone 3G, its capacity, and its ability to perform its stated functions, it would be
4   inequitable for Defendants to retain the benefits they gained from purchases by Plaintiffs and the
5   Class of the iPhone 3G and the exclusive, required service plans from ATTM.

6   161.   Plaintiffs and other Class members are entitled to the establishment of a
7   constructive trust consisting of the benefit conferred upon Defendants in the form of the excess
8   revenues and profits derived from the sale of these products and services and the return of any
9   monies by which Defendants were unjustly enriched.

10                              **TWELFTH CAUSE OF ACTION**
11                              **(Negligent Misrepresentation*)*

12   162.   Plaintiffs incorporate by reference each and every preceding paragraph as though
13   fully set forth herein.

14   163.   Apple and ATTM represented that the iPhone 3G and the required ATTM 3G
15   service plan would provide customers with sustained and reliable connectivity to the 3G
16   network, thereby obtaining materially faster data transfer rates.  Apple and ATTM advertised the
17   iPhone 3G as "Twice as Fast" on what was represented to be the "nation's fastest 3G network."
18   Apple also inserted the descriptive phrase "3G" in the name of the phone, representing that users
19   can reasonably expect regular access to a 3G network on the iPhone 3G.

20   164.   Defendants had no reasonable grounds for believing their representations were
21   true because the iPhone 3G has consistently had issues with providing reliable 3G network
22   connectivity, and the ATTM 3G network could not provide consistent 3G network connectivity
23   to customers who purchased service for their iPhone 3G, based on ATTM's overburdened and
24   under-supported 3G network.  Defendants should have known, or had a duty to learn, about the
25   true facts that contradicted their representations.

26   165.   In making these representations to Plaintiffs and the Class, Defendants Apple and
27   ATTM intended to induce Plaintiffs and the Class to purchase the iPhone 3G.

28   / / /

166.    At all times herein, Plaintiffs and the Class were unaware of the falsity of Defendants' statements.

167.    Plaintiffs and the Class reasonably acted in response to the statements made by Defendants when they purchased an iPhone 3G and were required to also sign up for a premium ATTM data service plan and other increased costs.

168.    As a proximate result of Defendants' negligent misrepresentations,  Plaintiffs and Class members purchased an iPhone 3G and are locked into a two-year service plan with ATTM for 3G network connectivity that is spotty at best and for which Plaintiffs and Class members pay a premium.

169.    Plaintiffs and the Class have been damaged and therefore request appropriate relief as described below.

## THIRTEENTH CAUSE OF ACTION

### (Fraud and Deceit)

170.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

171.    Defendants, from the time the iPhone 3G and service plans on the ATTM 3G network were first made available to Class members, consistently deceived Plaintiffs and the Class by: (1) making false uniform misrepresentations to Plaintiffs, the Class and the public, including, but not limited to, claims that the iPhone 3G and required service plans would provide customers with consistent 3G network connectivity; and (2) concealing from Plaintiffs, the Class and the public, despite having superior, if not exclusive, knowledge of material facts to the contrary and despite having partially spoken on the issue, that the iPhone 3G would not consistently function in terms of consistently accessing a 3G network and providing increased data transfer rates due to the manufacture and design of the iPhone 3G and the limitations of the ATTM 3G network as designed and implemented.  Plaintiffs and the Class were unaware these representations were false.

172.    Apple inserted the descriptive phrase "3G" in the name of the phone, representing to all users that they could reasonably expect faster processing rates using the iPhone 3G.

173.     Defendants suggested, asserted and/or promised the iPhone 3G, acting in combination with ATTM's 3G network, would have reliable and sustained functionality on the faster 3G network.  Defendants suggested, asserted and/or promised a phone that was "Twice as Fast" and operated on the "nation's fastest 3G network."  Such claims were false for the reasons detailed above.

