IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In Re: Apple iPhone 3G Products Liability Litigation | MDL NO. C 09-02045 JW<br><br>**ORDER GRANTING DEFENDANT AT&T MOBILITY, LLC'S MOTION TO DISMISS MASTER CONSOLIDATED COMPLAINT; DENYING AS MOOT ALL OTHER MOTIONS** |

## **I. INTRODUCTION**

Plaintiffs[1] bring this putative class action against Apple, Inc. ("Apple") and AT&T Mobility, LLC ("ATTM") (collectively, "Defendants"), alleging, *inter alia*, violation of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, violation of California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*, and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* Plaintiffs allege that Defendants misrepresented the capabilities of the iPhone 3G on ATTM's 3G data network while requiring Plaintiffs to pay a premium for 3G service.

Presently before the Court are (1) various motions by Defendant ATTM to compel arbitration,[2] (2) Defendant Apple's Motion to Dismiss the Master Administrative Consolidated

---

[1] Plaintiffs are Haig P. Ashikian, Ron J. Brayteson, William French, William J. Gillis Jr., Onel Gonzalez, Ione Jamison, Peter Keller, Avi Koschitzki, Jacob Medway, Karen Michaels, Alyce R. Payne, James R. Pittman, Timothy Ritchie, Alena Smith, Eulardi Tanseco, Wilton Lee Triggs II, and Aaron Walters. Plaintiffs filed actions in various district courts around the country. On July 1, 2009, the actions were consolidated by the Judicial Panel on Multi-district Litigation and assigned to this Court for pretrial procedures. All docket entries in this Order, unless otherwise noted, refer to the MDL case 09-02045-JW.

[2] (See Docket Item Nos. 70, 81, 92, 100, 110, 121, 131, 132.)

Complaint,[3] (3) Defendant Apple's Motion for a More Definite Statement,[4] (4) Defendant ATTM's Motion to Strike Portions of the Master Administrative Complaint,[5] (5) Defendant ATTM's Motion to Dismiss the Master Administrative Consolidated Complaint,[6] and (6) Defendant ATTM's Motion to Dismiss Plaintiff Jacob Medway's Amended Class Action Complaint.[7]

The Court conducted a hearing on March 1, 2010. Based on the papers submitted to date and oral argument, the Court GRANTS Defendant ATTM's Motion to Dismiss the Master Administrative Consolidated Amended Complaint and DENIES as moot all other Motions.

## II. BACKGROUND

### A. Factual Allegations

In a Master Administrative Consolidated Amended Complaint filed on October 21, 2009,[8] Plaintiffs allege as follows:

Plaintiffs are residents of various states who purchased Defendant Apple's iPhone 3G and subscribed to Defendant ATTM's service plan for use of the iPhone 3G.[9] Defendant Apple is a California corporation that is licensed to do, and is doing, business in California and throughout the United States. (Id. ¶ 25.) Its principal place of business is in Cupertino, California. (Id.) At all relevant times, Apple designed, manufactured, promoted, marketed, distributed, and sold the iPhone 3G throughout the United States and California. (Id.) Defendant ATTM is a Delaware corporation that is licensed to do, and is doing, business in

---

[3] (hereafter, "Apple's Motion to Dismiss," Docket Item Nos. 62, 63.)

[4] (Docket Item No. 66.)

[5] (Docket Item No. 69.)

[6] (hereafter, "ATTM's Motion to Dismiss," Docket Item No. 112.)

[7] (Docket Item No. 137.)

[8] (hereafter, "MAC," Docket Item No. 44.)

[9] (MAC ¶¶ 8-24.) The states are California, Florida, Texas, North Carolina, New York, Washington, New Jersey, Alabama, Arkansas, and Georgia. (See id.)

2

California and throughout the United States. (Id. ¶ 26.) ATTM's principal place of business is in Atlanta, Georgia. (Id.) ATTM transacts business in California and at all relevant times assisted in the design, promotion, marketing, provision and sale of the iPhone 3G. (Id.) At all relevant times, ATTM was—and still is—the exclusive provider of the telephone and data service plans for the iPhone 3G throughout the United States and in California. (Id.)

