WHATLEY DRAKE & KALLAS LLC
Joe R. Whatley, Jr.
jwhatley@wdklaw.com
Edith M. Kallas
ekallas@wdklaw.com
1540 Broadway, 37th Floor
New York, NY 10036
Tel: (212) 447-7070
Fax: (212) 447-7077

Adam Plant
aplant@wdklaw.com
2001 Park Place North, Suite 1000
Birmingham, AL 35203
Tel: (205) 328-9576
Fax: (205) 328-0669

Attorney for Plaintiff AARON WALTERS and
LEAD CLASS COUNSEL

[Additional counsel appear on signature pages]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| In re Apple iPhone 3G Products Liability Litigation<br>_____<br><br>THIS MATTER PERTAINS TO:<br><br>ALL ACTIONS.<br>_____ | CASE NO. M 09-02045 JW<br><br>**CLASS ACTION**<br><br>**MASTER ADMINISTRATIVE CONSOLIDATED SECOND AMENDED COMPLAINT BASED ON:** |

1.  **Violation of California Business & Professions Code § 17200,** *et seq.***;**
2.  **Violation of California Business & Professions Code § 17500,** *et seq.***;**
3.  **Violation of Consumers Legal Remedies Act, Cal. Civ. Code § 1750,** *et seq.***;**
4.  **Breach of Express Warranty and Implied Warranty of Merchantability;**
5.  **Violation of the Magnuson-Moss Warranty Act;**
6.  **Violation of Title 33, Ch. 501 of the Florida Consumer Protection Act;**
7.  **Violation of Title 56, Ch. 8 of the New Jersey Consumer Protection Act;**
8.  **Violation of § 349 of the New York General Business Law;**
9.  **Violation of N.C. Gen. Stat. § 75-1,** *et seq.***.**
10. **Negligence;**

1

| | |
|---|---|
| **11.** | **Common Counts and Unjust Enrichment;** |
| **12.** | **Negligent Misrepresentation;** |
| **13.** | **Fraud and Deceit;** |
| **14.** | **Declaratory Relief;** |
| **15.** | **Violation of the Federal Communications Act;** |
| **16.** | **Violation of Racketeer Influenced and Corrupt Organizations Act** |

**Judge:**     **Hon. James Ware**

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, based on the investigation of counsel and information that is available to the general public, and formed after a reasonable inquiry, submit this Master Administrative Consolidated Second Amended Complaint ("Complaint"). On information and belief (except where identified as being on personal knowledge), Plaintiffs make the following allegations, which likely will have evidentiary support after a reasonable opportunity for further investigation and discovery.[1]

This Complaint incorporates parties subject to this MDL proceeding and is intended to also amend the underlying Complaints in the event specific actions are sent back for trial to a particular transferee Court. If a specific action is transferred back to the transferee court, that underlying complaint will be amended to conform to the allegations of this Complaint. As to the actions that were either filed in or are pending before this Court for all purposes, this Complaint is the operative Complaint as to those actions. This Complaint does not merge all the related suits pending before this Court into a single case for all purposes nor alter the rights of any party in any respect. This Complaint shall have no effect on applicable choice of law principles and is not intended to waive any argument regarding the applicable choice of law governing these claims.

---

[1] To comply with the previous order of this Court set forth in Doc. 184, Plaintiffs have amended their complaint to include additional claims under federal law. They also, however, have pending a motion for leave to file a motion to reconsider the order dismissing state law claims in the previous complaint that this Court determined were preempted by the Federal Communications Act. That motion has not been ruled upon at the time this Complaint was filed (Doc. 187). Once that motion has been decided, Plaintiffs will conform this pleading accordingly, if necessary.

2

# I.

## __INTRODUCTION__

1.      Before July 2008, Apple iPhones operated on a 2G/2.5G network.   To lure additional customers and entice existing customers to upgrade to the "iPhone 3G," Apple Inc. ("Apple") and AT&T Mobility LLC ("ATTM")—the exclusive network provider for the iPhone 3G—as part of a joint venture agreement where ATTM paid Apple a significant subsidy estimated at several hundred dollars per iPhone, released the iPhone 3G with great fanfare.

2.      Marketing for the iPhone 3G extolled the virtues of the greater operating and network speed of the iPhone 3G, which, as its name implies, was represented as consistently operating on a faster 3G network.

3.      Apple not only named the iPhone "3G", asserting faster operating speed than the existing 2G/2.5G iPhone model and network, but also both Apple and ATTM uniformly advertised the iPhone 3G as "Twice as Fast" in comparison to the 2.0/2.5G "EDGE" network on which the earlier iPhone operated.

4.      Through marketing to consumers, and even by the very name of the phone itself, Defendants engaged in a campaign to represent to consumers that the new iPhone 3G itself would be significantly faster with regard to upload and download transfer rates and, therefore, superior to the predecessor iPhone, which operated on the slower EDGE network.

5.      In June and July 2008 news releases announcing the time for the product launch, both Apple and ATTM sounded an optimistic note for the iPhone 3G's capabilities.

6.      Defendants' representations regarding the iPhone 3G were false or misleading. The iPhone 3G did not result in the "tremendous value" or jump in technology in terms of being "twice as fact" that ATTM and Apple represented, because it could not actually perform to 3G standards.  Consumers who purchased the iPhone 3G mainly still connect to the 2G/2.5G EDGE network, not a 3G network.  Customers often receive no 3G connectivity at all.  As ATTM admitted in or about December 2009, under both types of coverage iPhone customers can access the Internet, send emails, stream music, download videos, send photos, text and talk on the phone. According to ATTM, "The only difference – with some data applications, 3G is faster

MASTER ADMINISTRATIVE CONSOLIDATED 2ND AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

than EDGE".  Thus, ATTM and Apple did not provide goods and services in accordance with the promises included in both Apple's and ATTM's advertising, based on the material differences between the promise of what a "3G" iPhone would provide over iPhone versions that operated only on the EDGE network ("Twice as fast. Half the price") and performance (similar if not slower iPhone performance overall, for higher monthly charges and additional fees).  ATTM and Apple misrepresented or failed to disclose material facts about the quality of the experience iPhone 3G consumers would actually receive, as they failed to inform consumers of material terms, conditions, or limitations on the allegedly superior 3G service provided consumers who purchased an iPhone 3G.

7.     As a result, Plaintiffs and Class members who purchased the iPhone 3G and entered into a two-year service commitment with ATTM have been injured in fact in their money or property, as set forth below.

**II.**

**PARTIES**

*The Plaintiffs*

8.     On personal knowledge, Plaintiff Haig P. Ashikian is, and at all material times was, a resident of Los Angeles County, California.  In August 2008, Ashikian purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Encino, California.  Ashikian was also required to enter into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Ashikian has suffered injury in fact and has lost money and/or property as described more fully below.

9.     On personal knowledge, Plaintiff Ron J. Brayteson is, and at all material times was, a resident of Volusia County, Florida.  In August 2008, Brayteson purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an AT&T Store in Ormond Beach, Florida.  Brayteson entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an

///

MASTER ADMINISTRATIVE CONSOLIDATED 2ND AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

equipment start up fee.  As a result of purchasing the iPhone 3G, Brayteson has suffered injury in fact and has lost money and/or property as described more fully below.

10.     On personal knowledge, Plaintiff William J. Gillis Jr. is, and at all material times was, a resident of San Diego County, California.  In August 2008, Gillis purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in San Diego, California.  Gillis entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service and an equipment start up fee.  As a result of purchasing the iPhone 3G, Gillis has suffered injury in fact and has lost money and/or property as described more fully below.

11.     On personal knowledge, Plaintiff Onel Gonzalez is, and at all material times was, a resident of Miami, Florida.  In approximately July 2008, Gonzalez purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Miami, Florida. Gonzalez entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Gonzalez has suffered injury in fact and has lost money and/or property as described more fully below.

12.     On personal knowledge, Plaintiff Ione Jamison is, and at all material times was, a resident of both Waxhaw, North Carolina, and Bethesda, Maryland.  In summer of 2008, Jamison purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Charlotte, North Carolina.  Jamison entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Jamison has suffered injury in fact and has lost money and/or property as described more fully below.

13.     On personal knowledge, Plaintiff Peter Keller is, and at all material times was, a resident of San Diego County, California.  In July 2008, Keller purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in San Diego, California. Keller entered into a monthly service agreement for iPhone service, exclusively provided by

ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Keller has suffered injury in fact and has lost money and/or property as described more fully below.

14.     On personal knowledge, Plaintiff Avi Koschitzki is, and at all material times was, a resident of Nassau County, New York.  In August 2008, Koschitzki purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Garden City, New York.  Koschitzki entered into a new monthly service agreement for the iPhone 3G, exlusively provided by ATTM, which includes a monthly premium for iPhone 3G service and an equipment start up fee.  As a result of purchasing the iPhone 3G, Koschitzki has suffered injury in fact and has lost money and/or property as described more fully below.

15.     On personal knowledge, Plaintiff Jacob Medway is, and at all material times was, a resident of Los Angeles County, California.  In September 2008, Medway purchased an Apple iPhone 3G, which Apple advertised, distributed, and/or sold, from an ATTM store in Los Angeles, California.  Medway entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Medway has suffered injury in fact and has lost money and/or property as described more fully below.

16.     On personal knowledge, Plaintiff James R. Pittman is, and at all material times was, a resident of the State of Washington.  In July 2008, Pittman purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Seattle, Washington.  Pittman was also required to enter into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee.  As a result of purchasing the iPhone 3G, Pittman has suffered injury in fact and has lost money and/or property as described more fully below.

17.     On personal knowledge, Plaintiff Timothy Ritchie is, and at all times has been, a resident of Middlesex County, New Jersey.  In September 2008, Ritchie purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Edison, New Jersey.   Ritchie entered into a monthly service agreement for iPhone service, exclusively

provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee. As a result of purchasing the iPhone 3G, Ritchie has suffered injury in fact and has lost money and/or property as described more fully below.

18. On personal knowledge, Plaintiff Jessica Alena Smith is, and at all material times was, a resident of Birmingham, Alabama. In or about July 2008, Smith purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Birmingham, Alabama. Smith entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee. As a result of purchasing the iPhone 3G, Smith has suffered injury in fact and has lost money and/or property as described more fully below.

19. On personal knowledge, Plaintiff Eulardi Tanseco is, and at all material times was, a resident of Middlesex County, New Jersey. In July 2008, Tanseco purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Bridgewater, New Jersey. Tanseco entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee. As a result of purchasing the iPhone 3G, Tanseco has suffered injury in fact and has lost money and/or property as described more fully below.

20. On personal knowledge, Plaintiff Wilton Lee Triggs II is, and at all material times was, a resident of Birmingham, Alabama. In July 2008, Triggs purchased an iPhone 3G, which Apple advertised, distributed, and/or sold, from an Apple Store in Birmingham, Alabama. Triggs entered into a monthly service agreement for iPhone service, exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee. As a result of purchasing the iPhone 3G, Triggs has suffered injury in fact and has lost money and/or property as described more fully below.

21. On personal knowledge, Plaintiff Aaron Walters is, and at all relevant times described herein was, a resident of Hazen, Arkansas. In or about July 2008, Walters purchased an iPhone 3G, which Apple and ATTM advertised, distributed, and/or sold, at an ATTM Store in Little Rock, Arkansas. Walters entered into a monthly service agreement for iPhone service,

exclusively provided by ATTM, which includes a monthly premium for iPhone 3G service, and an equipment start up fee. As a result of purchasing the iPhone 3G, Walters has suffered injury in fact and has lost money and/or property as described more fully below.

*The Defendants*

22.     Defendant Apple Inc. is a California corporation that is licensed to do, and is doing, business in California and throughout the United States. Its principal place of business is in Cupertino, California. At all relevant times, Apple designed, manufactured, promoted, marketed, distributed, and/or sold the iPhone 3G throughout the United States and California.

23.     Defendant AT&T Mobility LLC is a Delaware corporation that is licensed to do, and is doing, business in California and throughout the United States. ATTM's principal place of business is in Atlanta, Georgia. ATTM transacts business in California and at all relevant times assisted in the design, promotion, marketing, provision and/or sale of the iPhone 3G. At all relevant times, ATTM was—and still is—the exclusive provider of the telephone and data service plans for the iPhone 3G throughout the United States and in California. ATTM owns, operates and/or maintains a 3G network in this District and State and has other significant contacts with Apple in this State, including entering into service and provisioning contracts with Apple that are to be performed in this State. The activities at issue emanated at least in part from this District and State.

24.     Defendants acted in concert with each other in the design of the iPhone 3G and/or the representations made to the Class and, as a result, are each legally responsible in some manner for the unlawful acts of the other. Pursuant to an agreement entered into between Apple and ATTM regarding sales of the iPhone, the parties jointly market these phones, ATTM is the exclusive service provider for the iPhone, and ATTM pays a substantial fee to Apple for every iPhone sold and activated on the ATTM network in the United States. Authorized Apple and ATTM retailers were Defendants' agents, ostensible agents, employees, servants, joint ventures, actors in concert, or aiders and abettors. At all relevant times, Defendants have jointly made, and continue to make, misrepresentations in the marketing, advertising and/or sale of both the iPhone 3G and required service plans.

## III.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over the consolidated proceedings that are the subject of this Complaint under the Class Action Fairness Act, 18 U.S.C. § 1332(d), and the July 1, 2009 Order of the Judicial Panel on Multi-District Litigation ("MDL Panel"). In the aggregate, the damages suffered and sought to be recovered by Plaintiffs and the Class exceed the Court's jurisdictional minimum for a class action. The exact amount of damages caused to Class members cannot be precisely determined without access to Defendants' records. In addition, this Court has jurisdiction over the claims asserted herein based on principles of federal question jurisdiction.

26.     This Court has jurisdiction over each Defendant because each Defendant is either a corporation or an association organized under the laws of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State, or does sufficient business in or has sufficient minimum contacts with California, or otherwise intentionally avails itself of the California markets through the promotion, marketing, advertising and/or sale of their products and services in California to render the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

27.     Venue is proper in this Court based on the ruling of the MDL Panel, because Apple's principal place of business is in this District, and because ATTM engages in substantial business in this District.