174.     Defendants either misrepresented or suppressed the material fact that the iPhone 3G network could not provide reliable and sustained 3G network connectivity.  Defendants suppressed the material fact that the ATTM 3G network could not handle the influx of users and bandwidth demands as a result of the marketing and sale of the iPhone 3G.

175.     When Defendants made the foregoing misrepresentations, they knew or recklessly disregarded them to be false and/or had no reasonable basis for believing them to be true.

176.     The misrepresentations and concealment of material facts were made and conducted by Defendants with the intent to mislead and induce Plaintiffs and the Class to purchase the iPhone 3G and the required ATTM 3G service plan, and had the effect of doing so, even if they already had and used the older iPhone models that employed 2G EDGE technology.

177.     In affirmative response to the false, fraudulent and/or willful misrepresentations and concealment of material facts by Defendants, Plaintiffs and Class members were induced to and did purchase an iPhone 3G and were required to pay for a premium ATTM 3G service plan.  Plaintiffs and other Class members reasonably based their decision to purchase these phones and plans on the misrepresentations and omissions of material fact by Apple and ATTM, and were damaged thereby.

178.     Defendants' acts were done willfully, maliciously, with fraudulent intent and with deliberate disregard of the rights of Plaintiffs and the Class, requiring an award of exemplary damages in addition to actual damages.

179.     Plaintiffs and the Class request appropriate relief as described below.

/ / /

/ / /

/ / /

40

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief)

180.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

181.     An actual controversy over which this Court has jurisdiction now exists between Plaintiffs, the Class and Defendants concerning their respective rights, duties and obligations for which Plaintiffs desire a declaration of rights under the applicable claims asserted herein.

182.     Plaintiffs and Class members may be without adequate remedy at law, rendering declaratory relief appropriate in that:

(a)     damages may not adequately compensate the Class members for the injuries suffered, nor may other claims permit such relief;

(b)     the relief sought herein in terms of ceasing such practices or providing a full and complete corrective disclosure may not be fully accomplished by awarding damages; and

(c)     if the conduct complained of is not enjoined, harm will result to Class members and the general public because Defendants' wrongful conduct is continuing and persons are entitled to the direct monies taken from them.

183.     Plaintiffs request a judicial determination and declaration of the rights of Class members, and the corresponding responsibilities of Defendants.  Plaintiffs also request an order declaring Defendants are obligated to pay restitution to all members of the Class as appropriate and otherwise pay over all funds Defendants wrongfully acquired either directly or indirectly because of the illegal conduct by which Defendants were unjustly enriched.

184.     A judicial declaration is necessary and appropriate at this time under the circumstances so the parties may ascertain their respective rights and duties.

185.     Class members will be irreparably harmed unless the unlawful actions of the Defendants are enjoined, because Apple and ATTM will continue to advertise their false and misleading statements regarding the iPhone 3G.  To that end, Plaintiffs request an order compelling disclosures and/or disclaimers on the outside of the iPhone boxes or advertising material prior to making any electronics device purchase.  Absent injunctive relief, Defendants

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT                    CASE NO.: M 09-02045 JW

will continue to market, distribute, and sell iPhones to the detriment of their customers. Plaintiffs have not previously asked for such injunctive relief from the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class defined herein, as applicable, pray for judgment and relief as follows as appropriate for the above causes of action:

1.      An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

2.      A temporary, preliminary and/or permanent order for injunctive relief enjoining Defendants from pursuing the policies, acts and practices complained of herein;

3.      A declaratory judgment stating that Defendants may not pursue the policies, acts and practices complained of herein;

4.      A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants to undertake an informational campaign to inform members of the general public as to the wrongfulness of Defendants' practices;

5.      An award of actual, statutory and/or exemplary damages, as appropriate for the particular Causes of Action;

6.      An order requiring disgorgement of Defendants' ill-gotten gains by requiring the payment of restitution to Plaintiffs and members of the Class, as appropriate for the particular Causes of Action;

7.      Reasonable attorneys' fees;

8.      All related costs of this suit;

9.      Pre- and post-judgment interest; and

10.     Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all claims so triable.