Before July 2008, Apple iPhones operated on a 2G network. (MAC ¶ 1.) To lure additional customers and entice existing customers to upgrade to the "iPhone 3G," Apple and ATTM—the exclusive network provider for the iPhone 3G—released the iPhone 3G with great fanfare. (Id.) Both Apple and ATTM uniformly advertised the iPhone 3G as "Twice as Fast" in comparison to the "2G" EDGE network on which the earlier iPhone operated. (Id. ¶ 3.) Through marketing to consumers, and even by the very name of the phone itself, Defendants engaged in a campaign to represent to consumers that the new iPhone would be significantly faster with regard to upload and download transfer rates and, therefore, superior to the predecessor iPhone, which operated on the slower 2G network. (Id. ¶ 4.) Defendants' representations regarding the iPhone 3G were false or misleading. (Id. ¶ 6.) The iPhone 3G did not result in the "tremendous value" or jump in technology in terms of being "twice as fast" that ATTM and Apple represented, because it could not actually perform to 3G standards. (Id.) Consumers who purchased the iPhone 3G mainly still connect to the 2G EDGE network, not a 3G network. (Id.) Customers often receive no 3G connectivity at all, or experience a significant level of dropped calls because the iPhone 3G cannot locate an available 3G network connection. (Id.)

Class members are unable to choose any other network or carrier when using their iPhone 3G, and ATTM requires all iPhone 3G customers to sign up for a more expensive data connection plan. (MAC ¶ 45.) Apple and ATTM misled Plaintiffs and other consumers by misrepresenting material facts and not disclosing that the iPhone 3G and ATTM 3G network were faulty and failed to provide consistent connectivity on a 3G network. (Id.) Both Apple and ATTM profited by selling iPhone 3G devices without the appropriate

3

infrastructure in place and the presence of defective hardware and software in the iPhone 3G. (Id. ¶ 56.)

Apple and ATTM acted in concert to sell the iPhone 3G and either knew, should have known, or were obligated to understand that they were trying to sell more iPhone 3G devices than the existing ATTM 3G network could handle, and the iPhone 3G itself suffered from defective hardware and software. (MAC ¶ 76.) Had the true facts been disclosed, Plaintiffs would not have purchased the iPhone 3G at the prices and under the terms and conditions to which they were and are subjected. (Id.)

On the basis of the allegations outlined above, Plaintiffs allege fourteen causes of action: (1) Violation of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) Violation of California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (3) Violation of California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (4) Breach of Express Warranty and Implied Warranty of Merchantability; (5) Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*; (6) Violation of Title 33, Chapter 501 of the Florida Consumer Protection Act; (7) Violation of Title 56, Chapter 8 of the New Jersey Consumer Protection Act; (8) Violation of Section 349 of the New York General Business Law; (9) Violation of North Carolina General Statute §§ 75-1, *et seq.*; (10) Negligence; (11) Common Counts and Unjust Enrichment; (12) Negligent Misrepresentation; (13) Fraud and Deceit; and (14) Declaratory Relief.

**B. Procedural History**

On July 1, 2009, the Judicial Panel on Multi-district Litigation transferred twelve separate actions to the Court. (See Docket Item No. 1.) On September 22, 2009, the Court granted the parties' motions to appoint interim class counsel, to consolidate cases for pretrial purposes, and to file a consolidated master complaint. (See Docket Item No. 16.) On October 21, 2009, Plaintiffs filed their Master Administrative Consolidated Amended Complaint. (Docket Item No. 44.)

On November 23, 2009, the Court granted voluntary dismissal of Dickerson v. Apple Computer Inc., C 09-03577-JW, without prejudice. (Docket Item No. 54.) On December 4, 2009,

Plaintiff Medway filed an Amended Class Action Complaint for Damages and Equitable Relief in case C 09-00330-JW, and the Court granted voluntary dismissal of Defendant ATTM in <u>Gillis v. Apple Computer, Inc.</u>, C 09-00122-JW without prejudice. (See Docket Item Nos. 59-61.)

Presently before the Court are Defendants' various Motions. Since Defendant ATTM's Motion to Dismiss the Master Administrative Consolidated Amended Complaint may be dispositive, the Court considers it first.