## IV.

## CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated within the United States of America, or such states as the Court determines to be appropriate. Under Federal Rules of Civil Procedure 23(b)(1), (b)(2), and (b)(3), the proposed class is both ascertainable and shares a well-defined community of interest in common questions of law and fact.

29.     The Class is currently defined as follows:  "All persons in the United States of America, or in California and such other states within the United States as the Court determines to be appropriate, who purchased an iPhone 3G and entered into an ATTM 3G service plan between July 11, 2008 and the present."  Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues as discovery warrants.

A.     **Numerosity**

30.     Class members are so numerous that individual joinder of all members is impracticable.  While the precise number of Class members has not been determined at this time, and the facts to determine that number are presently within Defendants' sole control, based on public reports Plaintiffs believe the number of Class members who bought an iPhone 3G and purchased ATTM 3G service during and after July 2008 is likely well over four million people.

31.     Class members are readily ascertainable.  Defendants' sales, service plan and subscription records contain information as to the number and location of all Class members, a significant number of whom are likely still under service contracts with ATTM.  Because Defendants Apple and ATTM should have accurate and detailed sales and service information regarding individual Class members and up-to-date contact information, including their e-mail or SMS addresses, an easy and accurate method is available for identifying and notifying Class members of the pendency of this action.

B.     **Commonality**

32.     Common questions of law and fact predominate over questions affecting individual Class members.  These common questions of law and fact include:

(a)     Whether Defendants Apple and ATTM advertised and sold the iPhone 3G by focusing on the characteristics of increased speed and performance over the original iPhone, when in fact actual performance was materially different, and worse, than the promises and claims made by Defendants; and

///

(b)      Whether Apple and ATTM failed to disclose material facts about limitations in the speed and performance characteristics of the iPhone 3G to consumers, and whether such a failure violates statutory and common law prohibitions against such conduct, as detailed more fully below.

**C.      Typicality**

33.      Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs sustained injury and a loss of money or property arising from, and as a result of, Defendants' unlawful common course of conduct.  They each purchased the iPhone 3G based in substantial part on the uniform advertised claim of the iPhone 3G having the characteristics of increased data transfer speed and greater performance than was actually provided.   Those representations were a substantial factor in their decision to purchase the iPhone 3G.  Plaintiffs have received, at best, sporadic 3G speed or connection to a 3G network with their iPhone 3G.  They did not receive any disclosures from Defendants Apple or ATTM before or after purchase explaining the material limitations in the iPhone 3G, or how its interaction with ATTM 3G network materially reduced its actual speed and performance such that, for a significant period of time, the phones do not in fact provide 3G capability and access, but rather only access to the slower EDGE network. They also did not receive any disclosures that, at least according to ATTM, the only real material difference between 3G and EDGE network performance was that for some data applications, "3G is faster than EDGE".

**D.      Adequacy of Representation**

34.      Plaintiffs can fairly and adequately represent and protect the Class's interests.  Plaintiffs' claims are both typical of the Class's claims and are based on facts that are common to them and the Class.  The Class representatives have suffered similar injuries and damages arising from Defendants' conduct.   As such, Plaintiffs can adequately represent the Class because they seek the same or similar remedies that would be available to other Class members.  No irreconcilable conflicts exist between the positions of Plaintiffs and those of the Class members.

/ / /

35.     Plaintiffs have retained attorneys who are competent and experienced in litigating significant class actions to represent their interests and that of the Class.  Counsel have significant experience in handling class actions and the types of claims asserted herein, and have been appointed as class counsel by courts in other actions.  Plaintiffs and their counsel already have done significant work in identifying and investigating the potential claims in this action, and are willing to devote the necessary resources to vigorously litigate this action.  Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class to represent fairly and adequately the Class and are determined to discharge those duties by seeking the maximum possible recovery for the Class based on the merits of these claims and the available resources.

**E.     Superiority of a Class Action**

36.     A class action is a superior method for resolving the claims herein alleged as compared to other available group-wide methods for adjudicating these issues.  The remedy to resolve the common class-wide issues detailed herein would be to refund a portion of the cost of the iPhone 3G and/or service plan costs, which is estimated at less than $600 per Class member based on the required two-year service agreement.  Because of that low individual damage amount, individual Class members would have little incentive to prosecute such claims on an individual basis.  Such individual actions are not cost-effective or practical, as the costs associated with proving a *prima facie* case would exceed the obtainable recovery.

37.     Important interests are served by addressing the issues raised in the Complaint in a class action.  Adjudication of individual claims would result in a great expenditure of court and public resources.  Resolving the claims on a class-wide basis results in significant cost savings.  Class action treatment allows similarly situated persons to litigate their claims in a manner that is most efficient and economical for the parties and the judicial system.  All actions addressing the Apple iPhone 3G are pending before this Court and are appropriately centered in this geographic location.

38.     For those who seek judicial relief, there is a substantial likelihood of inconsistent verdicts, which would frustrate the resolution of these legal issues for Defendants and force them to comply with inconsistent legal standards.

39.     Failure to certify a class would make it impossible for a great many of the Class members to seek relief.  There is a strong likelihood that separate court rulings would lead to inconsistent verdicts, working a substantial prejudice on Defendants, especially, as in this case, where equitable relief is being sought.  A class action presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

40.     Plaintiffs are unaware of any insurmountable difficulties in the management of this action to preclude its maintenance as a class action and believe their claims can all be established at trial on a class-wide basis.

## V.

## STATEMENT OF FACTS

41.     Since at least June 2008, Defendants have uniformly misrepresented to the public the material characteristics of superior speed, strength and performance that consumers would obtain from Apple's iPhone 3G through an extensive advertising campaign, which reportedly has cost over $36 million.

42.     Defendants Apple and ATTM have an agreement whereby ATTM is the exclusive service provider for the iPhone 3G in the United States, and Apple and ATTM are the primary retail sellers of the iPhone 3G.  A close relationship exists between the two, with Apple being responsible for the consummation of the iPhone transaction and the activation of the iPhone 3G, thereby requiring Apple and ATTM to both be aware of consumers' needs.  Class members are unable to choose any other network or carrier when using their iPhone 3G, and ATTM requires all iPhone 3G customers to sign up for a more expensive data connection plan.  Through this joint agreement, Apple and ATTM misled Plaintiffs and other consumers by misrepresenting material facts as detailed below and not disclosing that the iPhone 3G and/or ATTM 3G network were faulty and failed to provide consistent connectivity on a 3G network.

43.     Apple offered its original iPhone for sale at a retail price of approximately $599, beginning in June 2007.  That original iPhone operated on a second generation, or 2.5G, multiple access standard known as GSM/EDGE, which had a maximum data transfer rate of 237

kbps (kilobytes per second), or on the 2G GSM/GPRS network.  The iPhone 3G was designed to operate both on the 2G/2.5G EDGE network and a third generation, or 3G, multiple access standard network.  According to Defendants, 3G technology features faster peak data transfer rates over previous networks.  For the radio chips installed in certain of the iPhone 3G devices, the 3G network is alleged to have a potential transfer rate of up to 7.2 Mbps (megabytes per second).  Yet, Apple's iPhone 3G and ATTM's 3G network fail to consistently deliver those characteristics advertised to Plaintiffs and Class members.  For many of the initial iPhone 3G models, the maximum data transfer rate was only increased to 384 kbps—meaning it would never actually be "twice as fast," contrary to Defendants' representations.

44.     Apple sells the iPhone 3G in its stores and consummates sales outside of its stores and on its web site.  These devices are activated for sale to the general public by Apple, and Apple does not discriminate regarding the sale of the iPhone 3G among consumers.  The iPhone 3G has capabilities—created and/or supported by Apple—to undertake the following tasks, among others:  download and play music from the iTunes internet site; send SMS/text messages, which appear to function like online chat on the iPhone 3G; browse the internet, either on the ATTM network or through a WiFi connection that does not require connectivity to the ATTM network; run numerous applications (or "apps") sold by Apple from its online app store; search data stored on the iPhone, such as contacts, calendars, notes, iPod downloads, or other keywords using Spotlight (Apple's desktop search function); record and edit audio messages, such as meetings, class lectures, or other sounds with the iPhone 3G device; exchange emails with other individuals, sometimes using Apple's proprietary MobileMe service that pushes email from a person's Mac desktop to their iPhone 3G; and send MMS messages with photo, audio, or video attachments.  *See* Apple iPhone Capabilities at http://www.apple.com/iphone/iphone-3g/.  The iPhone 3G, therefore, is not designed to merely operate as a telephone.

45.     In Apple's iPhone 3G advertising, Apple demonstrates this product's internet access device capabilities, not its cellular telephone abilities (other than to show it actually rings).  In addition, Class members use the iPhone as an internet access device.  According to a

June 10, 2009 Neilsen Research study of the demographics of iPhone users, 98% of iPhone users use the data features of their iPhone.    In addition:

- 88% access the Internet with their phone (making them 4 times as likely as the typical cellular telephone subscriber to do so)

- 75% download apps (5 times as likely as the typical subscriber)

- 72% use location based services (7 times as likely as the typical subscriber)

- 37% watch videos on their iPhone (6 times as likely as the typical subscriber)

Moreover, the "3G" designation refers not to enhanced telephone connectivity, but rather Internet data download capability.  As a result, the iPhone 3G is intended to be used, and in fact is used, as an Internet access device that can operate independently from the ATTM network.

46.    Apple named the iPhone "3G" and uniformly advertised the iPhone 3G as "Twice as Fast."  An example of an advertisement making that representation is set out below.



Because Apple and ATTM prepare these advertisements, this is an exemplar as they are aware of the scope of their advertising campaign for the iPhone 3G.

/ / /

/ / /

47.     Before the iPhone 3G was launched, ATTM and Apple represented through the press to the general public that the iPhone 3G would be "twice as fast" on the ATTM network as the earlier iPhone:

> Apple Inc. is about to release the follow-up to its widely popular iPhone device. Apple's iPhone 3G, supported by AT&T Inc.'s third-generation wireless network, will hit the market July 11.
>
> ***Apple (NASDAQ: AAPL) and AT&T (NYSE: T) officials say the new iPhone 3G will operate at network speeds that are twice as fast as the first generation iPhone. San Antonio-based AT&T remains the exclusive U.S. carrier for the new iPhone.***
>
> Apple and AT&T are going to sell the new device at a starting price of $199 with a two-year contract. The devices will be sold in more than 2,200 AT&T retail stores and kiosks, as well as direct business sales channels.
>
> "We're offering the most advanced mobile device ever on the nation's most advanced high speed network," says Ralph de la Vega, president and CEO of AT&T Mobility. "We think iPhone 3G is an amazing mobile device and our customers are going to love using iPhone 3G to make calls, send e-mails and surf the Web even faster."

Staff, *Apple, AT&T are releasing newest iPhone 3G*, San Antonio Bus. J., June 9, 2008 (emphasis added).

48.     These and similar representations were designed to focus consumers on the specific characteristic that the iPhone 3G would provide superior performance over iPhones that operate on a 2G or 2.5G network available before launch of the iPhone 3G.  Through the very name of the phone itself, Apple engaged in a campaign to lead consumers to believe this new phone is always, if not consistently, connected at faster uploading and downloading transfer rates and thus was superior to the predecessor iPhone, which operated on the slower 2G/2.5G EDGE network.  Indeed, in a 2008 Annual Report, ATTM recognized that mobility and speed are the "cornerstones of the wireless consumer business", which is why the very name of the iPhone 3G and the uniform advertising campaign engaged in by both Apple and ATTM stresses this purportedly enhanced performance characteristic.  The ability to obtain higher internet access speed routinely is an inherent quality or characteristic of the advertised iPhone 3G that was likely to be a substantial factor in a consumers' purchasing decision.  As ATTM has

/ / /

16

previously asserted, the availability of such access or service goes directly to their products' characteristics.

49. Without explaining the distinction between 2G/2.5G and 3G, Defendants actively and consistently advertised, beginning in or before June 2008, that the new iPhone 3G was "Twice as Fast," focusing consumers in television commercials on its almost immediate data transfer rate, while ATTM advertised the iPhone 3G operated on "the nation's fastest 3G network."

50. Prospective purchasers of the iPhone 3G are typically heavier users of data services than purchasers of traditional cellular telephones. As a result, such consumers placed great importance on the consistent availability of 3G coverage when deciding whether to purchase an Internet access device such as the iPhone 3G. The availability of, and having regular access to, the supposedly faster 3G network coverage was, therefore, a substantial factor in their decision to purchase an iPhone 3G, and was a key focus of the advertising efforts of both Apple and ATTM for the iPhone 3G. ATTM has recognized this is a material characteristic of the iPhone 3G, as it previously claimed in a July 2009 letter submitted to the National Advertising Division of the Better Business Bureau that "the primary advantage of 3G Networks over earlier generations of wireless network technology is the enhanced data speeds 3G networks provide."

51. At Apple's World Wide Developer's Conference in June 2008, at approximately 11:35 a.m., Apple CEO Steve Jobs made several representations regarding the speed of the iPhone 3G that were published by CNET, a leading source of technology information:

> Jobs goes over the 3G support first. Faster downloads are a no-brainer, he says. He does a side-by-side comparison of a Web page loading on EDGE vs. one on 3G. The National Geographic's home page downloads in 21 seconds on the 3G network, and the EDGE one is taking forever. Twenty-one seconds is a lot, but this is a pretty photo-heavy Web page. It took 59 seconds on EDGE. **The 3G speeds are close to Wi-Fi, Jobs said. Jobs compares the 3G iPhone to the Nokia N95 and Treo 750, two other 3G phones, and says the 3G iPhone is 36 percent faster to download the same Web page. In an iPhone 1.0 to iPhone 2.0 comparison, an e-mail attachment downloads in 5 seconds on the 3G model, and 18 seconds on EDGE.**

///

17

Tom Krazit, CNET news, *Live blog: Steve Jobs at WWDC 2008*, June 9, 2008, at http://news.cnet.com/8301-13579_3-9960064-37.html (last visited Oct. 8, 2009) (emphasis added).