/ / /

/ / /

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT                    CASE NO.: M 09-02045 JW

1   I, Alan M. Mansfield, am the ECF user whose ID and password are being used to file this

2   Joint Motion and accompanying papers.  In compliance with General Order 45, section X.B., I

3   hereby attest that I have on file the concurrences for any signatures indicated by a "conformed"

4   signature (/S) within this e-filed document.

5                                                   By:   S/Alan M. Mansfield
                                                            Alan M. Mansfield
6

7
       DATED:  October 21, 2009                     Respectfully Submitted,
8
                                                    WHATLEY DRAKE & KALLAS LLC
9
                                                    By:  S/Joe R. Whatley, Jr.
10                                                        Joe R. Whatley, Jr.
                                                          jwhatley@wdklaw.com
11
                                                    1540 Broadway, 37th Floor
12                                                  New York, NY 10036
                                                    Tel: (212) 447-7070
13                                                  Fax: (212) 447-7077

14                                                  Adam Plant
                                                    aplant@wdklaw.com
15                                                  2001 Park Place North, Suite 1000
                                                    Birmingham, AL  35203
16                                                  Tel: (205) 328-9576
                                                    Fax: (205) 328-0669
17
                                                    LEAD CLASS COUNSEL
18

19                                                  PLAINTIFFS' EXECUTIVE COMMITTEE

20                                                  THE CONSUMER LAW GROUP

21                                                  By:  S/Alan M. Mansfield
                                                         Alan M. Mansfield
22                                                       alan@clgca.com
                                                    9466 Black Mountain Rd., Suite 225
23                                                  San Diego, CA 92126
                                                    Tel: (619) 308-5034
24                                                  Fax: (888) 341-5048
                                                    (Counsel for Plaintiff William Gillis)
25

26

27

28

MASTER ADMINISTRATIVE CONSOLIDATED AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

CARELLA BYRNE BAIN GILFILLAN
CECCHI STEWART & OLSTEIN
James E. Cecchi
jcecchi@carellabyrne.com
Melissa E. Flax
mflax@carellabyrne.com
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700
Fax: (973) 994-1744

COUGHLIN STOIA GELLER RUDMAN &
ROBBINS, LLP
Shawn Williams
100 Pine Street, Suite 2600
San Francisco, CA  94111
Tel:  (415) 288-4545
Fax: (415) 288-4534

SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK S. REICH
58 South Service Road, Suite 200
Melville, NY  11747
Tel:  (631) 367-7100
Fax: (631) 367-1173
(Counsel for Plaintiff Avi Koschitzki)

EMERSON POYNTER LLP
Scott E. Poynter
scott@emersonpoynter.com
Christopher D. Jennings
cjennings@emersonpoynter.com
Gina M. Dougherty
gdoughterty@emersonpoynter.com
The Museum Center
500 President Clinton Ave., Suite 305
Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

EMERSON POYNTER LLP
John G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058
Tel: (281) 488-8854
Fax: (281) 488-8867
(Counsel for Plaintiff Aaron Walters)

44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FARUQI & FARUQI, LLP
Adam R. Gonnelli
agonnelli@faruqilaw.com
David H. Leventhal
dleventhal@faruqilaw.com
Jamie R. Mogil
jmogil@faruqilaw.com
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
(Counsel for Plaintiffs Timothy Ritchie, Onel
Gonzalez, Ron J. Brayteson, Alyce R. Payne,
William French and Karen Michaels)

FINKELSTEIN THOMPSON LLP
Rosemary M. Rivas
rrivas@finkelsteinthompson.com
100 Bush Street, Suite 1450
San Francisco, CA 94104
Tel: (415) 398-8700
Fax: (415) 398-8704