### III. STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief may be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990); <u>Robertson v. Dean Witter Reynolds, Inc.</u>, 749 F.2d 530, 533-34 (9th Cir. 1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." <u>Usher v. City of Los Angeles</u>, 828 F.2d 556, 561 (9th Cir. 1987). Any existing ambiguities must be resolved in favor of the pleading. <u>Walling v. Beverly Enters.</u>, 476 F.2d 393, 396 (9th Cir. 1973).

However, mere conclusions couched in factual allegations are not sufficient to state a cause of action. <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986); <u>see also</u> <u>McGlinchy v. Shell Chem. Co.</u>, 845 F.2d 802, 810 (9th Cir. 1988). The complaint must plead "enough facts to state a claim for relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). Thus, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." <u>Moss v. U.S. Secret Serv.</u>, 572 F.3d 962, 969 (9th Cir. 2009). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1129 (9th Cir. 2000).

5

## IV. DISCUSSION

Defendant ATTM moves to dismiss all causes of action on the ground that they are preempted by the Federal Communications Act because the gravamen of Plaintiffs' claims is a challenge to ATTM's 3G rates and market entrance. (ATTM's Motion to Dismiss at 6.)

### A. **Federal Preemption**

The Supremacy Clause of United States Constitution provides that federal laws and treaties "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2. The Supreme Court has recognized three types of federal preemption of state law under the Supremacy Clause: (1) express preemption, where Congress states explicitly the preemptive effect of its legislation on state law; (2) field preemption, where Congress intends for federal law to occupy exclusively an entire field of regulation; and (3) conflicts preemption, where it is impossible for a private party to comply with both state and federal requirements. English v. General Electric Co., 496 U.S. 72, 78-79 (1990).

"If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." Altria Group, Inc. v. Good, 129 S. Ct. 538, 543 (2008). Preemption analysis begins with "the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). The states' historic police powers include consumer protection laws. See California v. ARC Am. Corp., 490 U.S. 93, 101 (1989).

### B. **Preemption Under the Federal Communications Act**

The Federal Communications Act of 1934 ("FCA") regulates "common carriers." 47 U.S.C. §§ 151, *et seq.* A common carrier is "any person engaged in rendering communication service for hire to the public." Howard v. America Online Inc., 208 F.3d 741, 752 (9th Cir. 2000). "Congress created the [Federal Communications Commission ("FCC")] to enforce the Communications Act. The Supreme Court's opinions have repeatedly emphasized that the FCC's judgment regarding how the public interest is best served is entitled to substantial judicial deference." Id. (citations and quotation marks omitted).

6

The FCA contains a broad preemption clause: "[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service." 47 U.S.C. § 332(c)(3). "This clause completely preempt[s] the regulation of rates and market entry . . . ." Bastien v. AT&T Wireless Servs., Inc., 205 F.3d 983, 987 (7th Cir. 2000). However, the FCA also contains a savings clause that "allow[s] claims that do not touch on the areas of rates or market entry": "Nothing in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." Id. (citing 47 U.S.C. § 414).

> The two clauses read together create separate spheres of responsibility, one exclusively federal and the other allowing concurrent state and federal regulation. Cases that involve 'the entry of or the rates charged by any commercial mobile service or any private mobile service' are the province of federal regulators and courts. The states remain free to regulate 'other terms and conditions' of mobile telephone service.

Id. (citations omitted).

"In addition to rates and service, federal regulations expressly dictate the terms under which a provider may enter a new market." Id. The FCA "makes the FCC responsible for determining the number, placement and operation of the cellular towers and other infrastructure." Id. (citing 47 C.F.R. §§ 24.103, 24.132, 24.232).

"In practice, most consumer complaints will involve the rates charged by telephone companies or their quality of service." Bastien, 205 F.3d at 988. "Any claim for excessive rates can be couched as a claim for inadequate services and vice versa." AT&T Co. v. Central Office Tel., Inc., 524 U.S. 214, 223 (1998). This is because "[r]ates do not exist in isolation. They have meaning only when one knows the services to which they are attached." Id. "[A] complaint that service quality is poor is really an attack on the rates charged for the service . . . ." Bastien, 205 F.3d at 988.