52.     The ATTM website boasted at the time: "iPhone 3G harnesses the power of AT&T's broad and powerful 3G mobile broadband network, which offers 3G mobile phones download speeds of up to 1.4 Mbps.** AT&T's 3G network is currently available in 280 leading U.S. metropolitan areas; by year-end, the company plans to offer 3G service in nearly 350 metro areas."  ATTM web site *at* http://www.wireless.att.com/cell-phone-service/specials/iPhone.jsp?wtSlotClick=1-0015FP-0-1&WT.svl=calltoaction).

53.     On the AT&T Answer Center web site, ATTM represented the following as "benefits of the iPhone 3G":

- "iPhone 3G users will enjoy a home broadband-like speed experience when surfing the Internet, sharing files and using media-rich Web applications.  The new iPhone will operate in Wi-Fi mode through wireless modems in homes and offices, as well as public hot spots."

- "The new iPhone 3G is a serious business tool, designed to meet the needs of companies of all sizes. New business capabilities include access to corporate email, calendars, and intranets; generating updated PowerPoint customer presentations; sending video footage in real time; and uploading/downloading data in real time."

- "Features AT&T's super-fast mobile broadband network puts iPhone 3G in the broadband fast lane with download speeds of up to 1.4 Mbps."

ATTM web site, *at* http://www.wireless.att.com/answer-center/main.jsp?t=solutionTab&ft… Panels&locale=en_US&_dyncharset=UTF-8&solutionId=KB93031&isSrch=Yes .

54.     In an article from the *Detroit Free Press*, a technology columnist accepted the pitch being made by Apple and ATTM:

[T]he new iPhone 3G that goes on sale at 8 a.m. Friday at Apple and AT&T stores . . . has three things the current models don't have.

* * * * *

***Third, the iPhone 3G runs faster, using AT&T's advanced 3G, or third-generation, wireless network, which the company claims is twice as fast as the EDGE network used by the current iPhone. That's admittedly very nice.***

Since 2005, AT&T has spent more than $20 billion across the country beefing up its network.

"Having access to 3G in more places means having incredible speed and reliability from your broadband wireless network in places you once thought weren't possible," said Brian Ducharme, vice president and general manager for AT&T's wireless operations in Michigan.

The iPhone 3G will automatically detect 3G service and use it; otherwise it will connect to the slower EDGE network used by the older model. EDGE works across most of Michigan, even the Upper Peninsula.

*There's really only one reason to get the new iPhone 3G. That 3G AT&T network speed.*

*If you are in your car or on the road a lot and need full and fast connectivity, it's the phone for you. I plan to replace my old iPhone with the new model because of just those reasons.*

Mike Wendland, *What Makes the iPhone 3G Hot and Not So Hot*, <u>Detroit Free Press</u>, D1, July 10, 2008.

55.    Contrary to these representations, Plaintiffs and the Class experience connectivity on the 3G network only a fraction of the time they are connected to the ATTM network, or receive no 3G connectivity at all for a significant portion of time, such that the primary represented advantage of the iPhone 3G – consumers being able to use their iPhone 3G to operate at enhanced networks speeds and download data faster – was not being provided to consumers on a regular basis, resulting in a material difference between promised and actual performance.   The lack of 3G connectivity also causes Plaintiffs to experience a significant number of dropped calls when the iPhone 3G cannot locate an available 3G network connection. Apple and ATTM either were aware, reasonably should have known, or were obligated to understand that the iPhone 3G could not consistently perform at 3G levels, contrary to the Defendants' representations and that as a result such claims were false or misleading.

56.    Both Apple and ATTM profited by selling iPhone 3G devices.  At approximately $173 per phone, Apple is estimated to have achieved a 55% profit margin on each iPhone 3G sold.  ATTM, despite having to pay a reported $300 per phone subsidy to Apple, profited by requiring Plaintiffs and Class members to upgrade their service plans at a $10 per month premium over earlier iPhone plans; pay a $28 per phone equipment fee; and enter into a new

/ / /

two-year data connection contract at one of the highest monthly plan levels available from ATTM.

57.     ATTM enjoyed the benefit of being the exclusive service provider for Apple iPhone 3G devices in the United States, making the iPhone a substantial reason for ATTM's continued success and significantly increased profitability:

> AT&T Inc posted a smaller-than-expected drop in quarterly profit on improved margins for its wireless service, helped by the iPhone, and strong growth for its video and high-speed Internet service.
>
> Subsidies for Apple Inc's iPhone had cost AT&T dearly in recent quarters, but analysts said the partnership is now starting to help rather than hurt profits as users of the touch-screen phone spend heavily on data services.
>
> AT&T shares rose nearly 4 percent as analysts said the biggest U.S. phone company had reported impressive results given the weak economy.
>
> "For this economy, it was an outstanding performance," said Commresearch analyst Gregory Lundberg, citing very strong broadband, video and wireless growth.
>
> * * * * * *
>
> AT&T reported a wireless profit margin of 40.9 percent, above the 39.2 percent forecast by Bernstein analyst Craig Moffett, who saw iPhone as the key driver.
>
> AT&T said 1.6 million Apple iPhone customers had activated services on the AT&T network during the quarter, more than 40 percent of whom were new to the telephone operator.
>
> "The base of iPhone customers is now large enough to offset the subsidies for new iPhone users," said Moffett.
>
> Shares of Apple rose $1.75, or 1.44 percent to $123.51 on Nasdaq early Wednesday afternoon after the news.
>
> AT&T added 1.2 million net cell phone customers in the quarter, in line with analyst expectations. . . . .
>
> **Some analysts worry that AT&T, the exclusive U.S. provider for the** iPhone**, depends too heavily on one device, with an estimated three-quarters of its net new monthly bill-paying customers being iPhone users.**
>
> **"It's a little bit worrisome as to what happens if and when their exclusivity ends," said Stifel Nicolaus analyst Chris King. "Without iPhone their net adds would be negligible."**

Sinead Carew, *AT&T profit boosted by iPhone, video, Internet*, Reuters, Apr. 22, 2009, *available at* http://www.reuters.com/article/technologyNews/idUSTRE53L29L20090422 (last visited Oct. 15, 2009) (emphasis added).

/ / /

MASTER ADMINISTRATIVE CONSOLIDATED 2ND AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

58.     It has also been reported that ATTM's new customers are coming significantly from iPhone 3G sales (for example, in the third quarter of 2009, of its 4.3 million new customers, 3.2 million were iPhone customers), and that its profits are almost exclusively attributable to sales of the iPhone 3G.  According to President and CEO of ATTTM's wireless unit, Ralph de La Vega, iPhone subscribers accounted for one-third of ATTM's total revenues from all devices during that quarter.  For several quarters, ATTM's growth has come almost single-handedly from the iPhone. In the fourth quarter of 2009, ATTM said it activated 3.1 million new iPhones. In comparison, it counted only a net total of 2.7 million new subscribers as some customers moved from other phones to iPhones.  In addition to the monthly subscription fee that ATTM earns from iPhone subscribers, the company reportedly earns about 60% higher monthly data (such as internet and SMS) fees from iPhone subscribers than it does from the average ATTM customer.  And according to a *New York Times* report dated September 2, 2009, "The average iPhone owner pays AT&T $2,000 during his two-year contract — roughly twice the amount of the average mobile phone customer."

59.     Class members paid more so that they could specifically access a 3G network, yet often consumers could only access the slower 2G/2.5G EDGE network.  Based on the anticipated large profits each would receive, ATTM was in no position to tell Apple the iPhone 3G would not operate as represented at the time of its release, and Apple was in no position to delay the introduction of the iPhone 3G until basic problems regarding the phone's operation itself, and its operation on the ATTM 3G network, were resolved.

60.     Apple and ATTM either knew, reasonably should have known, or were obligated to understand that ATTM's 3G network could not handle the massive influx of bandwidth demand from iPhone 3G devices based on the phone's increased data transmission demands.  The network strain could not have surprised either of them, as the original iPhone sold more than seven million units and both companies were aware of the bandwidth necessary for the iPhone 3G to operate consistently on a 3G network.  ATTM representatives specifically represented that the network was prepared for and could handle the increased bandwidth demands:  "***We have anticipated the influx of users*** and can, [do] and will continue to support

1  that." Brian X. Chen, "iPhone 3G Users Heated Over Network Issues", Wired.com, July 23,

2  2008, http://blog.wired.com/ gadgets/2008/07/iphone-3g-users.html (emphasis added).

3      61.    Both Apple and ATTM were also on notice that such increased traffic was

4  likely because public reports indicated the companies anticipated the sale of millions of iPhone

5  3G devices in the first year alone. Eric Savitz, *Apple: Confusion Reigns On Q3 iPhone Sales*

6  *Projections*, BARRON'S: Tech Trader Daily (June 19, 2008), *available at*

7  http://blogs.barrons.com/techtraderdaily/2008/06/19/apple-confusion-reigns-on-q3-iphone-sales

8  -projections/ (last visited Oct. 21, 2009) ("Apple has forecast it would sell 10 million iPhones in

9  calendar 2008"). Further evidence of the demand Defendants created for the iPhone 3G is

10  found in a *Wall Street Journal* report that one out of five ATTM cell phone customers were

11  planning to upgrade to an iPhone. Technology research firm Trefis issued a report on February

12  26, 2010, that corroborates that information. According to Trefis, 3% of iPhone users account

13  for 40% of ATTM's network data traffic. In addition, according to ATTM in February 2010, its

14  network mobile data traffic in 2009 increased more than 200% from 2008, while other reports

15  state the volume of mobile data on the network increased more than 4,000% between 2005 and

16  2008.

17      62.    Both companies profited from their misleading representations by gaining

18  market share, by locking consumers into two-year contracts, and by receiving billions of dollars

19  in additional revenue by selling millions of new iPhone 3G devices and higher rate plans, all at

20  the expense of customers who were unable to consistently enjoy the benefits and characteristics

21  Defendants represented consumers would obtain with an iPhone 3G.

22      63.    While the actual reasons for the failure of the iPhone 3G to live up to the

23  representations made by ATTM and Apple are still the subject of investigation and discovery,

24  the iPhone 3G suffers from poor connectivity to the ATTM 3G network such that the iPhone 3G

25  does not consistently provide a key represented characteristic of the product. As far as the

26  iPhone itself is concerned this is due either to a hardware flaw—demanding too much power to

27  operate routinely at 3G bandwidth levels and due to the iPhone 3G device's sensitivity or

28  inability to consistently access 3G network radio connectivity—or a software flaw in the

programmed algorithms.  Such flaws appear to be separate and apart from the operation of the ATTM 3G network or any undisclosed deficiencies in that network to the point where Apple's device, rather than the ATTM network, may be the chief cause of the iPhone 3G's failure to live up to the representations made by ATTM and Apple.

64.   According to Roger Entner, senior vice president for telecommunications research at Nielsen Research, in a *New York Times* article published on or about December 13, 2009, the iPhone's "air interface," the electronics in the phone that allow it to connect to the cell towers, have shortcomings that "affect both voice and data."  Richard Windsor of Nomura Securities International also asserted in an August 12, 2008 report that "Problems [with the iPhone 3G] include high incidence of dropped calls, switching onto EDGE while the device is stationary and loss of reception while in good coverage.  We believe that these issues are typical of an immature chipset and radio protocol stack where we are almost certain that Infineon is the 3G [chip] supplier."   Additional sources, reported in an article dated August 14, 2008 in BloombergBusinessweek, asserted a similar reason related to the iPhone 3Gs' use of the Infineon chip, claiming "Apple programmed the Infineon chip to demand a more powerful 3G signal than the iPhone really requires. So if too many people try to make a call or go on the Internet in a given area, some of the devices will decide there's insufficient power and switch to the slower network—even if there is enough 3G bandwidth available."  Such conclusions, while disputed by Apple, may be corroborated by testing of the ATTM network using non-iPhone smartphones, where there have not been similar widespread reports of dropped calls and inability to achieve regular 3G connectivity.  In addition, there were claims by Apple itself that downloading its 2.1 version firmware update could resolve some consumers' connectivity and dropped call issues relative to the iPhone 3G, as well as Apple representatives' most controversial recommended "fix" – that in order to enhance the iPhone 3G's capabilities, consumers should shut off the 3G feature itself. Indeed, as detailed below, ATTM customer service representatives claimed that any reported problems regarding speed and connectivity issues are due to the iPhone itself, as compared to any limitations within or attributable to the ATTM network.

65.     The iPhone 3G is designed to search for an available 3G radio network connection, and if that is not available, a 2G/2.5G radio network connection.  It is common for iPhone 3G users to be on the 3G network for only a few minutes before their iPhone 3G switches over to the slower EDGE network on which the original iPhone operated, or simply lose connectivity altogether and need to re-boot their phone.  Such facts would further support the conclusion the defects at issue herein are attributable to the hardware or firmware within the iPhone 3G.

66.     Additionally, while the strain on the ATTM 3G network was foreseeable based on how the iPhone 3G is set up and designed, the ATTM network made it difficult for Class members to receive reliable and sustained connectivity on the 3G network as compared to the slower EDGE network.  According to Apple employees, a significant number of all iPhone 3G calls were dropped as consumers' phones searched for limited 3G network resources.  Whether attributable to the phone, the network, or both, that significant level of dropped calls is further evidence that iPhone 3G users do not consistently experience the represented benefits of paying for 3G service.

67.     Apple and ATTM overloaded the system by selling more phones and subscription plans than the ATTM 3G infrastructure could support, ultimately requiring ATTM to admit it needed to spend billions of dollars more to support  traffic on what  was supposedly the "nation's fastest 3G network."  *The New York Times* stated as follows regarding the degree to which the iPhone had taxed ATTM's exclusive network:

> Slim and sleek as it is, the iPhone is really the Hummer of cellphones.
>
> It's a data guzzler. Owners use them like minicomputers, which they are, and use them a lot. Not only do iPhone owners download applications, stream music and videos and browse the Web at higher rates than the average smartphone user, but the average iPhone owner can also use 10 times the network capacity used by the average smartphone user.
>
> "They don't even realize how much data they're using," said Gene Munster, a senior securities analyst with Piper Jaffray.
>
> The result is dropped calls, spotty service, delayed text and voice messages and glacial download speeds as AT&T's cellular network strains to meet the demand. Another result is outraged customers.

* * * * *

Taylor Sbicca, a 27-year-old systems administrator in San Francisco, checks his iPhone 10 to 15 times a day. But he is not making calls. He checks the scores of last night's baseball game and updates his Twitter stream. He checks the local weather report to see if he needs a coat before heading out to dinner — then he picks a restaurant on Yelp and maps the quickest way to get there.