FINKELSTEIN THOMPSON LLP
Burton H. Finkelstein
bfinkelstein@finkelsteinthompson.com
Mila F. Bartos
mbartos@finkelsteinthompson.com
Karen J. Marcus
kmarcus@finkelthompson.com
1050 30th Street NW
Washington, D.C. 20007
Tel: (202) 337-8000
Fax: (202) 337-8090
(Counsel for Plaintiff Haig P. Ashikian)

GLANCY BINKOW & GOLDBERG LLP
Marc L. Godino
mgodino@glancylaw.com
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
(Counsel for Plaintiff Jacob Medway)

HENINGER GARRISON DAVIS, LLC
W. Lewis Garrison, Jr.
lewis@hgdlawfirm.com
Brian D. Hancock
bdhancock@hgdlawfirm.com
Gayle L. Douglas
gdouglas@hgdlawfirm.com
2224 First Avenue North
Birmingham, AL 35203
Tel: (205) 326-3336
Fax: (205) 326-3332
(Counsel for Plaintiffs Jessica Alena Smith and
Wilton Lee Triggs, II)

HIDEN ROTT & OERTLE LLP
Michael Ian Rott
mrott@hrollp.com
David V. Hiden, Jr.
dhiden@hrollp.com
Eric M. Overholt
eoverholt@hrollp.com
2635 Camino Del Rio South, Suite 306
San Diego, CA 92108
Tel: (619) 296-5884 / Fax: (619) 296-5171
(Counsel for Plaintiffs Peter Keller and William
Gillis)

LITIGATION LAW GROUP
Gordon M. Fauth, Jr.
gmf@classlitigation.com
1801 Clement Avenue, Suite 101
Alameda, CA 94501
Tel: (510) 238-9610
Fax: (510) 337-1431
(Counsel for Plaintiff James R. Pittman)

SCHOENGOLD & SPORN P.C.
Jay P. Saltzman
jay@spornlaw.com
19 Fulton Street, Suite 406
New York, NY 10038
Tel: (212) 964-0046
Fax: (212) 267-8137
(Counsel for Plaintiff Eulardi Tanseco)

1

ADDITIONAL CO- COUNSEL:

2

DOYLE LOWTHER LLP
William J. Doyle II

3

bill@doylelowther.com
John Lowther

4

john@doylelowther.com
James Hail

5

jim@doylelowther.com
9466 Black Mountain Road, Suite 210

6

San Diego, CA 92126
Tel: (619) 573-1700

7

Fax: (619) 573-1701
(Co-Counsel for Plaintiffs Peter Keller and

8

Aaron Walters)

9

SEEGER WEISS, LLP
Stephen A. Weiss

10

sweiss@seegerweiss.com
One William Street

11

New York, NY 10004
Tel: (973) 994-1700

12

Fax: 9973) 994-1744

13

LAW OFFICE OF D. JOSHUA STAUB
D. Joshua Staub

14

P. o. Box 1914
Santa Monica, CA 90406-1914

15

Tel: (310) 576-7770
Fax: (310) 496-0702

16

(Co-Counsel for Plaintiff Haig P. Ashikian)

17

TRIMMIER LAW FIRM
Edward S. Reisinger

18

ereisinger@trimmier.com
Haydn M. Trechsel

19

haydn@trimmier.com
Jonathan Lee Kudulis

20

jkudulis@trimmier.com
2737 Highland Avenue

21

Birmingham, AL 35201
Tel: (205) 251-3151

22

Fax: (205) 322-6444
(Co-Counsel for Plaintiffs Jessica Alena Smith

23

and Wilton Lee Triggs, II)

24

STROM LAW FIRM, LLC
J. Preston "Pete" Strom Jr.

25

petestrom@stromlaw.com
Mario A. Pacella

26

mpacella@stromlaw.com
2110 N. Beltline Blvd., Suite A

27

Columbia, SC 29204-3999
Tel: (803) 252-4800

28

Fax: (803) 252-4801
(Counsel for Plaintiff Ione Rucker Jamison)

47