The key inquiry is "the nature of the claims . . . and what the effect of granting the relief requested would be." Id. at 989. Thus, the FCA preempts state law claims where the claims "challeng[e] the reasonableness or legality of [a] particular rate or rate practice." See Ball v. GTE Mobilnet of Cal., 81 Cal. App. 4th 529, 543 (Cal. Ct. App. 2000). Additionally, where the relief

7

sought would "alter the federal regulation of tower construction, location and coverage, quality of service and hence rates for service[,]" the claims tread upon the FCC's role in regulating the "modes and conditions under which [a wireless carrier] may begin to offer service in [a particular market]." See id.

## C. Effect of the FCA on Plaintiffs' Claims

Plaintiffs allege as follows:

> Since at least June 2008, Defendants have uniformly misrepresented to the public the material characteristics of superior speed, strength and performance that consumers would obtain from Apple's iPhone 3G through an extensive advertising campaign. Both Apple and ATTM profited by selling iPhone 3G devices without the appropriate infrastructure in place and the presence of defective hardware and software in the iPhone 3G. ATTM uniformly advertises and sells 3G network data plans for the iPhone 3G and requires Class members to pay higher rates for such plans. Class members are unable to choose any network or carrier other than ATTM when using their iPhone 3G. ATTM profited by requiring Plaintiffs and Class members to upgrade their service plans at a $10 per month premium over earlier iPhone plans; pay a $28 per phone equipment fee; and to enter into a new two-year data connection contract at one of the highest monthly plan levels available from ATTM. Apple iPhone customers on average paid ATTM 60% more in monthly fees than ATTM received from its average cellular telephone customers who were not on the exclusive licensing agreement with Apple for the iPhone 3G. Class members paid higher rates so that they could specifically access a 3G network, yet often consumers could only access the slower 2G network.
>
> Both companies profited from their misleading representations by gaining market share, by locking consumers into two-year contracts, and by receiving billions of dollars in additional revenue by selling millions of new iPhone 3G devices and rate plans, all at the expense of customers who were unable consistently to access the product and services Defendants represented consumers would obtain with an iPhone 3G.
>
> Defendants advertised the iPhone 3G as "twice as fast" as the previous generation iPhone. Contrary to Defendants' claims, Plaintiffs and the Class experience connectivity on the 3G network only a fraction of the time they are connected to the ATTM network, or receive no 3G connectivity at all for a significant portion of time. The previous generation iPhone operated on a second generation, or 2G, multiple access standard known as EDGE, which had a maximum data transfer rate of 237 kbps (kilobytes per second). The iPhone 3G was designed to operate both on the 2G network and a third generation, or 3G, multiple access standard network. For many of the initial iPhone 3G models, the maximum data transfer rate was only increased to 384 kbps—meaning it would never actually be "twice as fast," contrary to Defendants' representations.
>
> The iPhone 3G suffers from poor connectivity to the ATTM 3G network due either to a hardware flaw—demanding too much power to operate routinely at 3G bandwidth levels and the iPhone 3G device's sensitivity or inability to consistently access 3G network radio connectivity—or a software flaw in the programmed algorithms. Further, when the iPhone 3G was released, the ATTM 3G network lacked the established infrastructure necessary to handle the anticipated increased traffic and connectivity demands for the iPhone 3G, resulting in an overburdened and oftentimes inaccessible 3G network for Apple iPhone 3G users.
>
> Whether attributable to the phone, the network or both, the fact that customers experience a significant number of dropped calls is further evidence that iPhone 3G users do

> not consistently experience the represented benefits of 3G service, increased data transfer rates. Disclosures regarding the true nature and limitations of the iPhone 3G and ATTM's 3G network should have been provided to customers before they purchased an iPhone 3G.

(MAC ¶¶ 44-46, 55-56, 58, 61-63, 65, 71, 92.)

The Court finds that Plaintiffs' claims are based on the core allegation that Defendants knew that ATTM's 3G network was not sufficiently developed to accommodate the number of iPhone 3G users, and that Defendants deceived Plaintiffs into paying higher rates for a service that Defendants knew they could not deliver. Similar to the allegations in Bastien, where the court found preemption, Plaintiffs' allegations target the sufficiency of ATTM's network infrastructure and the ability of Apple's iPhone 3G to operate within the network to deliver the promised "twice as fast" performance. See Bastien, 205 F.3d at 985-86. As the court in Bastien recognized, "[w]hile these charges appear more like traditional state law claims, they are all founded on the fact that [the wireless carrier defendant] had not built more towers and more fully developed its network at the time [the plaintiff] tried to use the system." Id. at 989. The allegations also implicate the reasonableness of ATTM's rates in that Plaintiffs allege that they were paying for 3G service, for which ATTM charged a higher rate, but receiving 2G service. The Court finds that Plaintiffs' claims are an attack on ATTM's rates and 3G market entry, and therefore tread on ground reserved by the FCA. Thus, the Court finds that Plaintiffs' state law claims are preempted by the FCA as to Defendant ATTM.[10]