Or at least, he tries to.

"It's so slow, it feels like I'm on a dial-up modem," he said. Shazam, an application that identifies songs being played on the radio or TV, takes so long to load that the tune may be over by the time the app is ready to hear it. On numerous occasions, Mr. Sbicca says, he missed invitations to meet friends because his text messages had been delayed.

And picking up a cell signal in his apartment? "You hit the dial button and the phone just sits there, saying it's connecting for 30 seconds," he said.

More than 20 million other smartphone users are on the AT&T network, but other phones do not drain the network the way the nine million iPhones users do. Indeed, that is why the howls of protest are more numerous in the dense urban areas with higher concentrations of iPhone owners.

***"It's almost worthless to try and get on 3G during peak times in those cities," Mr. Munster said, referring to the 3G network. "When too many users get in the area, the call drops."*** The problems seem particularly pronounced in New York and San Francisco, where Mr. Munster estimates AT&T's network shoulders as much as 20 percent of all the iPhone users in the United States.

Owners of the iPhone 3GS, the newest model, "have probably increased their usage by about 100 percent," said Chetan Sharma, an independent wireless analyst. "It's faster so they are using it more on a daily basis."

Mr. Sharma compares the problem to water flowing through a pipe. "It can only funnel so much at a given time," he said. "It comes down to peak capacity loads, or spikes in data usage. That's why you see these problems at conferences or in large cities with high concentration of iPhone users."

When thousands of iPhone owners descended on Austin, Tex., in March during South by Southwest, an annual technology and music conference, attendees were unable to send text messages, check their e-mail or make calls until AT&T installed temporary cell sites to amplify the service.

***AT&T's right to be the exclusive carrier for iPhone in the United States has been a golden ticket for the wireless company. The average iPhone owner pays AT&T $2,000 during his two-year contract — roughly twice the amount of the average mobile phone customer.***

But at the same time the iPhone has become an Achilles' heel for the company.

"It's been a challenging year for us," said John Donovan, the chief technology officer of AT&T. "Overnight we're seeing a radical shift in how people are using their phones," he said. "There's just no parallel for the demand."

***AT&T says that the majority of the nearly $18 billion it will spend this year on its networks will be diverted into upgrades and expansions to meet the surging***

*demands on the 3G network. The company intends to erect an additional 2,100 cell towers to fill out patchy coverage, upgrade existing cell sites by adding fiber optic connectivity to deliver data faster and add other technology to provide stronger cell signals.*

\* \* \* \* \*

But AT&T faces another cost — to its reputation. AT&T's deal with Apple is said to expire as early as next year, at which point other carriers in the United States would be able to sell the popular Apple phones. Indeed, a recent survey by Pricegrabber.com found that 34 percent of respondents pinpointed AT&T as the primary reason for not buying an iPhone.

"It's a P.R. nightmare," said Craig Moffett, a senior analyst with Sanford C. Bernstein & Company.

\* \* \* \* \*

In preparation for the next wave of smartphones and data demands, all the carriers are rushing to introduce the next-generation of wireless networks, called 4G.

Analysts expect that in a year or so, AT&T's network will have improved significantly — but it may not be soon enough for some phone owners paying for the higher-priced data plans, like Mr. Sbicca, who says he plans to switch carriers as soon as the iPhone becomes available on other networks.

"What good is having all those applications if you don't have the speed to run them?" he said. "It's not exactly rocket science here. It's pretty standard stuff to be able to make a phone call."

Jenna Worthan, *Customers Angered as iPhones Overload AT&T*, N.Y. Times, Sept. 3, 2009, at http://www.nytimes.com/2009/09/03/technology/companies/03att.html (last visited Oct. 20, 2009) (emphasis added).

68.     Despite these inherent flaws, the President and CEO of ATTM's wireless unit, Ralph de la Vega, directly aligned ATTM with the sale of the iPhone 3G to encourage continued sales of the iPhone 3G, even when initial problems with its network were an issue: "We will continue to expand our 3G network coverage into new areas, grow our lineup of industry-leading devices, such as iPhone 3G, and deliver compelling new 3G services to market like Video Share SM."   ATTM News Release, *AT&T Offers Nation's Fastest 3G Network: Nation's Fastest 3G Network Complements Best Global Coverage and Industry-Leading Portfolio of 3G Devices*, July 10, 2008, http://www.att.com/gen/pressroom?pid=4800&cdvn= news&newsarticleid=25993.

/ / /

69.     In response to initial complaints about this 3G connectivity issue, ATTM spokesperson Brad Mays represented in July 2008 that the iPhone 3G is "performing great. . . . Customers in 300 major metro areas in the United States and 350 by the end of the year are experiencing the fast network connectivity that our 3G network provides."  Mays stated, "***We have anticipated the influx of users*** and can, [do] and will continue to support that."  Brian X. Chen, "iPhone 3G Users Heated Over Network Issues", *Wired.com*, July 23, 2008, http://blog.wired.com/gadgets/2008/07/iphone-3g-users.html  (emphasis added).     Internally, however, ATTM recognized its 3G network, as configured, could not handle the bandwidth demands attributable to the iPhone 3G.  Ultimately, in a *Fortune* magazine article in September 2009, ATTM admitted this material, misrepresented fact:

> "*3G networks were not designed effectively for this kind of usage,*" says John Donovan, AT&T's chief technology officer, referring to the current generation of broadband wireless.  "We fight the day-to-day guerrilla warfare as the customers move around."

John Fortt, "Bandwidth Hogs – iPhone and Other Smartphones," *FORTUNE: Brainstorm Tech Blog*, Aug. 28, 2009, *at* http://brainstormtech.blogs.fortune.cnn.com/2009/08/28/bandwidth-hogs-iphone-and-other-smartphones/ (last visited Oct. 19, 2009).  In addition, in a speech to the CTIA in October 2009, Mr. Donovan conceded the difficulties Class members were exposed to based on ATTM's network limitations, such that if ATTM was to improve the experience for iPhone 3G users to be consistent with its representations, it would need to be at the cost of other customers: "We have to manage our network so that all of our customers get a good experience. *We have to manage the data-hungry devices on our network to ensure quality for others*." (emphasis added).

70.     Although Apple's TV advertisements released both before and during the initial release of the iPhone 3G attempted to show how much faster the iPhone 3G would operate as compared to the original iPhone and consistently repeated the phrase "twice as fast," in real life an iPhone 3G operating on the ATTM network may achieve an actual speed of about half of Apple's advertised performance—about the same as the original iPhone, if not slower.  In numerous Apple advertisements that ran when the iPhone 3G was initially released during the

Summer of 2008, Apple shows an iPhone 3G that is able to switch seamlessly and immediately among websites. Yet when consumers attempted to replicate these advertisements, they demonstrated it would take at least twice as long to perform the tasks Apple showed in its advertisements.

71. Apple's packaging for the iPhone 3G does not contain a disclaimer of any of these material facts and limitations.

72. Disclosures regarding the true nature and limitations of both the iPhone 3G and ATTM's 3G network's performance as compared to what Apple and ATTM promised should have been provided to customers before they purchased an iPhone 3G. Based on the extensive multi-million dollar advertising campaign focusing on this 3G characteristic, Defendants consistently represented to potential and actual customers that the iPhone 3G would operate on a faster 3G network, as compared to the slower EDGE network, and by being "twice as fast" would consistently provide faster upload and download capabilities than the original iPhone.

73. In response to ATTM's competitor Verizon's "there's a map for that" advertising campaign that began in October 2009 (playing off the iPhone 3G "there's an app for that" campaign), ATTM filed a lawsuit against Verizon, claiming Verizon was engaging in misleading advertising when it displayed a map of ATTM's actual 3G coverage. That map had been prepared by an independent third party research company called American Roamer, and showed for the first time large geographic areas, and several states, where ATTM did not provide *any* 3G coverage – contrary to what had been represented to consumers.

74. ATTM admitted during the course of that lawsuit that Verizon's 3G maps accurately depicted ATTM's actual 3G network coverage. However, ATTM's and Apple's iPhone 3G television and print advertisements and other promotional materials did not inform consumers of the limited scope of the 3G coverage ATTM actually provides, which were accurately depicted on the map American Roamer created and Verizon publicized. Rather, Defendants included a small font, hard to read superscript disclaimer that merely says "3G not available everywhere" or "3G not available in all areas", and gave customers no further information. Such a statement was overshadowed in advertisements by the powerful imagery of

the iPhone 3G and how it operates. Although Verizon's challenged advertising contained a similar small disclaimer statement, Andy Wilson, Vice President of Consumer Marketing for ATTM, asserted in a November 3, 2008 Declaration that such a small disclaimer "has done nothing to change the misleading message in [Verizon's] advertisements", based on consumer surveys conducted by ATTM!

75.    In addition, brochures advertising the iPhone 3Gs provided to potential consumers included a map detailing ATTM's non-3G voice and data coverage, rather than the actual 3G coverage both Defendants focus upon in their advertising campaigns for the iPhone 3G. A true and correct copy of that brochure is attached hereto as Ex. 1 and is incorporated herein by reference. Even retail stores that had such information provided consumers with maps of ATTM's non-3G coverage areas, which presents a materially different picture than the 3G data coverage iPhone 3G users can actually obtain.

76.    It is also very difficult for consumers to find actual 3G coverage maps on ATTM's website, and even then it takes several steps to find ATTM's admission that: "The AT&T 3G/BroadbandConnect network is currently available *in most major metropolitan areas and is expanding rapidly*", that several states are not listed at all, and that many states only have a handful of cities listed. (Emphasis added.) This is a very different statement than the ambiguous and misleading disclaimer "3G not available everywhere", which is virtually meaningless to consumers because of the dearth of material information contained there. Even the plaintiffs who live in these "3G covered" areas do not routinely obtain 3G coverage on their iPhone 3G.

77.    All of the information detailed herein was material and likely to mislead consumers regarding the scope of actual 3G coverage Class members could access if they used the iPhone 3G. As ATTM asserted in its November 3, 2009 Application for a Temporary Restraining Order in the ATTM/Verizon litigation, "AT&T's product is the delivery of wireless coverage to its customers. A misleading claim about the extent of such coverage, or AT&T's ability to provide that coverage goes to the very heart of AT&T's business."

/ / /

78.     In response to Verizon's disclosures of the material differences between ATTM's promises and its actual performance, ATTM also issued a statement in or about December 2009 to "set the record straight on Verizon Ads". In that statement it admitted that, in fact, there were no significant differences between the more expensive 3G service it required consumers to pay for in purchasing the iPhone 3G and the default EDGE network: "In both 3G and EDGE coverage, customers can access the Internet, sent email, surf the Web, stream music, download videos, send photos, text, talk and more. *The only difference – with some data applications 3G is faster than EDGE.*" In addition, in Mr. Wilson's Declaration referenced above and during the course of the ATTM/Verizon litigation, ATTM stated that customers in EDGE network areas could perform almost all the same tasks as if they were receiving 3G coverage, and that having access to a 3G network may not matter at all for many tasks.

79.     If ATTM's own statements are to be believed, Class members were required to enter into new contracts and pay more in monthly service and equipment fees for the promised superior 3G service as compared to EDGE service in connection with their purchase of the iPhone 3G. In fact, in terms of actual performance they regularly received similar, if not inferior, coverage and service as they would receive for less expensive EDGE coverage, with the only potential difference arising from the use of some unidentified data applications.

80.     Defendants thus failed to warn or disclose to Plaintiffs and Class members of material limitations associated with using the iPhone 3G, or ATTM's internal understanding that its 3G network was not designed to provide consistent connectivity to its 3G network for a large number of iPhone 3G users, despite its express statements and advertisements that it offered the "nation's fastest 3G network".

81.     Even Apple and ATTM cannot agree who is responsible for these material defects. When consumers complained to ATTM about such issues, they were told by customer service representatives that ATTM recognized a problem with the iPhone 3G existed, but that the problem was with the iPhone itself. When consumers complained to Apple about such issues, they were told by customer service representatives that Apple recognized problems

///

existed, but that problem was the fault of the ATTM 3G network. Representatives of both Defendants thus recognized a defect existed, but blamed the other for that defect.

82. Plaintiffs were injured in fact and lost money or property as a result of these material misstatements and omissions of material fact by paying more to receive essentially the same, if not inferior, service. In addition to the $299 cost of the iPhone 3G, ATTM charged consumers $10 per month for 24 months in additional fees to sign up for additional 3G network coverage and a $28 additional equipment charge. Customers were required to enter into a two-year data plan contract with ATTM to use their iPhone 3G and/or an $18 additional service fee that ATTM imposes on iPhone 3G customers.

83. Some customers, including several Plaintiffs, already had an iPhone when they purchased the iPhone 3G. Like the rest of the Class, they did not receive the benefits of "upgrading" to the iPhone 3G, and also spent money on a second iPhone.

84. As a result of Defendants' material misrepresentations and omissions of material facts, Plaintiffs and Class members are locked into a two-year service plan with inferior ATTM 3G network connectivity. A substantial factor in entering into those agreements was the representation that the iPhone 3G would operate as a true 3G internet access device, which it does not.

85. Apple and ATTM acted in concert to sell the iPhone 3G and either knew, should have known, or were obligated to understand that they were trying to sell more iPhone 3G devices than the existing ATTM 3G network could handle and/or the iPhone 3G itself suffered from defective hardware and/or software. Plaintiffs were injured, either directly or indirectly, in response to the representations, advertising and other promotional materials that were prepared and approved by Apple and/or ATTM and disseminated on the face of the product and/or through advertising that contained the representations regarding the iPhone 3G and ATTM 3G network. Had the true facts been disclosed, Plaintiffs would not have purchased the iPhone 3G at the prices and under the terms and conditions to which they were and are subjected.

86. Defendants failed to disclose at the time of making their false and misleading statements to Plaintiffs and the Class that the infrastructure of the ATTM 3G network and/or the

iPhone 3G itself were defective and inadequate to provide the represented performance and speed, resulting in injury and loss to the Plaintiffs and the Class. Neither of the Defendants have offered a remedy to this situation, despite written demands provided to both defendants prior to the filing of this Second Amended Complaint.