---

[10] Although the FCA does not preempt federal claims pertaining to rates and market entry, the Court finds that Plaintiffs' sole federal claim under the Magnuson-Moss Warranty Act is not viable in the absence of any state law warranty claims because the Magnuson-Moss Warranty Act merely provides a federal cause of action for state law implied warranty claims. See 15 U.S.C. § 2301(7); Stearns v. Select Comfort Retail Corp., No. 08-2746 JF, 2009 WL 1635931, at *9 (N.D. Cal. June 5, 2009).

1 **D.    Post-Bastien Views of the Scope of FCA Preemption**

2     **1.    FCC Opinions**

3     In support of their contention that the FCA does not preempt their state law claims, Plaintiffs rely on a post-Bastien FCC opinion, which found that "Section 332(c)(3) does not generally preempt damage awards based on state contract or consumer protection laws."[11]

6     As a matter of federal law, courts should "defer to the reasonable judgment of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering." Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 739 (1996) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)).  Thus, the Court considers the applicability of FCC opinions with regard to the preemptive effect of Section 332(c)(3).

11     In In re Wireless Consumers Alliance, a California plaintiff filed a class action against a commercial mobile radio service ("CMRS') provider, alleging state law claims and seeking a declaratory ruling from the FCC to determine "whether the Federal Communications Act preempts state courts from awarding monetary relief as a remedy for fraud and false advertising claims."[12] Although the FCC opined that a state court does not *per se* engage in ratemaking "by awarding damages to customers damaged by a CMRS provider's breach of contract or fraud violation," the FCC expressly agreed with the Seventh Circuit's finding in Bastien that "state law claims may, in specific cases, be preempted by Section 332." 15 F.C.C.R. at 17035.  The FCC found that its conclusion was not in conflict with Bastien because Bastien stands for the proposition that "it is the substance, not merely the form of the state claim or remedy, that determines whether it is preempted under Section 332."  Id. at 17037.  "[T]he question of whether a specific damage award or a specific

---

[11] (Plaintiffs' Opposition to Motion of AT&T Mobility LLC to Dismiss Master Administrative Consolidated Amended Complaint at 3-4, hereafter, "Plaintiffs' ATTM Opposition," Docket Item No. 143 (citing In re Wireless Consumers Alliance, Inc., 15 F.C.C.R. 17021, 17022 (F.C.C. 2000)).)

[12] 15 F.C.C.R. at 17023.  The state class action was Spieholz v. Los Angeles Cellular Tel. Co., 2002 WL 34421007 (Cal. Sup. Ct. Oct. 23, 2002).  The state court case was stayed pending the FCC's resolution of the issue on petition.

grant of injunctive relief constitutes rate or entry regulation prohibited by Section 332(c)(3) would depend on all facts and circumstances of the case." Id. at 17041.

The Court finds that the FCC's ruling in In re Wireless Consumers Alliance is limited to whether the FCA *per se* preempts state courts from awarding monetary relief against CMRS providers. See 15 F.C.C.R. at 17040. Despite Plaintiffs' contentions to the contrary, In re Wireless Consumers Alliance does not reach the relevant issue here: whether Plaintiffs' state law claims involve the Court in regulating "the entry of or the rates charged by" Defendants in the particular factual circumstances of this case. Since resolving Plaintiffs' state law claims would require the Court to make a determination of the reasonableness of Defendants' rates in light of the rates charged, the Court finds that those claims fall within the preemptive scope of Section 332(c)(3).[13]