87.   In summary, Apple uniformly advertised the iPhone 3G as "Twice as Fast," together with ATTM asserting it operates the "nation's fastest 3G network". Yet the iPhone 3G connects to the Internet using the slower EDGE network a significant part of the time and/or results in a significant number of dropped calls as the iPhone 3G searches for an available 3G network path. Calling this product an "iPhone 3G" was likely to lead reasonable consumers, including Plaintiffs, to believe the advertised "Twice as Fast" is in relation to the 3G term, meaning the iPhone 3G is twice as fast as earlier iPhone models in terms of data transfer rates and processing. Appellations like "3G" and "twice as fast" were a substantial factor in consumers purchasing the iPhone 3G. Yet, the iPhone 3G did not provide significantly faster data transfer rates despite the installed 3G radio chip and, even if consumers used later iPhone 3G versions, they could not regularly achieve faster rates because of the inadequate ATTM 3G network and/or hardware or software defects in the iPhone 3G itself.

## VI.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Unlawful, Unfair, and Fraudulent Business Practices in Violation of
California Business & Professions Code §17200, *et seq.*)**

88.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

89.   The Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*, defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

/ / /

/ / /

90.     Defendant   Apple   violated,   and   continues   to   violate,   California   Business   and Professions Code § 17200, *et seq*., by misrepresenting the actual speed and performance of its iPhone 3G models.

91.     Defendant ATTM violated, and continues to violate, California Business and Professions Code § 17200, *et seq.*, by misrepresenting the strength of the ATTM 3G network in terms of its ability to support the millions of iPhone 3G users and the ability of the iPhone 3G to be in regular connection with its 3G network as compared to the EDGE network.

92.     By engaging in the above described acts and practices, Defendants have committed an unfair business practice within the meaning of California Business and Professions Code § 17200, *et seq*.  Consumers suffered substantial injury they could not reasonably have avoided other than by not purchasing the product, and there was no countervailing benefit to consumers from Defendants' unsupported claims and premature release of the iPhone 3G.

93.     Defendants' acts and practices have deceived and/or are likely to deceive Class members and the public and thus constitute a fraudulent business practice.

94.     The acts and practices of Apple and ATTM are an unlawful business act or practice because they violate the laws identified in this Complaint, including Negligence, Breach of Express and Implied Warranty of Merchantability, the Magnuson-Moss Warranty Act, Fraud and Deceit, Negligent Misrepresentation, the Consumers Legal Remedies Act, and California Business & Professions Code § 17500, as described below.

95.     As discussed above, Plaintiffs and the members of the Class purchased an iPhone 3G model and service plan directly from Apple and/or ATTM and/or their authorized agents. Plaintiffs were injured in fact and lost money or property as a result of such acts of unfair competition.

96.     Apple and ATTM received the funds paid by Plaintiffs and the members of the Class.  Apple and ATTM profited enormously by misrepresenting the speed and performance of the iPhone 3G and not disclosing material problems and limitations with the iPhone 3G and/or its interaction with the ATTM 3G network.  Apple's and ATTM's revenues attributable thereto

33

are thus directly traceable to the millions of dollars paid out by Plaintiffs and the Class for the iPhone 3G, the required service plans and the associated fees.

97.     Unless Defendants Apple and ATTM are enjoined from continuing to engage in the unlawful, unfair and fraudulent business acts and practices as described herein, Plaintiffs and the Class will continue to be injured by Apple's and ATTM's conduct.

98.     Apple and ATTM, through their acts of unfair competition, have acquired money from Class members.  Plaintiffs and the Class request this Court disgorge and restore such money to them and enjoin Apple and ATTM from continuing to violate California Business and Professions Code §17200, *et seq*.

99.     The unlawful, unfair and fraudulent conduct described herein is ongoing and continues to this date. Plaintiffs and the Class, therefore, are entitled to relief described below as appropriate for this Cause of Action.

## SECOND CAUSE OF ACTION

### (False and Misleading Advertising in Violation of California Business & Professions Code §17500, *et seq*.)

100.     Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

101.     Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the Class and the public.  Apple and ATTM have spent over $36 million to advertise, including through their websites on the Internet, to call attention to, or give publicity to Apple's and ATTM's iPhone 3G and 3G network service.   Apple uniformly advertises the iPhone 3G as "Twice as Fast," and ATTM uniformly advertises such phones operate on the "nation's fastest 3G network."  In reality, the iPhone 3G connects over the slower 2G EDGE network a significant amount of the time and/or drops a significant number of calls while searching for limited 3G network resources.  Marketing the phone by naming it "iPhone 3G" would lead a reasonable consumer, including Plaintiffs, to believe they regularly can obtain 3G network connectivity and significantly higher data transfer rates.

/ / /

102.    ATTM uniformly advertises and sells 3G network data plans for the iPhone 3G and requires Class members to pay higher rates for such plans.  For a significant amount of time, Plaintiffs and Class members are unable to access a 3G network and cannot consistently get 3G connectivity and data transfer rates despite Defendants uniformly advertising this characteristic and selling it to them at a premium.

103.    By their actions, Apple and ATTM are disseminating uniform advertising concerning their products and services, which by its nature is unfair, deceptive, untrue, or misleading within the meaning of California Business & Professions Code §17500, *et. seq*.  Such advertisements are likely to deceive, and continue to deceive, the consuming public for the reasons detailed above.

104.    The above-described false, misleading, and deceptive advertising Apple and ATTM disseminated continues to have a likelihood to deceive in that Apple and ATTM have failed to disclose the true and actual performance of the iPhone 3G based on its own defects and/or its interaction with ATTM's 3G network.  Apple and ATTM have failed to instigate a public information campaign to alert consumers of these deficiencies, which continues to create a misleading perception of the iPhone 3G's speed, performance and enhanced network and operating connectivity.

105.    In making and disseminating the statements alleged herein, Apple and ATTM should have known their advertisements were untrue and misleading in violation of California Business & Professions Code § 17500, *et seq*.  Plaintiffs and the Class members based their decisions to purchase the iPhone 3G in substantial part on Defendants' misrepresentations and omitted material facts.  The revenues to Apple and ATTM attributable to products sold in those false and misleading advertisements amount to millions of dollars for the iPhone 3G and required service plans.  Plaintiffs were injured in fact and lost money or property as a result.

106.    The misrepresentations and non-disclosures by Apple and ATTM of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code § 17500, *et. seq*.

/ / /

107. As a result of Apple's and ATTM's wrongful conduct, Plaintiffs and the Class request that this Court cause Apple and ATTM to restore money to them, and to enjoin Apple and ATTM from continuing to violate California Business & Professions Code § 17500, *et. seq.*

108. Such conduct is ongoing and continues to this date. Plaintiffs and the Class are therefore entitled to the relief described below as appropriate for this Cause of Action.

## **THIRD CAUSE OF ACTION**

**(Violation of Consumers Legal Remedies Act – California Civil Code § 1750, *et seq.*)**

109. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

110. This cause of action is brought under the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA"). Plaintiffs are consumers as defined by California Civil Code § 1761(d), and the Apple iPhone 3G and ATTM's 3G network are goods and services within the meaning of the CLRA.

111. Defendants violated and continue to violate the CLRA by engaging in the following deceptive practices proscribed by California Civil Code § 1770(a) in connection with transactions intended to result in, and that did result in, the sale of the iPhone 3G at issue herein to Plaintiffs and members of the Class in violation of, *inter alia*, the following provisions:

    a. Representing the goods and services have characteristics, uses or benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

    b. Representing the goods and services are of a particular standard, quality or grade if they are of another (Cal. Civ. Code § 1770(a)(7));

    c. Advertising goods and services with the intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

    d. Representing a transaction involves rights, remedies or obligations that it does not have or involve (Cal. Civ. Code § 1770(a)(14)); and

    e. Representing the goods and services have been supplied in accordance with a previous representation when they have not (Cal. Civ. Code § 1770(a)(16)).

112.    Plaintiffs and other Class members, in purchasing and using the iPhone 3G as herein alleged, did reasonably act in response to Defendants' above representations or would have considered the omitted facts detailed herein material to their purchase decision.  Plaintiffs and the Class have suffered damage by the wrongful acts and practices of Defendants that are in violation of California Civil Code § 1781.

113.    Under Section 1782 of the CLRA, Defendants have received notice in writing by certified mail of the particular violations of Section 1770 of the CLRA from several Plaintiffs on behalf of all Class members, demanding Defendants offer to resolve the problems associated with the actions detailed above and give notice to all affected consumers of the intent to so act.  The time for Defendants to respond to those letters has passed without an agreement to take the actions required by the CLRA on behalf of all affected consumers.  Plaintiffs and the Class are therefore entitled to all forms of relief provided under Section 1780 of the CLRA, including actual and statutory damages, restitution and injunctive relief.

114.    Based on their knowledge or reckless disregard of the facts as detailed herein, Defendants were guilty of acting with malice, oppression or fraud.  Plaintiffs and members of the Class are therefore also entitled to recover exemplary damages in addition to actual damages under Civil Code § 1780(a)(4) for the reasons set forth above.

115.    Plaintiffs and the Class pray for all relief set forth below as appropriate under this Cause of Action.

## FOURTH CAUSE OF ACTION

### (Breach of Express Warranty and Implied Warranty of Merchantability)

116.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.  All Plaintiffs except Smith and Triggs assert this Cause of Action.

117.    Plaintiffs and Class members purchased the iPhone 3G and used them for their ordinary and intended purpose of providing consistent, reliable and sustained access to the supposedly faster 3G network, and entered into agreements with Apple or its agents and received uniform warranties in connection with the purchase of such phones.

/ / /

118.    The iPhone 3G cannot perform its ordinary and represented purpose because the iPhone 3G does not provide consistent connection to the ATTM 3G network in combination with using the iPhone 3G.  Whether the problem is with the iPhone itself or with the ATTM 3G network, or a combination of the two, is irrelevant as to whether the warranty was breached.

119.    When Defendants placed the iPhone 3G into the stream of commerce, they knew, reasonably should have known, or were obligated to understand that the intended and ordinary purpose of their phone was to provide consistent connectivity to a supposedly faster 3G network and that users would expect regular 3G connectivity and materially faster data transfer rates as compared to the original iPhone.

120.    Plaintiffs and the Class purchased their iPhone 3G with the reasonable expectation that they would receive reliable and sustained connectivity to a purportedly faster 3G network.  The advertisements Defendants disseminated that stressed the excellence and reliability of the iPhone 3G constitute a warranty that the products would operate as advertised during their useful life, upon which Plaintiffs and the Class reasonably acted.  The iPhone 3G is not fit for its warranted, advertised, ordinary and intended purpose of providing reliable 3G network connectivity and is in fact defective, or would not pass without objection in the trade or industry in terms of being unable to provide consistent and reliable 3G network connectivity.  This defect has manifested for all Plaintiffs and Class members as they do not consistently receive 3G network connectivity using their iPhone 3G.

121.    Plaintiffs have given notice to Defendants of this breach, either by separate letter or demand or by virtue of the filing of a lawsuit, which demands have been ignored or rejected.  Apple has tried several firmware fixes, which have not provided Plaintiffs or the Class with reliable or sustained 3G connectivity.

122.    Defendants' breach of the warranty described above also constitutes a violation of Cal. Civ. Code §1792, *et seq.*

123.    Plaintiffs and Class members are entitled to damages as a result of such breaches.  Plaintiffs and the Class request relief as described below as appropriate for this Cause of Action.

/ / /

## FIFTH CAUSE OF ACTION

### (Violation of the Magnuson-Moss Warranty Act)

124.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.  All Plaintiffs except Plaintiffs Smith and Triggs assert this Cause of Action.

125.    Plaintiffs and Class members are "consumers" within the meaning of the Magnuson-Moss Act.

126.    Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Act.

127.    The iPhone 3G is a "consumer product" within the meaning of the Magnuson-Moss Act.

128.    Defendants' written affirmations of fact, promises and/or descriptions as alleged herein are each a "written warranty" as to the iPhone 3G providing consistent 3G network connectivity and/or there exists an implied warranty for the sale of such products within the meaning of the Magnuson-Moss Act.

129.    For the reasons detailed above, Defendants breached these express and implied warranties, as the iPhone 3G did not perform as Defendants represented or were not fit for their intended use.  Defendants have refused to remedy such breaches, and their conduct caused damages to Plaintiffs and members of the Class.

130.    The amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

131.    As Defendants have refused all previous requests, resorting to any informal dispute settlement procedure and/or affording Defendants another opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Defendants have indicated they have no desire to participate in such a process at this time.  Any requirement under the Magnuson-Moss Act or otherwise that Plaintiffs resort to any informal

dispute settlement procedure and/or afford Defendants a reasonable opportunity to cure the breach of warranties described above is excused and/or has been satisfied.

132.    As a result of Defendants' breaches of warranty, Plaintiffs and Class members have sustained damages and other losses in an amount to be determined at trial.  Plaintiffs and Class members are entitled to recover damages, specific performance, costs, attorneys' fees, rescission, and/or other relief as is deemed appropriate.

## SIXTH CAUSE OF ACTION

### (Violation of Title 33, Chapter 501, of Florida's Consumer Protection Act)

133.    This claim is asserted by Plaintiffs Gonzalez and Brayteson, who incorporate by reference each and every preceding paragraph as though fully set forth herein.

134.    Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

135.    By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in Florida, Defendants engaged in deceptive acts and practices.

136.    Defendants materially misled Plaintiffs and other Class members located in Florida and as a result Defendants' acts and practices were improper.

137.    Defendants have violated, and continue to violate, Florida law, and specifically Title 33, Chapter 501 of the Florida Consumer Protection Act, which makes such deceptive acts and practices unlawful.

138.    Plaintiffs seek to enjoin such unlawful deceptive acts and practices as described above.  Each Class member located in Florida will be irreparably harmed unless Defendants' unlawful actions are enjoined in that Apple and ATTM continue to falsely and misleadingly advertise with respect to the speed, characteristics and performance of the iPhone 3G.  Towards that end, the above Plaintiffs request an order granting appropriate injunctive relief.  The above Plaintiffs have not previously asked for such injunctive relief.