In another opinion, which Plaintiffs do not rely on directly but which nonetheless holds some relevance here, the FCC addressed the issue of whether Section 332(c)(3) preempts state law claims alleging that CMRS providers violated state consumer fraud laws by charging for calls in whole minute increments ("rounding up") and charging subscribers for incoming calls. In re Sw. Bell Mobile Sys., Inc., 14 F.C.C.R. 19898, 19898-99 (F.C.C. 1999). In that case, the FCC found that pursuant to Section 332(c)(3), states do not have authority to prohibit such practices because doing so would effectively regulate the rates charged by CMRS providers. Id. at 19908. However, the FCC rejected the proposition that "state contract or consumer fraud laws relating to the disclosure of rates and rate practices have generally been preempted with respect to CMRS." Id. The FCC pointed to the legislative history of Section 332, which clarified that "other terms and conditions of commercial mobile services," which states are expressly allowed to regulate, include "such matters

---

[13] The Court notes that in the state class action underlying In re Wireless Consumers Alliance, the California court of appeals ultimately rejected Bastien and found that the state law claims were not preempted. See Spielholz v. Superior Court, 86 Cal. App. 4th 1366 (Cal. Ct. App. 2001). The Spieholz court interpreted the statutory phrase "regulate . . . the rates" narrowly to only encompass circumstances in which the "principal purpose and direct effect" of a judicial act "are to control rates." Id. at 1374. However, the United States Supreme Court has rejected such a narrow view of when a case involves rates or ratesetting, that is, "[r]ates . . . do not exist in isolation. They have meaning only when one knows the services to which they are attached." Am. Tel. and Tel., 524 U.S. at 223.

11

1  as customer billing information and practices and billing disputes."[14]  Here, the Court finds that
2  Plaintiffs do not complain that Defendants have engaged in a deceptive or unfair billing practice.
3  Instead, Plaintiffs directly allege that they have not received the level of cell phone service that they
4  paid for, and that Defendants do not have the infrastructure necessary to provide that level of
5  service.  Thus, Plaintiffs' claims relate to entry of or rates charged by a CMRS provider, not to other
6  terms and conditions of commercial mobile services that are left open to state regulation.

7  Neither of the two FCC opinions dealing with the scope of FCA preemption of state law
8  remedies are contrary to the Court's finding of preemption here.  In In re Wireless Consumers
9  Alliance, the FCC found that the FCA does not *per se* preempt all state law claims for monetary
10  damages against a CMRS provider, but expressly concurred with the central holding of Bastien that
11  the FCA may preempt state law claims depending on the particular factual circumstances of each
12  case.  In In re Sw. Bell Mobile Sys., Inc, the FCC found that the FCA does not preempt all state
13  contract or consumer fraud laws relating to the disclosure of rates and rate practices, but recognized
14  that the legislative history of the FCA makes clear that the areas of commercial mobile service that
15  states may regulate are those that involve "such matters as customer billing information and
16  practices and billing disputes."  Since the gravamen of Plaintiffs' Complaint here is poor quality of
17  service for the price charged, and not unfair or deceptive billing practices, the Court finds that
18  Plaintiffs' state law claims fall within the scope of the FCA's preemption clause as that provision
19  has been interpreted by the FCC.

20  **2. District Court Cases Finding No Complete Preemption**

21  Courts have differed as to whether the FCA provides complete preemption of state law
22  claims.  For example, two district court cases from the Central District of California held that the
23  FCA does not completely preempt state law claims for purposes of removal jurisdiction.  See Gatton
24  v. T-Mobile USA, Inc., 2003 WL 21530815 (C.D. Cal. 2003); TPS Utilicom Svc., Inc. v. AT&T
25  Corp., 223 F. Supp. 2d 1089 (C.D. Cal. 2002).  The Central District's finding of no complete

---

[14] Id. (citing H.R. Rep. No. 103-111 (1993), *reprinted in* 1993 U.S.C.C.A.N. 378, 588.)

12

preemption, however, is not relevant to the present case because the FCA's preemption clause expressly displaces state law claims involving commercial mobile services ratesetting or market entry regardless of whether there is complete preemption for purposes of removal jurisdiction.