139.    In addition, as a direct and proximate result of Defendants' violation of the Florida Consumer Protection Act, Class members located in Florida have been injured and have suffered damages, in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Violation of Title 56, Chapter 8, of New Jersey's Consumer Protection Act)

140.   This claim is asserted by Plaintiffs Tanseco and Ritchie.   Those plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

141.   Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

142.   By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in New Jersey, Defendants engaged in deceptive acts and practices.

143.   As Defendants materially misled such Class members, Defendants' acts and practices were improper.

144.   Defendants have violated, and continue to violate, Title 56, Chapter 8 of the New Jersey Consumer Protection Act, which makes such deceptive acts and practices unlawful.

145.   Plaintiffs seek to enjoin such unlawful and deceptive acts and practices as described above.   Class members located in New Jersey will be irreparably harmed unless Defendants' unlawful actions are enjoined in that Apple and ATTM will continue to falsely and misleadingly advertise with respect to the speed, characteristics and performance of the iPhone 3G.   Towards that end, Plaintiffs request an order granting appropriate injunctive relief. Plaintiffs have not previously asked for such injunctive relief.

146.   In addition, as a direct and proximate result of Defendants' violation of the New Jersey Consumer Protection Act, Class members located in New Jersey have been injured and have suffered damages, in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### (Violation of Section 349 of the New York General Business Law)

147.   This claim is asserted by Plaintiff Koschitzki.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

148.   Defendants engaged in false and misleading advertising concerning the speed, characteristics and performance of the iPhone 3G.

/ / /

149.   By advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in New York, Defendants engaged in, and continue to engage in, deceptive acts and practices.

150.   Defendants materially misled such Class members such that Defendants' acts and practices were improper.

151.   Defendants have violated, and continue to violate, § 349 of the New York General Business Law, which makes deceptive acts and practices unlawful.

152.   Plaintiff seeks to enjoin such unlawful deceptive acts and practices as described above.   Class members located in New York will be irreparably harmed unless Defendants' unlawful actions are enjoined.   Towards that end, Plaintiff requests an order granting appropriate injunctive relief.   Plaintiff has not previously asked for such injunctive relief.

153.   As a direct and proximate result of Defendants' violation of Section 349 of the New York General Business Law as described above, Plaintiff and Class members located in New York have been injured and have suffered damages, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

**(Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq*.)**

154.   This claim is asserted by Plaintiff Jamison.   Jamison incorporates by reference each and every preceding paragraph as though fully set forth herein.

155.   The North Carolina Unfair Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, defines a trade practice as unfair or deceptive if it has the capacity or tendency to deceive.

156.   Defendants violated the NCUDTPA by advertising, marketing, distributing, and/or selling the iPhone 3G to Class members located in North Carolina.

157.   Defendants engaged in, and continue to engage in, deceptive acts and practices.

158.   By engaging in those acts and practices, Defendants have committed one or more deceptive and unfair acts of trade within the meaning of the NCUDTPA.

/ / /

159.   Defendants' acts and practices as described herein have deceived and/or are likely to deceive members of the public.

160.   Jamison and other North Carolina purchasers purchased iPhone 3G devices directly from Apple and/or one of its authorized retailers or resellers.

161.   Jamison and other North Carolina purchasers were injured in fact and lost money or property as a result of their purchase of iPhone 3G devices from Apple, ATTM, and/or their authorized agents, and the false and misleading statements described above were a substantial factor in their decisions to purchase an iPhone 3G.

162.   Defendants, through their acts of unfair competition, have acquired money from Jamison and other North Carolina purchasers.  This Court, therefore, should disgorge and restore this money to Jamison and other North Carolina purchasers and enjoin Defendants from continuing to violate the NCUDTPA, N.C. Gen. Stat. § 75-1, *et seq*.

## **TENTH CAUSE OF ACTION**

### **(Negligence*)***

163.   Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

164.   At all times mentioned herein, Defendants undertook a duty to properly manufacture, design, test, produce, assemble, inspect, distribute, market, package, prepare for use and sell the iPhone 3G to function as advertised and represented on the ATTM 3G network.

165.   The Apple iPhone 3G, either alone or by acting in combination with the ATTM 3G network with which it exclusively operates, was negligently tested, manufactured, built and/or designed, which causes Plaintiffs and the Class to fail to receive reliable and sustained connectivity to the ATTM 3G network.

166.   Defendants, by the conduct detailed above, breached their duty to properly manufacture, design, test, produce, assemble, inspect, distribute, market, package, prepare for use, or sell the iPhone 3G to function as advertised.

167.   As a proximate result of Defendants' negligence, Plaintiffs and the Class suffered separate economic damages and loss from the purchase of the iPhone 3G itself, as alleged herein.

**ELEVENTH CAUSE OF ACTION**

**(Common Counts and Unjust Enrichment)**

168. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

169. Defendants have benefited from their unlawful conduct as detailed above by receiving millions of dollars in revenues and profits derived from the sale of the Apple iPhone 3G and access to the ATTM 3G network. Defendants appreciated the benefit of the receipt of such revenues and profits.

170. Because Defendants were unjustly enriched and have received this excessive revenue at the expense of Plaintiffs and the Class based on false and misleading statements regarding the iPhone 3G, its capacity, and its ability to perform its stated functions, it would be inequitable for Defendants to retain the benefits they gained from purchases by Plaintiffs and the Class of the iPhone 3G and the exclusive, required service plans from ATTM.

171. Plaintiffs and other Class members are entitled to the establishment of a constructive trust consisting of the benefit conferred upon Defendants in the form of the excess revenues and profits derived from the sale of these products and services and the return of any monies by which Defendants were unjustly enriched.

**TWELFTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

172. Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

173. Apple and ATTM represented that the iPhone 3G and the required ATTM 3G service plan would provide customers with sustained and reliable connectivity to the 3G network, thereby obtaining materially faster data transfer rates. Apple and ATTM advertised the iPhone 3G as "Twice as Fast" on what was represented to be the "nation's fastest 3G network." Apple also inserted the descriptive phrase "3G" in the name of the phone, representing that users can reasonably expect regular access to a 3G network on the iPhone 3G.

/ / /

174.    Defendants had no reasonable grounds for believing their representations were true because the iPhone 3G has consistently had issues with providing reliable 3G network connectivity, and the ATTM 3G network could not provide consistent 3G network connectivity to customers who purchased service for their iPhone 3G, based on ATTM's overburdened and under-supported 3G network.  Defendants should have known, or had a duty to learn, about the true facts that contradicted their representations.

175.    In making these representations to Plaintiffs and the Class, Defendants Apple and ATTM intended to induce Plaintiffs and the Class to purchase the iPhone 3G.

176.    At all times herein, Plaintiffs and the Class were unaware of the falsity of Defendants' statements.

177.    Plaintiffs and the Class reasonably acted in response to the statements made by Defendants when they purchased an iPhone 3G and were required to also sign up for a premium ATTM data service plan and other increased costs.

178.    As a proximate result of Defendants' negligent misrepresentations, Plaintiffs and Class members purchased an iPhone 3G and are locked into a two-year service plan with ATTM for 3G network connectivity that is spotty at best and for which Plaintiffs and Class members pay a premium.

179.    Plaintiffs and the Class have been damaged and therefore request appropriate relief as described below.

**THIRTEENTH CAUSE OF ACTION**

**(Fraud and Deceit)**

180.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

181.    Defendants, from the time the iPhone 3G and service plans on the ATTM 3G network were first made available to Class members, consistently deceived Plaintiffs and the Class by: (1) making false uniform misrepresentations to Plaintiffs, the Class and the public, including, but not limited to, claims that the iPhone 3G and required service plans would provide customers with consistent 3G network connectivity; and (2) concealing from Plaintiffs, the Class

and the public, despite having superior, if not exclusive, knowledge of material facts to the contrary and despite having partially spoken on the issue, that the iPhone 3G would not consistently function in terms of consistently accessing a 3G network and providing increased data transfer rates due to the manufacture and design of the iPhone 3G and the limitations of the ATTM 3G network as designed and implemented. Plaintiffs and the Class were unaware these representations were false.

182. Apple inserted the descriptive phrase "3G" in the name of the phone, representing to all users that they could reasonably expect faster processing rates using the iPhone 3G.

183. Defendants suggested, asserted and/or promised the iPhone 3G, acting in combination with ATTM's 3G network, would have reliable and sustained functionality on the faster 3G network. Defendants suggested, asserted and/or promised a phone that was "Twice as Fast" and operated on the "nation's fastest 3G network." Such claims were false for the reasons detailed above.

184. Defendants either misrepresented or suppressed the material fact that the iPhone 3G network could not provide reliable and sustained 3G network connectivity. Defendants suppressed the material fact that the ATTM 3G network could not handle the influx of users and bandwidth demands as a result of the marketing and sale of the iPhone 3G.

185. When Defendants made the foregoing misrepresentations, they knew or recklessly disregarded them to be false and/or had no reasonable basis for believing them to be true.

186. The misrepresentations and concealment of material facts were made and conducted by Defendants with the intent to mislead and induce Plaintiffs and the Class to purchase the iPhone 3G and the required ATTM 3G service plan, and had the effect of doing so, even if they already had and used the older iPhone models that employed EDGE technology.

187. In affirmative response to the false, fraudulent and/or willful misrepresentations and concealment of material facts by Defendants, Plaintiffs and Class members were induced to and did purchase an iPhone 3G and were required to pay for a premium ATTM 3G service plan. Plaintiffs and other Class members reasonably based their decision to purchase these phones and

/ / /

plans on the misrepresentations and omissions of material fact by Apple and ATTM, and were damaged thereby.

188.    Defendants' acts were done willfully, maliciously, with fraudulent intent and with deliberate disregard of the rights of Plaintiffs and the Class, requiring an award of exemplary damages in addition to actual damages.

189.    Plaintiffs and the Class request appropriate relief as described below.

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief)

190.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

191.    An actual controversy over which this Court has jurisdiction now exists between Plaintiffs, the Class and Defendants concerning their respective rights, duties and obligations for which Plaintiffs desire a declaration of rights under the applicable claims asserted herein.

192.    Plaintiffs and Class members may be without adequate remedy at law, rendering declaratory relief appropriate in that:

(a)    damages may not adequately compensate the Class members for the injuries suffered, nor may other claims permit such relief;

(b)    the relief sought herein in terms of ceasing such practices or providing a full and complete corrective disclosure may not be fully accomplished by awarding damages; and

(c)    if the conduct complained of is not enjoined, harm will result to Class members and the general public because Defendants' wrongful conduct is continuing and persons are entitled to the direct monies taken from them.

193.    Plaintiffs request a judicial determination and declaration of the rights of Class members, and the corresponding responsibilities of Defendants.  Plaintiffs also request an order declaring Defendants are obligated to pay restitution to all members of the Class as appropriate and otherwise pay over all funds Defendants wrongfully acquired either directly or indirectly because of the illegal conduct by which Defendants were unjustly enriched.

/ / /

MASTER ADMINISTRATIVE CONSOLIDATED 2ND AMENDED COMPLAINT          CASE NO.: M 09-02045 JW

194.    A judicial declaration is necessary and appropriate at this time under the circumstances so the parties may ascertain their respective rights and duties.

195.    Class members will be irreparably harmed unless the unlawful actions of the Defendants are enjoined, because Apple and ATTM will continue to advertise their false and misleading statements regarding the iPhone 3G.  To that end, Plaintiffs request an order compelling disclosures and/or disclaimers on the outside of the iPhone boxes or advertising material prior to making any electronics device purchase.  Absent injunctive relief, Defendants will continue to market, distribute, and sell iPhones to the detriment of their customers. Plaintiffs have not previously asked for such injunctive relief from the Court.

## **FIFTEENTH CAUSE OF ACTION**

### **(Violation of the Federal Communications Act, 47 U.S.C. §§ 201 and 207)[2]**

196.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

197.    Under the Federal Communications Act ("FCA"), 47 U.S.C. § 201(b), "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful."

198.    Under 27 U.S.C. § 207, Plaintiffs have a private right of action to enforce the rights granted under Section 201(b) in this Court.  "Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may . . . bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction."

199.    Based on the conduct alleged above, Defendants have violated Section 201(b) of the FCA.  The FCC previously has ruled that false and misleading claims violate Section 201(b) of the FCA, and Defendants' charges for the iPhone 3G as an internet access device and the companion ATTM premium service plans that Plaintiffs and Class members were required to

---

[2]    Plaintiffs do not concede that all state law claims are preempted under the Federal Communications Act, because the Apple iPhone 3G is an Internet access device.  As such, the FCC may not be able to regulate that device under the limited authority of the FCA.

purchase, as detailed above, were unjust based upon the claims and promises Defendants made as compared to what they actually provided.

200.   Defendants also misrepresented or omitted material facts concerning the quality or scope of the 3G coverage service available to Class members using the iPhone 3G, particularly in terms of comparison to coverage on the EDGE network. ATTM's service was thus not provided in accordance with its terms and conditions or in accordance with the promises included in both its and Apple's advertising, resulting in there being a material  difference between their promises and actual performance. Even if Defendants charged a "reasonable rate" for their products and services, they are still liable for damages based on their non-disclosure or false advertising of the material facts set forth herein, because they made affirmative misrepresentations and failed to inform Class members of other material terms, conditions, or limitations on the products and services they provided to Class members.

201.   Based on the conduct alleged above, Defendants have therefore violated the FCA in at least two respects.  First, the FCC previously has ruled that such false and misleading claims violate Section 201(b) of the FCA.  As such, the practices described in this Complaint are unjust within the meaning of Section 201(b) of the FCA.

202.   Second, Defendants have violated the FCA because they charged Plaintiffs and Class members more for the iPhone 3G as an internet access device and the required ATTM premium service plans as detailed above than they should have based on the actual 3G coverage they provided access to as compared to what they promised.  Those practices are also unjust under the FCA.

203.   By asserting this Cause of Action, Plaintiffs do not concede that the Apple iPhone 3G is subject to FCC regulation as an Internet Access Device, based on the Net Neutrality Doctrine.[3]

/ / /

/ / /

_____

[3]   As stated in the pending motion for leave to file a motion for reconsideration (*see* n. 1, *supra*), Plaintiffs believe the FCA applies against Apple, but Plaintiffs also believe state law claims against Apple remain viable because of the limited preemptive reach of the FCA.