In <u>TPS Utilicom</u>, the court found that it did not have removal jurisdiction over an action filed in state court challenging an AT&T subsidiary's participation in an FCC auction for 422 wireless telecommunications spectrum licenses. 223 F. Supp. at 1094. Although the <u>TPS Utilicom</u> court disagreed with the finding of the Seventh Circuit in <u>Bastien</u> that Section 332(c)(3)(A) provides complete preemption,[15] which is necessary to convert state claims into a federal question, the court nonetheless dismissed the plaintiff's state law claims on express and conflict preemption grounds. <u>Id.</u> at 1096-1100, 1108. Specifically, the court found that the plaintiff's claim that it was injured by the defendants' participation in the license auction was "an attempt to regulate entry into the market for wireless communications by challenging the FCC eligibility criteria for competitive bidding on wireless licenses." <u>Id.</u> at 1108. Similarly here, the Court finds that Section 332(c) expressly preempts Plaintiffs' state law claims on the basis of the allegations in the Complaint regardless of whether the Section also provides complete preemption for purposes of providing federal question jurisdiction, which the Supreme Court has only recognized in limited circumstances.[16]

In <u>Gatton v. T-Mobile USA, Inc.</u>, another district court in the Central District of California reiterated the holding of <u>TPS Utilicom</u> that the FCA does not provide complete preemption. 2003 WL 31530185, at *6 (C.D. Cal. 2003). In <u>Gatton</u>, the court found that it did not have subject matter jurisdiction over an action filed in state court regarding a dispute between a CMRS provider and a customer. <u>Id.</u> In so finding, the court emphasized that "section 332(c)(3)(A) is limited in its

---

[15] The <u>TPS Utilicom</u> court noted that "[t]he Ninth Circuit has not decided whether the express preemption clause at 47 U.S.C. § 332(c)(3)(A) provides complete preemption." This Court also has not found any case in which the Ninth Circuit has addressed the issue directly.

[16] The three instances in which "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule,'" are: (1) ERISA § 502(a)(1)(B), <u>Met. Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 65 (1987), (2) the LMRA § 301, <u>Avco Corp. v. Aero Lodge No. 733</u>, 390 U.S. 557 (1968), and (3) claims relating to possessory rights in Indian land grants, <u>Oneida Indian Nation v. County of Oneida</u>, 414 U.S. 661, 666-67 (1974).

13

preemptive reach to choice of law rather than removal jurisdiction." Id.  Again here, subject matter jurisdiction is not at issue, so it is not necessary to find complete preemption in order to find that the FCA expressly preempts Plaintiffs' claims.

Neither TPS Utilicom nor Gatton is contrary to the Court's finding that the FCA preempts Plaintiffs' state law claims.  Both cases, however, illustrate the distinction between complete preemption, which is necessary for removal of state claims on the basis of federal question jurisdiction, and express or conflict preemption, which displace state law claims but are insufficient bases for federal question jurisdiction.  Although the Seventh Circuit in Bastien found that Section 332(c) provided complete preemption of state law claims, the Court here may properly dismiss Plaintiffs' claims on express or conflict preemption grounds without reaching the question of complete preemption.

In sum, the Court GRANTS Defendant ATTM's Motion to Dismiss on the ground of preemption.

### E.     Effect of Preemption on Defendant Apple

At issue is whether Plaintiffs' claims can proceed as to Defendant Apple in the absence of Defendant ATTM.

The Court finds that the claims alleged against Defendant Apple are inextricably tied to the claims alleged against Defendant ATTM.  Plaintiffs' claims are based on allegations that Defendants acted together to deceive Plaintiffs despite both knowing that the iPhone 3G operating in ATTM's 3G network could not perform as promised.  (See MAC ¶¶ 45, 50, 55, 58-60, 66, 76, 83, 91-92, 109-110, 118, 155, 163.)  Although some allegations state that flaws in the iPhone 3G contributed to the poor performance experienced by Plaintiffs, the gravamen of the allegations is that any defect in the iPhone 3G merely exacerbated the poor quality of service resulting from ATTM's allegedly deficient 3G network infrastructure by, for example, using more bandwidth than the network was capable of providing.  (Compare id. ¶¶ 46, 62, 80, with id. ¶¶ 56, 65, 69, 76, 83.)  Based on the allegations, the Court finds that it is unable to reasonably separate Plaintiffs' claims to pertain only to Defendant Apple.  Thus, the Court finds that the claims are preempted as to both Defendants.