49

/ / /

## SIXTEEN CAUSE OF ACTION

**(Violation of the Racketeer Influenced And Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq.)**

204.    Plaintiffs incorporate by reference each and every preceding paragraph as though fully set forth herein.

### The Enterprise

205.    Plaintiffs, the Class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

206.    The following persons constitute a group of persons associated in fact that Plaintiffs refer to as the "Enterprise": (1) ATTM; (2) Apple; (3) their respective officers and directors; and (4) other subsidiaries, agents and affiliated entities of Defendants not named as Defendants. This Enterprise operates pursuant to the joint venture agreement where ATTM pays Apple a subsidy of several hundred dollars for every iPhone 3G sold, whether sold by Apple or ATTM, and Apple agrees ATTM is the exclusive iPhone service provider.

207.    The Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

208.    While Defendants participated in and are members and part of the Enterprise, they also have an existence separate and apart from the Enterprise.

209.    The members of the Enterprise act with the common purpose of increasing revenue by increasing both the volume of sales and the sales prices paid for iPhone 3G, and for ATTM service for the iPhone 3G for which ATTM charges a premium, thereby increasing the profits received by each Defendant.

210.    The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

211.    The Defendants control and operate the Enterprise through a variety of means, including, but not limited to, the following: (a) by agreeing to and by marketing each iPhone 3G in accordance with a common promotional plan designed to mislead prospective and actual

/ / /

buyers of the iPhone 3Gs; and (b) by agreeing to falsely market and represent the iPhone 3G without disclosing the material facts detailed herein.

### Predicate Acts

### Mail and Wire Fraud

212. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

213. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Defendants in violation of 18 U.S.C. § 1341 caused matter and things to be delivered by the Postal Service in terms of shipping the iPhone 3G to consumers who ordered it over the phone or through an on-line service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

214. Defendants carried out their scheme in different states and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

215. For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, also transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals, including the advertisements detailed herein. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

216. The matter and things sent by Defendants via the Postal Service, private or

commercial carrier, wire or other interstate media include, *inter alia,* (a) marketing materials that intentionally misled Plaintiffs and Class members regarding the qualities and characteristics of the iPhone 3G and the ATTM 3G network; (b) marketing materials, contracts, agreements and other materials that failed to disclose Defendants' fraudulent scheme to sign up customers for more expensive 3G service that did not perform as represented; (c) marketing materials, contracts, agreements and other materials that failed to disclose Defendants' fraudulent scheme to mislead Class members regarding the limitations in terms of the iPhone 3G itself and what ATTM actually provided in terms of 3G coverage relative to the iPhone 3G; and (d) other matters and things sent through or received from the Postal Service, private or commercial carrier or interstate wire transmission by Defendants that included information or communications in furtherance of or necessary to effectuate the scheme detailed herein.

217.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the Class and obtaining their money and property for Defendants' gain.

218.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the Class acted in positive response to the misrepresentations and omissions set forth above.

219.    As a result of Defendants' fraudulent scheme, Defendants have obtained money and property belonging to Plaintiffs and Class members, and Plaintiffs and the Class have been injured in their business or property by the Defendants' overt acts of mail and wire fraud.

**Pattern of Racketeering Activity**

220.    Defendants did knowingly, willfully and unlawfully conduct or participate in the affairs of the Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c).  This racketeering activity was made possible by the Defendants' regular and repeated use of the facilities and services of the Enterprise.

221.    Defendants committed or aided and abetted in the commission of at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. §§ 1341, 1343, 1956 and 1957 as described above, within the past ten years.  In fact, Defendants collectively have committed

thousands of acts of racketeering activity. The acts of racketeering were not isolated, but rather had the same or similar purpose, participants, method of commission, and victims, including Plaintiffs and Class members. The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

222. Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 and 1343.

223. As a direct and proximate result, Plaintiffs and the members of the Class have been injured in their business or property by the predicate acts which make up the Defendants' pattern of racketeering activity through operation of the Enterprise.

224. In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c). The conspiracy commenced at least as early as 2008 and continues to this date. The object of the conspiracy was to actively promote and sell iPhone 3Gs resulting in increased profits for Defendants either through increased iPhone 3G sales or requiring customers to enter into two-year ATTM service agreements.

225. As set forth above, each of the Defendants knowingly, willfully, and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§ 1341 and 1343 in violation of 18 U.S.C. § 1962(c).

226. Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of such conspiracy.

227. The purpose of the acts that caused injury to Plaintiffs and Class members was to advance to overall objective of the conspiracy. The harm to Plaintiffs and Class members was a reasonably foreseeable consequence of Defendants' scheme.

228. As a direct and proximate result, Plaintiffs and Class members have been injured in their business or property by Defendants' conspiracy and by the predicate acts which make up

the Defendants' pattern of racketeering activity conducted through the Enterprise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class defined herein, as applicable, pray for judgment and relief as follows as appropriate for the above causes of action:

1.  An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

2.  A temporary, preliminary and/or permanent order for injunctive relief enjoining Defendants from pursuing the policies, acts and practices complained of herein;

3.  A declaratory judgment stating that Defendants may not pursue the policies, acts and practices complained of herein;

4.  A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants to undertake an informational campaign to inform members of the general public as to the wrongfulness of Defendants' practices;

5.  An award of actual, statutory and/or exemplary damages, as appropriate for the particular Causes of Action;

6.  An order requiring disgorgement of Defendants' ill-gotten gains by requiring the payment of restitution to Plaintiffs and members of the Class, as appropriate for the particular Causes of Action;

7.  Reasonable attorneys' fees;

8.  All related costs of this suit;

9.  Pre- and post-judgment interest; and

10. Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury on all claims so triable.

I, Alan M. Mansfield, am the ECF user whose ID and password are being used to file this Joint Motion and accompanying papers. In compliance with General Order 45, section X.B., I

1  hereby attest that I have on file the concurrences for any signatures indicated by a "conformed"

2  signature (/S) within this e-filed document.

3                                                    By:   S/Alan M. Mansfield
                                                          Alan M. Mansfield
4

5
   DATED:  May 7, 2010                              Respectfully Submitted,
6
                                                    WHATLEY DRAKE & KALLAS LLC
7
                                                    By:   S/Joe R. Whatley, Jr.
8                                                         Joe R. Whatley, Jr.
                                                          jwhatley@wdklaw.com
9                                                   1540 Broadway, 37th Floor
                                                    New York, NY 10036
10                                                  Tel: (212) 447-7070
                                                    Fax: (212) 447-7077
11
                                                    Adam Plant
12                                                  aplant@wdklaw.com
                                                    2001 Park Place North, Suite 1000
13                                                  Birmingham, AL  35203
                                                    Tel: (205) 328-9576
14                                                  Fax: (205) 328-0669

15                                                  LEAD CLASS COUNSEL

16
                                                    PLAINTIFFS' EXECUTIVE COMMITTEE
17
                                                    THE CONSUMER LAW GROUP
18
                                                    By:   S/Alan M. Mansfield
19                                                        Alan M. Mansfield
                                                          alan@clgca.com
20                                                  9466 Black Mountain Rd., Suite 225
                                                    San Diego, CA 92126
21                                                  Tel: (619) 308-5034
                                                    Fax: (888) 341-5048
22                                                  (Counsel for Plaintiff William Gillis)

23                                                  CARELLA BYRNE BAIN GILFILLAN
                                                    CECCHI STEWART & OLSTEIN
24                                                  James E. Cecchi
                                                    jcecchi@carellabyrne.com
25                                                  Lindsey H. Taylor
                                                    ltaylor@carellabyrne.com
26                                                  5 Becker Farm Road
                                                    Roseland, NJ 07068
27                                                  Tel: (973) 994-1700
                                                    Fax: (973) 994-1744
28

                                   55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUGHLIN STOIA GELLER RUDMAN &
ROBBINS, LLP
Shawn Williams
100 Pine Street, Suite 2600
San Francisco, CA  94111
Tel:  (415) 288-4545
Fax: (415) 288-4534

SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK S. REICH
mreich@csgrr.com
58 South Service Road, Suite 200
Melville, NY  11747
Tel:  (631) 367-7100
Fax: (631) 367-1173
(Counsel for Plaintiff Avi Koschitzki)

EMERSON POYNTER LLP
Scott E. Poynter
scott@emersonpoynter.com
Christopher D. Jennings
cjennings@emersonpoynter.com
Gina M. Dougherty
gdoughterty@emersonpoynter.com
The Museum Center
500 President Clinton Ave., Suite 305
Little Rock, AR 72201
Tel: (501) 907-2555
Fax: (501) 907-2556

EMERSON POYNTER LLP
John G. Emerson
jemerson@emersonpoynter.com
830 Apollo Lane
Houston, TX 77058
Tel: (281) 488-8854
Fax: (281) 488-8867
(Counsel for Plaintiff Aaron Walters)

FARUQI & FARUQI, LLP
Adam R. Gonnelli
agonnelli@faruqilaw.com
David H. Leventhal
dleventhal@faruqilaw.com
Jamie R. Mogil
jmogil@faruqilaw.com
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
(Counsel for Plaintiffs Timothy Ritchie, Onel
Gonzalez, Ron J. Brayteson)

56

1   FINKELSTEIN THOMPSON LLP
    Rosemary M. Rivas
2   rrivas@finkelsteinthompson.com
    100 Bush Street, Suite 1450
3   San Francisco, CA 94104
    Tel: (415) 398-8700
4   Fax: (415) 398-8704

5   FINKELSTEIN THOMPSON LLP
    Burton H. Finkelstein
6   bfinkelstein@finkelsteinthompson.com
    Mila F. Bartos
7   mbartos@finkelsteinthompson.com
    Karen J. Marcus
8   kmarcus@finkelthompson.com
    1050 30th Street NW
9   Washington, D.C. 20007
    Tel: (202) 337-8000
10  Fax: (202) 337-8090
    (Counsel for Plaintiff Haig P. Ashikian)
11
    GLANCY BINKOW & GOLDBERG LLP
12  Marc L. Godino
    mgodino@glancylaw.com
13  1801 Avenue of the Stars, Suite 311
    Los Angeles, CA 90067
14  Tel: (310) 201-9150
    Fax: (310) 201-9160
15  (Counsel for Plaintiff Jacob Medway)

16  HENINGER GARRISON DAVIS, LLC
    W. Lewis Garrison, Jr.
17  lewis@hgdlawfirm.com
    Brian D. Hancock
18  bdhancock@hgdlawfirm.com
    Gayle L. Douglas
19  gdouglas@hgdlawfirm.com
    2224 First Avenue North
20  Birmingham, AL 35203
    Tel: (205) 326-3336
21  Fax: (205) 326-3332
    (Counsel for Plaintiffs Jessica Alena Smith and
22  Wilton Lee Triggs, II)

23  HIDEN ROTT & OERTLE LLP
    Michael Ian Rott
24  mrott@hrollp.com
    David V. Hiden, Jr.
25  dhiden@hrollp.com
    Eric M. Overholt
26  eoverholt@hrollp.com
    2635 Camino Del Rio South, Suite 306
27  San Diego, CA 92108
    Tel: (619) 296-5884 / Fax: (619) 296-5171
28  (Counsel for Plaintiffs Peter Keller and William
    Gillis)

57

LITIGATION LAW GROUP
Gordon M. Fauth, Jr.
gmf@classlitigation.com
Alexis A. Phocas
aap@classlitigation.com
1801 Clement Avenue, Suite 101
Alameda, CA 94501
Tel: (510) 238-9610
Fax: (510) 337-1431
(Counsel for Plaintiff James R. Pittman)

LAW OFFICES OF JAY SALTZMAN, P.C.
Jay P. Saltzman
jay@saltzmanlawny.com
19 Fulton Street, Suite 406
New York, NY 10038
Tel: (212) 964-0046
Fax: (212) 267-8137
(Counsel for Plaintiff Eulardi Tanseco)

ADDITIONAL CO- COUNSEL:

DOYLE LOWTHER LLP
William J. Doyle II
bill@doylelowther.com
John Lowther
john@doylelowther.com
James Hail
jim@doylelowther.com
9466 Black Mountain Road, Suite 210
San Diego, CA 92126
Tel: (619) 573-1700
Fax: (619) 573-1701
(Co-Counsel for Plaintiffs Peter Keller and
Aaron Walters)

SEEGER WEISS, LLP
Stephen A. Weiss
sweiss@seegerweiss.com
One William Street
New York, NY 10004
Tel: (973) 994-1700
Fax: 9973) 994-1744

LAW OFFICE OF D. JOSHUA STAUB
D. Joshua Staub
P. O. Box 1914
Santa Monica, CA 90406-1914
Tel: (310) 576-7770
Fax: (310) 496-0702
(Co-Counsel for Plaintiff Haig P. Ashikian)

TRIMMIER LAW FIRM
Edward S. Reisinger
ereisinger@trimmier.com
Haydn M. Trechsel
haydn@trimmier.com
Jonathan Lee Kudulis
jkudulis@trimmier.com
2737 Highland Avenue
Birmingham, AL 35201
Tel: (205) 251-3151
Fax: (205) 322-6444
(Co-Counsel for Plaintiffs Jessica Alena Smith
and Wilton Lee Triggs, II)

STROM LAW FIRM, LLC
J. Preston "Pete" Strom Jr.
petestrom@stromlaw.com
Mario A. Pacella
mpacella@stromlaw.com
2110 N. Beltline Blvd., Suite A
Columbia, SC 29204-3999
Tel: (803) 252-4800
Fax: (803) 252-4801
(Counsel for Plaintiff Ione Rucker Jamison)

EXHIBIT 1

# AT&T plans for Apple iPhone



On the nation's fastest 3G network



# AT&T Plans for iPhone (U.S. Coverage Packages)

## AT&T Nation℠



| | a-list with ROLLOVER℠ exclusively from AT&T | Get UNLIMITED calling up to 5 numbers on any network, and keep the minutes you save with Rollover. | UNLIMITED Data (Email/Web) Visual Voicemail |
|---|---|---|---|
| UNLIMITED Data (Email/Web) | Visual Voicemail | Rollover℠ | | | |
| UNLIMITED Mobile to Mobile | UNLIMITED Nights & Weekends | | | | |
| **Anytime Minutes** | 450 | 900 | 1350 | UNLIMITED |
| **Night & Weekend Minutes** | 5000 | UNLIMITED | UNLIMITED | — |
| **Additional Minutes** | 45¢ | 40¢ | 35¢ | N/A |
| **Per Month** | $69.99 | $89.99 | $109.99 | $129.99 |