Additionally, the Court finds that this case cannot proceed against Defendant Apple alone because Defendant ATTM is an indispensable party. Indispensable parties under Federal Rule of Civil Procedure 19(b) are "persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." E.E.O.C. v. Peabody W. Coal Co., 400 F.3d 774, 780 (9th Cir. 2005). The Court finds that the case could not proceed without ATTM in "equity and good conscience" because any adjudication of claims as to Defendant Apple would necessarily require a determination of the sufficiency of ATTM's 3G network infrastructure. Additionally, much of the remedy sought by Plaintiffs would require participation by ATTM.

Accordingly, the Court finds that Defendant ATTM is an indispensable party without which the claims against Defendant Apple cannot proceed.

**F.     Leave to Amend to State Claims Under the FCA**

At issue is whether the Court should grant leave to amend so that Plaintiffs may state claims under the FCA. At the hearing, Plaintiffs contend that they can state claims under Sections 201, 206, and 207 of the FCA.

The Supreme Court has recognized that Section 207 provides a private right of action for violations of Section 201(b) and regulations implementing that Section. See Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 52-55 (2007); North County Commc'ns Corp. v. California Catalog & Tech., No. 08-55048, 2010 WL 446505 (9th Cir. Feb. 10, 2010).

Upon review of the Master Administrative Consolidated Amended Complaint, the Court discerns a potential basis for asserting claims under the FCA. Thus, the Court finds that leave to amend to assert claims under the FCA is warranted.

## V.  CONCLUSION

The Court GRANTS Defendant ATTM's Motion to Dismiss the Master Administrative Consolidated Amended Complaint as preempted by the FCA with prejudice. This dismissal is as to

all state law causes of action and the Fifth Cause of Action for Violation of the Magnuson-Moss Warranty Act and applies with equal weight as to Defendant Apple. The Court DENIES as moot all other Motions.

Any amended complaint shall be filed on or before **April 26, 2010** and shall be consistent with the terms of this Order.

Dated: April 2, 2010

JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Adam Plant aplant@wdklaw.com
Adam R. Gonnelli agonnelli@faruqilaw.com
Alan M. Mansfield alan@clgca.com
Alexis Alexander Phocas aap@classlitigation.com
Andrew David Muhlbach amuhlbach@mofo.com
Anne M. Hunter Ahunter@mofo.com
Christopher D. Jennings cjennings@emersonpoynter.com
Donald M. Falk dfalk@mayerbrown.com
Gina M. Doughterty gdougherty@emersonpoynter.com
Gordon M. Fauth gmf@classlitigation.com
Heather A. Moser hmoser@mofo.com
James E. Cecchi jcecchi@carellabyrne.com
James Robert Hail jim@doylelowther.com
Jason C. Murray jmurray@crowell.com
Jay P. Saltzman jay@spornlaw.com
Joe R. Whatley jwhatley@wdklaw.com
John Allen Lowther john@doylelowther.com
John G. Emerson jemerson@emersonpoynter.com
Kathleen Taylor Sooy ksooy@crowell.com
Lynn E. Parseghian lparseghian@crowell.com
Marc Lawrence Godino mgodino@glancylaw.com
Mark S. Reich mreich@csgrr.com
Martha Kay Martin mmartin@crowell.com
Michael M. Goldberg info@glancylaw.com
Mila F Bartos mbartos@finkelsteinthompson.com
Penelope A. Preovolos Ppreovolos@mofo.com
Penelope Athene Preovolos ppreovolos@mofo.com
Rosemary M. Rivas rrivas@finkelsteinthompson.com
Scott E. Poynter scott@emersonpoynter.com
Stephen A. Weiss sweiss@seegerweiss.com
W Lewis Garrison pputman@hgdlawfirm.com
William James Doyle bill@doylelowther.com
Aaron L. Agenbroad alagenbroad@jonesday.com
Arthur William Lazear awl@hoffmanandlazear.com
Catherine Suzanne Nasser cnasser@jonesday.com
H. Tim Hoffman hth@hoffmanandlazear.com
Morgan Matthew Mack mmm@hoffmanandlazear.com

Dated: April 2, 2010                             **Richard W. Wieking, Clerk**

                                                 **By:      /s/ JW Chambers**
                                                 **Elizabeth Garcia**
                                                 **Courtroom Deputy**