Includes Wi-Fi access at thousands of AT&T Wi-Fi hotspots nationwide, including Starbucks.*

## AT&T FamilyTalk℠
*Includes 2 Lines.*



| | a-list with ROLLOVER℠ exclusively from AT&T | Get UNLIMITED calling up to 10 numbers on any network, and keep the minutes you save with Rollover. | UNLIMITED Data (Email/Web) Visual Voicemail |
|---|---|---|---|---|---|---|
| UNLIMITED Data (Email/Web) | Visual Voicemail | Rollover℠ | | | | | |
| UNLIMITED Mobile to Mobile | UNLIMITED Nights & Weekends | | | | | | |
| **Shared Anytime Minutes** | 700 | 1400 | 2100 | 3000 | 4000 | 6000 | UNLIMITED |
| **Additional Minutes** | 45¢ | 40¢ | 35¢ | 25¢ | 20¢ | 20¢ | N/A |
| **Per Month** | $129.99 | $149.99 | $169.99 | $209.99 | $259.99 | $359.99 | $259.99 |
| **Additional iPhone Line** | $39.99 per line (up to 3 additional lines). | | | | | | $129.99 |

Includes Wi-Fi access at thousands of AT&T Wi-Fi hotspots nationwide, including Starbucks.*

**Included Features with AT&T Nation and Family Talk Plans:**
Nationwide Long Distance and Roaming, Call Forwarding, Call Waiting, 3-Way Calling and Caller ID.

iPhone is configured to work only with the wireless services provided by AT&T. iPhone voice and data plans required for use of iPhone. The $30 data plan for iPhone does not allow access to corporate email, company intranet sites, and other business applications. There are no employer discounts available with the purchase of any iPhone device. Visual Voicemail can be password protected to secure your voicemail messages, contacts and related content. All plans require an activation fee and are subject to AT&T credit approval. The purchase of an iPhone does not guarantee service. AT&T also imposes monthly a Regulatory Cost Recovery Charge of up to $1.25 to help defray costs incurred in complying with State and Federal telecom regulations, State and Federal Universal Service Charges, and surcharges for customer-based and revenue-based state and local assessments on AT&T. These are not taxes or government-required charges. Prices are billed monthly and are valid for use in the U.S. only. A-List is available only with select rate plans. Numbers must be entered online at MyWireless Account at att.com/Mywireless. Only standard domestic landline or wireless numbers are eligible. A-List is not eligible on CRU accounts. For additional terms, see www.wireless.att.com/cell-phone-service/legal/plan-terms.jsp. *Wi-Fi available at U.S. company-operated Starbucks locations equipped with a hotspot. Starbucks and the Starbucks logo are registered trademarks of Starbucks U.S. Brands, LLC.

## Add Messaging Plan

**For individuals**

| | | | | |
|---|---|---|---|---|
| Messaging Unlimited | $20 per month | | | |
| 1500 Messages | $15 per month | 5¢ per additional message | | |
| 200 Messages | $5 per month | 10¢ per additional message | | |

**For FamilyTalk**

| | |
|---|---|
| UNLIMITED | $30 per month - includes up to 5 lines |
| Pay Per Use | 20¢ per text message/30¢ per picture/video message |

Picture/video capabilities will be available in late summer 2009. Prices are billed monthly and are valid for use in the U.S. only. Messaging plans may be cancelled at any time. Charges for international messages sent from the U.S. are 25¢ for Text Messages and 50¢ for Picture/Video Messages. Charges for usage while roaming internationally: 50¢ for each text message sent, and $1.30 for each picture/video message sent. Web Browsing $2/MB applies to new customers or customers who change voice plans or cancel data plans, otherwise 1¢/KB. Additional charges for premium messages and content apply. For full details on Messaging & Data Plans, go to att.com/dataterms.

## International Roaming

Outside of the U.S., voice and data usage, including data usage incurred from delivery of Visual Voicemail messages, will be charged at international rates. Data Global Plans for iPhone can be added for reduced data rates in over 90 countries. For a complete list of countries, visit att.com/dataconnectglobal, and rates, visit att.com/worldpackages.

## Coverage Area Map



Wireless Coverage Area

3G not available in all areas.
Your phone's display does not indicate the rate you will be charged. Please review your coverage map for areas included in and out of plan. Map depicts an approximation of outdoor coverage. Map may include areas served by unaffiliated carriers and may depict their licensed area rather than an approximation of the coverage there. Actual coverage area may differ substantially from map graphics, and coverage may be affected by such things as terrain, weather, foliage, buildings and other construction, signal strength, customer equipment and other factors. AT&T does not guarantee coverage. Charges will be based on the location of the site receiving and transmitting the call, not the location of the subscriber. Future coverage, if depicted above, is based on current planning assumptions but is subject to change and may not be relied upon.

# Introducing Apple iPhone 3GS

### New Features



**Speed**
Load Web pages, launch apps, open attachments, and take pictures faster than ever before. iPhone 3GS makes your entire iPhone experience more responsive.*



**Video Camera**
iPhone 3GS now lets you shoot and edit video, then share it via email, Picture/Video Messaging,** MobileMe, or YouTube. And still pictures get better with a 3-megapixel camera, built-in autofocus, and a tap-to-focus feature.



**Voice Control**
With Voice Control, you can use your voice to call someone in your Contacts list, dial a number, or play a song.

### More New Features



**Digital Compass**
Find out what direction you're facing with a new digital compass.***



**Cut, Copy & Paste**
Cut, copy, and paste words and photos, even between applications. Copy and paste images and content from the Web too.



**Messages**
Use messages to send text, photos, audio, video, and more.**



**Spotlight Search**
Find what you're looking for across your iPhone, all from one place.



**Landscape Keyboard**
Rotate iPhone to use a larger keyboard in Mail, Messages,** Notes and Safari.



**Voice Memos**
Capture a voice memo, a meeting, or any audio recording on the go.

* Up to 2x faster compared with iPhone 3G.
** Picture/Video Messaging support from AT&T coming in late summer.
*** Compass reliability may be affected by usage conditions, such as nearby magnetic fields.

## AT&T Advantages

**THE NATION'S FASTEST 3G NETWORK**

**THE BEST COVERAGE WORLDWIDE***

**UNLIMITED MOBILE TO MOBILE CALLING**
to over 79 million AT&T's wireless customers

**UNLIMITED NIGHT AND WEEKEND MINUTES**
Nights are 9 p.m. to 6 a.m.

**ROLLOVER MINUTES®**
Only AT&T lets you keep your unused minutes

*Claim based on the most phones that work in the most countries.

att.com/wireless
1-800-331-0500
For deaf/hard of hearing customers:
(TTY) 1-866-241-6567
Questions on accessibility by persons with disabilities:
1-866-241-6568




**Terms Applicable to AT&T Nation/FamilyTalk® GSM Plans: Credit approval required.** Subscriber must live and have a mailing address within AT&T's owned network coverage area. An early termination fee of $175 applies if service is terminated before the end of the contract term, and will be reduced by $5 for each full month toward your minimum term that you complete. If phone is returned within 3 days, activation fee will be refunded. If phone is returned within 30 days in like-new condition with all components, early termination fee will be waived. All other charges apply. Some dealers impose additional fees. **iPhone returns will be subject to a 10% restocking fee, except where prohibited. Minute Increment Billing and Usage:** Airtime and other measured usage are billed in full-minute increments, and actual airtime and usage are rounded up to the next full increment at the end of each call for billing purposes. AT&T charges a full-minute increment of usage for every fraction of the last minute used on each wireless call. Minutes will be depleted according to usage in the following order: Night and Weekend Minutes, Mobile to Mobile Minutes, Anytime Minutes and Rollover Minutes. Calls placed on networks served by other carriers may take longer to be processed, and billing for these calls may be delayed. Those minutes will be applied against your Anytime monthly minutes in the month in which the calls appear on your bill. Unanswered outgoing calls of 30 seconds or longer incur airtime. You may obtain usage information by calling customer service or using one of our automated systems. **Pricing/Taxes/No Proration:** Final month's charges are not prorated. Prices are subject to change. Prices do not include taxes. **Activation Fees:** $36 Activation Fee for each new line. $26 Activation Fee applies on each additional FamilyTalk line. **Nights and Weekends:** Nights are 9:00 p.m. to 6:00 a.m. Weekends are 9:00 p.m. Friday to 6:00 a.m. Monday (based on time of day at switch providing your service). Included long distance calls can be made from the 50 United States, Puerto Rico and U.S. Virgin Islands to the 50 United States, Puerto Rico, U.S. Virgin Islands, Guam and Northern Mariana Islands. Roaming charges do not apply when roaming within the service area of land-based networks of the 50 United States, Puerto Rico and U.S. Virgin Islands. International long distance rates vary. Additional charges apply to services used outside the land borders of the U.S., Puerto Rico and U.S. Virgin Islands. **Unlimited Voice Services:** Unlimited voice services are provided solely for live dialogue between two individuals. Unlimited voice services may not be used for conference calling, call forwarding, monitoring services, data transmissions, transmission of broadcasts, transmission of recorded material, or other connections which do not consist of uninterrupted live dialogue between two individuals. If AT&T finds that you are using an unlimited voice service offering for other than live dialog between two individuals, AT&T may, at its option, terminate your service or change your plan to one with no unlimited usage components. AT&T will provide notice that it intends to take any of the above actions, and you may terminate the agreement. **International Roaming:** Substantial

charges may be incurred if phone is taken out of the U.S., even if no services are intentionally used. Receipt of Visual Voicemail messages roaming internationally are charged at international data pay-per-use rates unless customer has an international iPhone plan, in which case receipt of Visual Voicemail messages decrement kilobytes included in the international plan. **Off-net Usage:** If your voice or messaging service usage (including unlimited services) during any two consecutive months or data service usage (including unlimited services) during any month on other carrier networks ("off-net usage") exceeds your off-net usage allowance, AT&T may, at its option, terminate your service, deny your continued use of other carriers' coverage, or change your plan to one imposing usage charges for off-net usage. Your off-net usage allowance is equal to the lesser of 750 or 40% of the Anytime Minutes, the lesser of 24 MB or 20% of the MB included with your plan, or the lesser of 3000 messages or 50% of the messages included with your plan. AT&T will provide notice that it intends to take any of the above actions, and you may terminate your agreement. **Caller ID Blocking:** Your billing name may be displayed along with your wireless number on outbound calls to other wireless and landline phones with Caller ID capability. Contact customer service for information on blocking the display of your name and number. You may be charged for both an incoming and an outgoing call when incoming calls are routed to voicemail, even if no message is left. See Wireless Service Agreement for additional conditions and restrictions. **FamilyTalk:** FamilyTalk requires a two-year service agreement for each line. FamilyTalk plans include only package minutes included with the primary number, and minutes are shared by the additional lines. The rate shown for additional minutes applies to all minutes in excess of the Anytime Minutes. FamilyTalk requires two lines. If the rate plan for the primary number is changed to an ineligible plan or the primary number is disconnected, one of the existing additional lines shall become the primary number on the rate plan previously subscribed to by the former primary number; if only one line remains, it shall be converted to the closest single line rate. **Rollover Minutes:** Rollover Minutes accumulate and expire through 12 rolling bill periods. Bill Period 1 (activation) unused Anytime Minutes will not carry over. Bill Period 2 unused Anytime Minutes will begin to carry over. Rollover Minutes accumulated starting with Bill Period 2 will expire each bill period as they reach a 12-bill-period age. Rollover Minutes will also expire immediately upon default if customer changes to a non-Rollover plan. If you change plans (including the formation of a FamilyTalk plan), or if an existing subscriber joins your existing FamilyTalk plan, any accumulated Rollover Minutes in excess of your new plan or the primary FamilyTalk line's included Anytime Minutes will expire. Rollover Minutes are not redeemable for cash or credit and are not transferable. **Mobile to Mobile Minutes:** Mobile to Mobile Minutes may be used, subject to the above provisions governing unlimited usage, when directly dialing or receiving calls from any other AT&T wireless phone number from within your calling area. Mobile to Mobile Minutes may not be used for interconnection to other networks. Calls to AT&T voicemail and return calls from voicemail not included. **Terms Applicable to Features/Data Plans:** For full details on messaging and data usage, see att.com/dataterms. Certain features will not be available in all areas at all times. See Roadside Assistance welcome letter and/or brochures for full terms and conditions. **VoiceDial:** See VoiceDial brochure for full details. No discounts available on Unlimited calling plans. **Data Plans:** An eligible data plan is required for certain devices, including iPhone and other designated Smartphones and PDA's. Eligible data plans cover data usage in the U.S. and do not cover international data usage and charges. If it is determined that you are using iPhone or other designated Smartphone or PDA without an eligible data plan, AT&T reserves the right to add an eligible data plan to your account and bill you the appropriate monthly fee. Use of iPhone 3G to access corporate email, company intranet sites, and/or other business applications requires an Enterprise Data Plan for iPhone. For applicable rates, terms and conditions, see AT&T Business Plans for iPhone 3G brochure. **AT&T Wi-Fi Services:** AT&T Wi-Fi service use with a Wi-Fi capable wireless device is subject to the Terms of Services & Acceptable Use Policy ("Terms") found at https://secure.sbc.com/tosaup.adp. Your use represents your agreement to those Terms, incorporated herein by reference. AT&T Wi-Fi Basic service is available at no additional charge to wireless customers with select Wi-Fi capable devices and a qualified data rate plan. Other restrictions may apply. © 2009 AT&T Intellectual Property. All rights reserved. AT&T and the AT&T logo are trademarks of AT&T Intellectual Property. Subsidiaries and affiliates of AT&T Inc. provide products and services under the AT&T brand. © 2009 Apple Inc. All rights reserved. Apple, the Apple logo, iPod, iTunes, and Safari are trademarks of Apple Inc., registered in the U.S. and other countries. iPhone and Multi-Touch are trademarks of Apple Inc. App Store and MobileMe are service marks of Apple Inc.

RTP BR T 0809 2391 E

## AT&T plans for Apple iPhone



On the nation's fastest 3G network

